**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **MARTHA FINLEY,** | * | |
| | * | |
| **PLAINTIFF,** | * | |
| | * | |
| **v.** | * | **CASE NO. 2:08-cv-00051-MHT-CSC** |
| | * | |
| **MERCK & CO., INC., et al.,** | * | |
| | * | |
| **DEFENDANTS.** | * | |

<u>**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO REMAND**</u>

COMES NOW the Plaintiff, Martha Finley, and hereby submits her brief in support of her Motion to Remand.  Defendant, Merck & Co., Inc., has failed to meet its burden of establishing federal jurisdiction. As a result, the Plaintiff's Motion to Remand is due to be **GRANTED**, and this cause should be remanded back to the Circuit Court of Montgomery County, Alabama for the following reasons:

1.  This Court lacks subject matter jurisdiction**.**  In her Complaint, Plaintiff asserts viable claims under the laws of Alabama against Defendants Merck & Co. and individual Merck sales representatives. Plaintiff and all of the individual sales representative defendants are citizens of Alabama.  Diversity jurisdiction, pursuant to 28 U.S.C. § 1332, is not present.   Defendants have not shown and cannot show that any of the individual sales representative defendants are fraudulently joined.

The allegations in Plaintiff's Complaint adequately sets forth the factual and legal basis of her claims under Alabama law and sets out how individual resident Defendants acted independently and in concert with co-defendant Merck & Co. and may be held jointly and severally liable.

2.  The decision of the United States Court of Appeals for the Eleventh Circuit in Legg v. Wyeth, 428 F.3d 137 (11th Cir. 2005), is not applicable and does not support the conclusion that the individual resident Defendants in this case are fraudulently joined.

3. Plaintiff has not had an opportunity to engage in discovery.  Despite this fact, Plaintiff offers evidence disputing the statements contained in the affidavits of Carol James and Michael Beck which were attached to the Notice of Removal.

4.  Because the parties are not diverse, the issue of the amount in controversy is not relevant. Nonetheless, Defendants have failed to meet their burden of showing that the amount in controversy in this case exceeds $75,000 as set out in 28 U.S.C. § 1332.

5.  Defendant Merck's Notice of Removal is defective because all Defendants have not joined in removal of this action.

## I.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

This product liability action arises from the injuries that Martha Finley suffered as a result of taking the prescription drug FOSAMAX®, a bisphosphonate drug used primarily to mitigate or reverse the effects of osteoporosis, osteopenia, and Paget's Disease.[1]  As set forth in the Complaint, Mrs. Finley, a resident of Montgomery County, Alabama, was prescribed and ingested FOSAMAX® to combat osteoporosis.  Dr. Brian Elrod, the physician who prescribed FOSAMAX® to Mrs. Finley, practices medicine and has his primary office in Montgomery County, Alabama.  Mrs. Finley filled her FOSAMAX® prescriptions in Montgomery County, Alabama.  Mrs. Finley ingested FOSAMAX® for an eight-year period beginning in September 1998 and ending in October 2006.

---

[1] Paget's Disease is a disease that deforms and weakens bones, in which rapid decalcification is followed by excessive calcification. (Webster's New World College Dictionary 2002 (Fourth Edition).

On October 23, 2006, Mrs. Finley was hospitalized at Baptist Medical Center for an infection in her jawbone. At that time, she was diagnosed with osteonecrosis of the jaw. Mrs. Finley contracted osteonecrosis of the jaw as a direct and proximate result of ingesting FOSAMAX®. As a result of this injury, Mrs. Finley suffered severe pain and emotional distress. Mrs. Finley has undergone medical treatment for this debilitating jaw condition and will continue to do so in the future.

Defendant Merck designed, manufactured, marketed, distributed, and/or sold FOSAMAX®. The individual resident Defendants marketed, distributed and sold FOSAMAX®. The Defendants did so despite knowing that FOSAMAX® causes serious and potentially catastrophic side effects, such as osteonecrosis of the jaw. The Defendants, jointly and severally, encouraged the use of FOSAMAX® through an aggressive marketing campaign. Defendant Merck spent tens of millions of dollars advertising FOSAMAX® through direct-to-consumer advertising, such as direct mail, television commercials and advertisements in major magazines and newspapers.

Defendants Carol James, Michael Beck, Julie Melton and Sheila Davis, residents of the State of Alabama, are all employed by Merck as sales representatives. It is believed that these sales representatives visited or met with physicians in Alabama, including Dr. Elrod, to market, distribute, and sell FOSAMAX®.

Defendants, collectively and individually, misrepresented the effectiveness of FOSAMAX® and concealed the known and serious side effects from physicians and from the consuming public, including Mrs. Finley. Mrs. Finley and her prescribing physician, Dr. Elrod, reasonably relied upon Defendants' representations. Defendants knew of the defective and unreasonably dangerous nature of FOSAMAX®, yet continued

to design, manufacture, and sell FOSAMAX® so as to maximize gross sales and profits in conscious disregard of the foreseeable harm that could be caused by FOSAMAX®. Though the Defendants were aware that FOSAMAX® was unreasonably dangerous as designed and could cause osteonecrosis of the jaw as well as other conditions in patients taking the drug, they failed to warn physicians and the public of the drug's dangerous propensities.

It is believed that the sales representative Defendants who "detailed"[2] Dr. Elrod were informed of the drug's dangerous propensities, but participated in a scheme to suppress and withhold information about the dangers associated with the drug from Dr. Elrod, other physicians, and the consuming public. These sales representative Defendants benefited from the suppression and/or misrepresentation of this critical information by increasing the sales of the drug, which correspondingly increased the commissions, bonuses and incentives earned from the sale of FOSAMAX®. According to Merck's public reporting, it currently earns more than three billion dollars per year in FOSAMAX® sales.

Defendants failed to provide Mrs. Finley with timely and adequate post-marketing warnings or instructions as additional information became available to the Defendants about the risks posed to those who ingested or would ingest FOSAMAX®.

Defendants failed to exercise ordinary care and were negligent in the manufacture, marketing, sale, and testing of FOSAMAX® as it placed the drug into the stream of commerce. Despite their knowledge that FOSAMAX® caused serious side

---

[2] "Detailing" is a term of art used to describe the process by which sales representatives call on physicians to promote, market, sell, supply and/or otherwise distribute pharmaceutical drugs, such as FOSAMAX®.

effects, Defendants continued to market FOSAMAX® to the public, including Mrs. Finley, when there were safer, alternative methods of treatment available.

Defendant Merck also breached express and implied warranties made in relation to FOSAMAX®. Both before Mrs. Finley was first prescribed FOSAMAX® and during the period in which she ingested FOSAMAX®, Defendant Merck expressly warranted that FOSAMAX® was safe, and impliedly warranted that FOSAMAX® was safe and fit for its intended, ordinary uses. It is believed that the fact that Defendant Merck was providing false information to the public about FOSAMAX® was known or became known to the resident sales representative Defendants and other sales representatives of Merck, and that the company's sales representatives became active participants in the concealment of critical safety information. Contrary to the warranties and representations of the Defendants, FOSAMAX® was not safe and could and did cause serious side effects and harm to those who took the drug, and accordingly was not fit for its intended, ordinary purpose. At the time the Defendants marketed, sold and distributed FOSAMAX® for use by Mrs. Finley, Defendants knew their representations about the safety of FOSAMAX® were false, or they made those representations with reckless disregard for their falsity. The Defendants' wrongful acts or omissions were a contributing or proximate cause of Mrs. Finley's injuries.

On December 17, 2007, Plaintiff filed suit in the Circuit Court of Montgomery County, Alabama. Plaintiff asserted various causes of action against Defendants, including product liability under Alabama's Extended Manufacturer's Liability Doctrine, negligence, breach of express warranty, breach of implied warranty, fraudulent concealment and fraudulent misrepresentation.

On January 18, 2008, Defendants filed a Notice of Removal with this Court. Plaintiff now urges this Court to remand this action to state court in accordance with 28 U.S.C. § 1447(c) and the authority referenced herein.

## II.    STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 1447(c), after a case has been removed to federal district court but "at any time before final judgment," the plaintiff may move for remand, and "the case *shall* be remanded [if] it appears that the district court lacks subject matter jurisdiction." (emphasis added.)  It is well settled that federal courts are courts of limited jurisdiction and are "empowered to hear only cases within the judicial power established by Article III of the United States as authorized by Congress.  See University of South Alabama v. American Tobacco Co., 168 F.3d 405, 409 (11th Cir. 1999) (quoting Taylor v. Appleton, 30 F.3d 1365, 1367 (11th Cir. 1994)).  Because the statutes governing removal are jurisdictional, and because removal jurisdiction raises significant federalism concerns, removal statutes must be strictly construed in favor of state court jurisdiction and against removal.  See Shamrock Oil & Gas v. Sheets, 313 U.S. 100, 108-09, 61 S. Ct. 868 (1941); University of South Alabama, 168 F.3d at 411; Clay v. Brown & Williamson Tobacco Corp., 77 F. Supp. 2d 1220, 1221 (M.D. Ala. 1999) (DeMent, J.).

"An action is not properly removable if it consists of a non-separable controversy involving both resident and nonresident defendants."  Coker v. Amoco Oil Co., Inc., 709 F.2d 1433, 1439 (11th Cir. 1983).  Thus, where a removing defendant asserts federal subject matter jurisdiction based on an amount in controversy over $75,000 and the diversity of citizenship of the parties, the defendant must show there is actually complete diversity.  Triggs v. John Crum Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998) (citing

Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1355 (11th Cir. 1996)). In an action based upon a removal petition and a motion to remand, the defendant, as the removing party, bears the burden of establishing federal subject matter jurisdiction. See Pacheco de Perez v. AT & T Co., 139 F.3d 1368, 1373 (11th Cir. 1998).

The court "must accept all factual allegations in the Complaint as true and 'construe them in the light most favorable to the plaintiff.'" Henderson v. Washington Nat'l Ins. Co., 454 F.3d 1278, (11th Cir. 2006) (emphasis added); accord Cope v. American Int'l Group, 2006 WL 317238 *1 (M.D. Ala. 2006) (Albritton, Senior J.) ("[T]he Eleventh Circuit favors remand of removed cases where federal jurisdiction is not absolutely clear.").

Because federal courts are courts of limited jurisdiction, all doubts about federal subject matter jurisdiction on removal should be resolved in favor of remand to state court, University of South Alabama, 168 F.3d at 411; Pacheco de Perez, 139 F.3d at 1373; Seroyer v. Pfizer, Inc., 991 F. Supp. 1308, 1312 (M.D. Ala. 1997).

### III.    ARGUMENT

#### A.    Diversity Jurisdiction Does Not Exist

Plaintiff Martha Finley is a resident of Alabama. In her Complaint, she has stated viable claims under the laws of the State of Alabama against each Defendant. Defendants James, Beck, Melton, and Davis are residents of the State of Alabama. Diversity jurisdiction, as codified in 28 U.S.C. § 1332, is not present. Therefore, this Court lacks subject matter jurisdiction, and Plaintiff's motion to remand is due to be granted.

This court and other district courts in the Eleventh Circuit have repeatedly rejected the frivolous attempts by Defendant Merck to remove cases stating valid claims against resident Defendants.  See, e.g., Turner v. Merck & Co., Inc., et al, Case No. 2:05cv702-T (M.D. Ala. Sept. 21, 2005); Struthers v. Merck & Co., Inc., et al., Case No. 2:06cv127-MHT (M.D. Ala. March 13, 2006); Leverett v. Merck & Co., Inc., et al., Case No. 3:06cv128-MHT (M.D. Ala March 15, 2006)[3]; Irvin v. Merck & Co., Inc., et al, Case No. 03-80514-cv-Hurley (S.D. Fla. Oct. 9, 2003).

This Court, in an order granting plaintiffs' motions to remand in the Struthers and Leverett cases, found the following:

> This lawsuit, which was removed from state to federal court based on diversity-of-citizenship jurisdiction, 28 U.S.C. §§ 1332, 1441, is now before the court on plaintiff's motion to remand.  The Court agrees with plaintiff that this case should be remanded to state court.  First, there has not been fraudulent joinder of any resident defendant (that is, plaintiff has colorable claims against such a defendant), see Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983); Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989).  Second, there has not been fraudulent misjoinder of any resident defendant (that is, plaintiff has reasonably joined such a defendant with other defendants pursuant to Rule 20 of the Federal Rules of Civil Procedure), see Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1360 (11th Cir. 1996).

In the Turner, Struthers, Leverette, and Irvin cases, the district courts in question found that the plaintiffs  presented colorable claims that, if proven, would subject the in-state, sales representative defendants to liability.  These cases are indistinguishable from the present case.  In the present case, Plaintiff has also stated colorable claims against Defendant Merck and the individual resident Defendants.

---

[3] See Exhibit "A", attached and filed with this brief.  See also Exhibit "B" for other federal districts courts which have ruled accordingly in Vioxx-related litigation.

The sole question before this Court is whether there is subject matter jurisdiction in this case. Defendant Merck has wholly failed to establish that Plaintiff fraudulently joined the individual sales representative Defendants. Plaintiff's Complaint alleges valid claims against all the Defendants that, if proven at trial, would sustain a jury verdict against all Defendants.

Merck does not dispute that complete diversity is missing on the face of Plaintiff's Complaint. Rather, Defendant Merck contends that the citizenship of the individual resident Defendants should be disregarded on the ground that they were fraudulently joined. Defendant Merck has failed to carry its burden on this issue and, thus, this cause is due to be remanded back to the Circuit Court of Montgomery County, Alabama.

> **1.    Defendants Must Establish Fraudulent Joinder by Clear and Convincing Evidence**

"Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity." Triggs, 154 F.3d at 1287. If there is any possibility that a state court would find that the Complaint states a cause of action against a resident defendant, a district court must reject a defendant's assertion that there has been fraudulent joinder. Id. at 1287.

The removing party bears the burden of establishing fraudulent joinder by "clear and convincing evidence." Henderson v. Washington Nat'l Ins. Co., 454 F.3d 1278, 1284 (11th Cir. 2006); see also Coker, 709 F.2d at 1440; Pacheco de Perez, 139 F.3d at 1380; Cope at * 2. This burden is a heavy one. See Pacheco de Perez, 139 F.3d at 1380; Crowe v. Coleman, 113 F.3d 1536, 1538 (11th Cir. 1997); B., Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (1981). see also, Florence v. Crescent 484 F.3d 1293 (11th Cir. 2007),

Grady Brothers v. GMAC 2007 WL 4577701 (S.D. Ala., Dec. 27, 2007), and Abrams v. Olin Corp. 2007 WL 4189507 (S.D. Ala., Nov. 21, 2007) (all holding that remand was appropriate where defendants failed to prove by clear and convincing evidence that there was **no possibility** that plaintiffs could prevail on their claims under Alabama law against the resident defendants).

To prove that a resident Defendant has been fraudulently joined, the removing Defendants must show either that "there is no possibility that the Plaintiff would be able to establish a cause of action against the resident Defendant in state court or that there has been outright fraud in the Plaintiff's pleading of jurisdictional facts." Coker, 709 F.2d at 1440; Pacheco de Perez, 139 F.3d at 1380; Crowe, 113 F.3d at 1538; see also Henderson, 454 F.3d at 1284 (setting forth two occasions when fraudulent joinder may exist); Triggs v. John Crump Toyota, 154 F.3d 1284, 1287 (11th Cir. 1998) (setting forth three occasions when fraudulent joinder may exist).

"While 'the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed. R. Civ. P. 56(b),' the jurisdictional inquiry 'must not subsume substantive determination.'" Crowe, 113 F.3d at 1538 (quoting B. Inc., 663 F.2d at 550) (citations omitted). "When considering a motion for remand, federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." Crowe, 113 F.3d at 1538. According to the Court in Crowe:

> In terms of this circuit's law, the main point for us is this one: For a Plaintiff to present an arguable claim against an in-state Defendant and, therefore, to require a case removed to federal court to be remanded to state court, the Plaintiff need not show that he could survive in the district court a motion for summary judgment filed by that in-state Defendant. For a remand, the Plaintiff's burden is much lighter than that: after

drawing all reasonable inferences from the record in Plaintiff's favor and then resolving all contested issues of fact in favor of the Plaintiff, there need only be "a reasonable basis for predicting that the state law *might* impose liability on the facts involved."

Id. at 1541-42 (quoting B., Inc., 663 F.2d at 550) (emphasis added).

Stated differently, "[i]n the remand context, the district court's authority to look into the ultimate merit of the Plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims." Crowe, 113 F.3d at 1542. "Where there have been allegations of fraudulent joinder . . . the question is whether there is arguably a reasonable basis for predicting that the state law might impose liability on the facts involved. If that possibility exists, a good faith assertion of such an expectancy in a state court is not a sham … and is not fraudulent in fact or in law." B., Inc., 663 F.2d at 550 (quoting Bobby Jones Garden Apartments v. Suleski, 391 F.2d 172, 177 (5th Cir. 1968)).

### 2. Plaintiff States Valid Claims Against Resident Defendants under Alabama Law

Merck has made no claim that Plaintiff fraudulently pled jurisdictional facts. Accordingly, this Court's inquiry is limited to determining whether there is **a possibility** that the state court might find, under Alabama law, that Plaintiff has asserted valid claims against any one of the individual resident Defendants. See Triggs, 154 F.3d at 1287; Crowe, 113 F.3d at 1538. "If there is **a possibility** that a state court would find that the complaint states a cause of action against any one of the resident Defendants, the federal court must find that the joinder was proper and remand the case to state court." Coker, 709 F.2d at 1440-41 (citing Davis v. GMC, 353 F. Supp.2d 1203, 1207 (M.D. Ala. 2005) (emphasis added)).

Where, as here, the Notice of Removal is filed before the Plaintiff has had a opportunity to develop their claims against the individual sales representative Defendants through discovery, Alabama federal courts have assessed those claims in accordance with the standard of Fed. R. Civ. P. 11. See Clay, 77 F. Supp. 2d at 1224 (DeMent, J.); see also Sellers v. Foremost Ins. Co., 924 F. Supp. 1116, 1118-19 (M.D. Ala. 1996) (Thompson, J.). Plaintiff is not required to have a winning case against a resident Defendant, but only have **a possibility** of stating a valid cause of action in order to defeat arguments of fraudulent joinder. Triggs, 154 F.3d at 1287.

Defendant Merck relies upon rulings by other courts, including In re Rezulin Products Liability Litigation, 133 F. Supp. 2d 272 (S.D.N.Y. 2001), for the general proposition that Plaintiff cannot sustain her claims against individual resident Defendants. Defendant Merck's reliance on this ruling is misplaced since the New York court applied a standard of "no reasonable basis" to determine whether the Plaintiffs' claims against non-diverse defendants were sufficiently pled. This standard is substantially different from the "no possibility" standard utilized by courts in the Eleventh Circuit. See Triggs, 154 F.3d at 1287 (citing Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1355 (11th Cir. 1996)).

> **a.  Plaintiff has stated valid product liability (AEMLD) claims against the Individual Resident Defendants.**

To establish a prima facie case under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD), a plaintiff must demonstrate that:

> (1) He suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if

(a)    the seller is engaged in the business of selling such a product, and

(b)    it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2)    Showing the above elements, a plaintiff has proved a prima facie case although

(a)    the seller has exercised all possible care in the preparation and sale of her product, and

(b)    the user or consumer has not bought the product from, or entered into any contractual relation with, the seller.

See Casrell v. Altec Industries, Inc., 335 So. 2d 128, 132-33 (Ala. 1976); Atkins v. American Motors Corp., 335 So. 2d 134, 141 (Ala. 1976).

It is well settled under Alabama law that employees of a company may be held liable for their active participation in the torts of the company.  "[O]fficers and employees of a corporation are liable for torts in which they have personally participated, irrespective of whether they were acting in a corporate capacity."  Ex parte Charles Bell Pontiac, 496 So. 2d at 775 (citing Candy H. v. Redemption Ranch, Inc., 563 F. Supp. 505, 513 (M.D. Ala. 1983)); see Clay v. Brown & Williamson Tobacco Corp., 77 F. Supp. 2d 1220, 1224 (M.D. Ala. 1999); see also Seaborn v. R. J. Reynolds Tobacco Co., 1996 WL 943621, NO. CIV. A. 96-T-1540-N  (M.D. Ala., Dec. 30, 1996).

In the present case, the individual resident Defendants aggressively marketed FOSAMAX® to healthcare professionals, including Mrs. Finley's physician, Dr. Elrod. They did so by frequently calling on physicians, distributing samples to physicians for patient use, conducting educational seminars for physicians, and distributing sales literature to healthcare professionals and the consuming public.   Individual sales

representative Defendants, in communications with physicians, compared the efficacy of FOSAMAX® to other existing drugs, sought to distinguish FOSAMAX® from other drugs already on the market, and worked to persuade physicians to prescribe FOSAMAX® to their patients. Individual sales representative Defendants provided physicians with FOSAMAX® product information. Throughout these activities to increase the sales of FOSAMAX®, Individual sales representative Defendants failed to warn physicians, like Dr. Elrod, of the dangers associated with FOSAMAX®. They failed to provide adequate warnings despite the Defendants' extensive knowledge of the negative safety profile of FOSAMAX®.

FOSAMAX® was first introduced to the U.S. market in 1995. By 1996, FOSAMAX® was the leading pharmaceutical drug in the number of adverse event reports (AERs) received by the FDA.[4]

**During this same time period, the** FDA sent Warning Letters to Merck for "misleading" physicians and consumers regarding the "important risk information" of FOSAMAX®, as well as overstating the benefits of FOSAMAX® while minimizing the risks associated with the drug.[5] Misleading and inaccurate flashcards, brochures and other promotional materials referenced in the Warning Letters were used **by individual sales representatives when detailing physicians** to persuade physicians to write FOSAMAX® prescriptions.

The devastating effects of FOSAMAX® have been documented in the scientific literature. In 2004, case-studies, including Salvatore Ruggiero's report on 63 patients with osteonecrosis of the jaw, were published in the *Journal of Oral and Maxillofacial*

---

[4] http://www.fda.gov/cder/dpe/annrep96/- See FDA Table 4: Postmarket ADE Reports by Top-10 Ranked Suspect Drugs
[5] See Exhibit C.

*Surgery*.[6]    Further studies were performed and published in the *Journal of Clinical Oncology* in 2005 and February 2006.[7]   Most recently, a comprehensive article describing osteoporosis drugs, published in the esteemed British Medical Journal, highlighted Merck's practice of overstating the benefits of FOSAMAX® while minimizing the risks.[8]

Defendant Merck and the individual sales representative Defendants had far superior knowledge of the efficacy and safety profile of FOSAMAX® than that of prescribing physicians and patients who took the drug.  Mrs. Finley and her prescribing physician, Dr. Elrod, detrimentally relied on information provided by the individual sales representative defendants, which failed to provide adequate warnings of the risks of harm and adverse effects associated with the use of FOSAMAX®.  Dr. Elrod, as the prescriber, in turn, passed these erroneous information on to patients, including Mrs. Finley.  Mrs. Finley relied on such information.  If these allegations are proven to be true, a finding of individual liability under AEMLD against the individual sales representative Defendants is more than a mere "possibility."

In Clay and Seaborn, *supra*, this Court found that, to the extent a manufacturer defendant allegedly violated AEMLD, "it acted through its employees; the company does not employ ghosts."  Clay, 77 F. Supp. 2d at 1224; Seaborn, 1996 WL 943621, at *3.  The Court allowed the plaintiffs to pursue the distributors and employee sales representatives individually -- even in the absence of any personal contact with the

---

[6]Exhibit D, Osteonecrosis of the Jaws Associated With the Use of Bisphosphonates: A Review of 63 Cases, Ruggiero, Mehrotra, Rosenberg, Engroff (American Association of Oral and Maxillofacial Surgeons, 2004).

[7] Journal of Clinical Oncology, Vol. 23, No. 34 (December 1), 2005: pp. 8580-8587; Vol. 24, No. 6 (February 20) 2006: pp 945-952.

[8] Exhibit E, British Medical Journal, 2008 Vol. 336; 126-129, 129 ("Alendronate (Fosamax) has well established side effects, including potentially serious gastrointestinal side effects and rare but catastrophic osteonecrosis of the jaw, which again are not discussed.").  The re-analysis referred to in the British Medical Journal quote refers to a study in which three of the five authors were either a Merck employee, consultant, or speaker.

plaintiffs -- and to substitute new individual defendants in the event Plaintiffs had named the wrong individuals at the outset.  Significantly, the Court noted that discovery might well establish that the individual in-state defendant might have had superior knowledge to others, which could establish his independent liability under the AEMLD.

Other United States District Courts in Alabama have consistently rejected arguments that in-state defendant sales representatives are fraudulently joined in the context of products liability actions.  See Barry Pace, et al. v Parke-Davis, No. 3:00-3046 (N.D. Ala. Nov. 21, 2000) (Johnson, J.); see also Donald McCaffery v. Warner-Lambert Co., et al., No. 4:00-2848 (N.D. Ala. Dec. 8, 2000) (Propst, J.); Acton v. R.J. Reynolds Tobacco Co., No. 96-C-2737-W (N.D. Ala. Oct. 23, 1996).  And other United States District Courts from throughout the country have remanded to state court or refused to stay other pharmaceutical-related, products-liability cases.[9]

As Judge Ira DeMent wrote in Brown, "federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." Brown, 77 F. Supp. 2d at 1223, quoting de Perez, 139 F.3d at 1380-81 and Crowe, 113 F.3d at 1538.  The question of whether drug sales representatives can be held liable under

---

[9] See, Landrum v. Merck & Co., Inc., et al., Case no. CV-05-01055-J (N.D. Ala. May 25, 2005) (holding that diversity jurisdiction was absent and remanding to state court, relying upon Marshand v.Wyeth, et al., CV-03-CO-319-5-W (N.D. Ala. 2004)); Sokarda, et al. v. Merck & Co., Inc., et al., Case no. SACV-05-177-JFW (MANX) (C.D. Calif. April 22, 2005) (holding that under California law, case should be remanded to state court based upon properly named in-state defendant); Amisch v. Merck Co., Inc., et al., Case no. 04-CV-847-DRH (S.D. Ill. Dec. 22, 2004) (holding that motion to stay pending JPML's ruling on motion to transfer should be denied and that forum court should address subject matter jurisdiction, and remanding case to state court because defendant failed to meet its burden to sustain removal); Brame v. Merck & Co., Inc., et al., Case no. 05-034-GPM (S.D. Ill. Feb. 17, 2005) (holding that defendant failed to meet its burden to establish fraudulent joinder, refusing to stay proceedings pending ruling by JPML, and remanding case back to state court); McQuay v. Merck & Co., Inc., et al., Case No. 05-038-GPM (S.D. Ill. Feb. 17, 2005) (same); Tomlin v. Merck & Co., Inc., et al., Case no. 04-14335-CIV-Moore (S.D. Fla. Feb. 14, 2005) (holding that motion to stay pending JPML was inappropriate, holding that plaintiff adequately pleaded a claim against sales representative under Florida law, finding that there was no fraudulent joinder, and remanding the case back to state court).

the AEMLD is "arguable under state law."  As a result, Plaintiff has stated "possible" viable claims against the individual sales representative Defendants.

> **b.  The Plaintiff has alleged valid claims of fraud,  fraudulent misrepresentation, fraudulent suppression and concealment against the Individual Resident Defendants.**

Under Alabama law, in order to state a claim for fraud and fraudulent misrepresentation, a plaintiff must show that the defendant made a misrepresentation of material fact, that he made it willfully to deceive, recklessly, without knowledge, or mistakenly, that the misrepresentation was justifiably relied on by the plaintiff under the circumstances, and that the misrepresentation caused damage as a proximate consequence. Ala. Code § 6-5-101 (1975); <u>Harrington v. Johnson-Rast & Hays Co.</u>, 577 So. 2d 437 (Ala.1991).

In the case at bar, Plaintiff alleges that Merck and the individual sales representative Defendants, together or separately, negligently, recklessly, intentionally and fraudulently made material misrepresentations that FOSAMAX® was safe.  The individual sales representative Defendants did so with the intent to induce physicians to prescribe and for consumers, including Mrs. Finley, to purchase FOSAMAX®.  Moreover, Plaintiff alleges that, at the time the Defendants made these representations, the Defendants were aware of the falsity of these representations and/or made these representations with reckless disregard to the truth.  Plaintiff also alleges that she and her prescribing physician, Dr. Elrod, detrimentally relied upon the material misrepresentations and suppressions of Defendants and, as a result, Mrs. Finley suffered injuries.

Defendant Merck asserts in its Notice of Removal that claims of fraud cannot be maintained against the individual sales representative Defendants. In so arguing, defendant Merck suggests that the Individual Resident Defendants made no representations to Mrs. Finley. Specifically, in his Declaration, Defendant Beck asserts that he has "never met or spoken with Martha Finley." See Declaration of Michael Beck ¶ 8. However, it "is not always necessary to prove that a misrepresentation was made directly to the person who claims to have been injured." Bloodsworth, 2005 WL at *11 (quoting Thomas v. Halstead, 605 So. 2d 1181, 1184 (Ala. 1992)). "If a third person is injured by the deceit, he may recover against the one who made possible the damages to him by practicing the deceit in the first place." Id. at *11 (quoting Thomas, 605 So. 2d at 1184). It is well settled in Alabama law that "there is a duty not to make a false representation to those to whom a defendant intends, for his own purposes, to reach and influence by the representation." Id. at *11 (quoting Wheelan v. Sessions, 50 F. Supp. 2d 1168, 1174 (M.D. Ala. 1999) (DeMent, J.); see Colonial Bank of Ala. v. Ridley & Schweigert, 551 So. 2d 390, 396 (Ala. 1989); see also Brasher v. Sandoz Pharmaceuticals Corp., 2001 U.S. Dist. Lexis 18364, at *31 - *33 (N.D. Ala. Sept. 21, 2001) (wherein the Court found that the Plaintiffs "clearly were the parties who were injured by the alleged fraud. It also was clear that the drug manufacturer 'for its own purposes of promoting its product and making a profit, intended to reach and influence the patients of obstetricians, such as the Plaintiffs.'") Thus, Merck's position that plaintiff has no claim for fraud against the individual sales representative Defendants because those Defendants made no representations directly to Mrs. Finley is contrary to Alabama law.

What is clear from Defendant Beck's affidavit is that he detailed FOSAMAX® to physicians. See Declaration of Michael Beck ¶¶ 3, 5, 6 & 7. Ostensibly, though not specifically stated in his Declaration, Defendant Beck called on physicians in Alabama, making representations regarding the efficacy and risks associated with FOSAMAX®. Unlike the sales representative in Legg, Defendant Beck does not deny that he detailed FOSAMAX®.

Moreover, United States District Courts in Alabama have repeatedly rejected similar fraudulent joinder claims in the context of fraudulent misrepresentation and suppression claims against pharmaceutical sales representatives and have remanded these cases to state court. See Floyd v. Wyeth, No. 03-C-2564-M (N.D. Ala. Oct. 20, 2003) (Clemon, J.); Crittenden v. Wyeth, No. 03-T-920-N (M.D. Ala. Nov. 21, 2003) (Thompson, J.); Terrell v. Wyeth, No. CV-03-BE-2876-S (N.D. Ala. Dec. 12, 2003) (Bowdre, J.) ("Although the Plaintiffs' claims against Defendant Parker appear to raise novel questions of Alabama state law, this court will not speculate that the plaintiffs have *no* possibility of establishing a cause of action against this non-diverse defendant. Little, if any, discovery has been done to-date in this case; thus, it would be premature for this court to make rash decisions regarding the nature and the timing of the injury sustained by the Plaintiffs, or the employment history of defendant Parker. Nor can the court conclusively determine that Plaintiffs would not be successful in urging its various theories under Alabama law."); Ballard v. Wyeth, No. 03-T-1255-N (N.D. Ala. Jan. 23, 2004) (Thompson, J.); Brunson v. Wyeth, No. 03-T-1167-S (N.D. Ala. Jan. 23, 2004) (Thompson, J.); Blair v. Wyeth, No. 03-T-1251-S (N.D. Ala. Jan. 23, 2004) (Thompson, J.); Storey v. Wyeth, No. CV-04-BE-27-E (N.D. Ala. Jan. 30, 2004) (Bowdre, J.); Cash v.

Wyeth, No. 03-RRA-3378-E (N.D. Ala. Feb. 3, 2004) (Armstrong, Mag. J.); Marshal v. Wyeth, No. CV-04-TMP-179-S (N.D. Ala. Feb. 18, 2004) (Putnam, Mag. J.); McGowan v. Wyeth, No. CV-04-TMP-298-S (N.D. Ala. Feb. 24, 2004) (Putnam, Mag. J.); Johnson v. Wyeth, No. CV-04-TMP-224-S (N.D. Ala. Feb. 23, 2004) (Putnam, Mag. J.); Bradford v. Wyeth, No. 03-P-3157-5 (N.D. Ala. Feb. 27, 2004) (Proctor, J.); Smith v. Wyeth, No. 04-P-226-M (N.D. Ala. Feb. 27, 2004) (Proctor, J.); Boudreaux v. Wyeth, No. CV-04-P-227-M (N.D. Ala. Feb. 27, 2004) (Proctor, J.); Bridges v. Wyeth, No. 04-AR-0297-J (N.D. Ala. Mar. 2, 2004) (Acker, J.); Hough v. Wyeth, No. 04-H-393-S (N.D. Ala. Mar. 5, 2004) (Hancock, J.); Brogden v. Wyeth, No. 04-T-068-S (M.D. Ala. Mar. 8, 2004) (Thompson, J.); Reeder v. Wyeth, No. 04-T-066-N (M.D. Ala. Mar. 8, 2004) (Thompson, J.); Eaton v. Wyeth, No. CV-04-P-380-M (N.D. Ala. Mar. 9, 2004) (Proctor, J.); Allen v. Wyeth, No. 04-CV-0238-T (M.D. Ala. Apr. 9, 2004) (Thompson, J.); Chestnut v. Wyeth, No. 04-CV-0295-T (M.D. Ala. May 3, 2004) (Thompson, J.); King v. Wyeth, No. 04-CV-0409-T (M.D. Ala. May 24, 2004) (Thompson, J.); Culpepper v. Wyeth, No. 04-CV-0411-T (M.D. Ala. May 24, 2004) (Thompson, J.); Braden v. Wyeth, No. 04-CV-0384-T (M.D. Ala. May 24,  2004) (Thompson, J.); Cross v. Wyeth, No. 03-0882-BH-M (S.D. Ala. Mar. 29, 2004) (Hand, J.); Bennett v. Wyeth, No. 04-CV-0416-T (M.D. Ala. June 2, 2004) (Thompson, J.).

Federal District Courts in Alabama have rightly found that Plaintiffs who allege claims of fraudulent misrepresentation and suppression against sales representatives of drug companies have alleged valid claims under Alabama law.  Accordingly, Plaintiff has stated colorable claims of fraud and concealment against the individual sales representative Defendants.

          c.      **Plaintiff's complaint was pleaded with sufficient particularity to support her claims of fraud against the Individual Resident Defendants.**

Merck also asserts that Plaintiff failed to plead her claim of fraudulent misrepresentation with particularity. However, in her Complaint, plaintiff sufficiently allege that the individual sales representative defendants fraudulently misrepresented and/or suppressed material information regarding the safety and efficacy of FOSAMAX® and its harmful side effects in order to induce physicians to prescribe these drugs and to induce consumers, including Mrs. Finley, to purchase FOSAMAX®. Plaintiff further alleges that the individual sales representative defendants misrepresented and/or suppressed the fact that FOSAMAX® was not safe and that the Defendants were under a duty to communicate this information to Plaintiff, that the individual sales representative Defendants marketed, sold, supplied and/or otherwise distributed FOSAMAX®, that FOSAMAX® was defective and unreasonably dangerous as designed, was unreasonably dangerous due to inadequate testing, and was defective as marketed due to inadequate warnings or instructions, that the Defendants failed to warn Mrs. Finley of the dangers of FOSAMAX® therapy, that the Defendants failed to provide post-marketing warnings to Mrs. Finley after she began to take the drug, and that as a direct and proximate result of the Defendants placing FOSAMAX® on the market and Mrs. Finley's ingestion of FOSAMAX®, Mrs. Finley suffered injuries. These allegations are sufficiently specific to support the claims asserted by Plaintiff in her Complaint against the Defendants, including the individual sales representative defendants.

      Should the Court find Plaintiff's Complaint deficient to satisfy the heightened pleading requirements, such a finding would not lead this Court to an automatic finding

of fraudulent joinder.  See Bloodsworth, 2005 WL at *11 (citing Duffin v. Honeywell Intern., Inc., 312 F. Supp. 2nd 869, 870 (N.D. Miss. 2004).  Rather, "a plaintiff should ordinarily be given an opportunity to amend their complaint to allege fraud with greater particularity, before such claims are dismissed with prejudice upon a finding of fraudulent joinder." Bloodsworth, 2005 WL at *11 (citing Hart v. Bayer Corp., 199 F.3d 239, 248 n. 6 (5th Cir. 2000)).

**B.  Legg v. Wyeth Is Not Applicable**

Merck refers to the decision of the United States Court of Appeals for the Eleventh Circuit, Legg v. Wyeth, 428 F.3d 1317 (11th Cir. 2005), and argues that the decision supports a denial of the Plaintiff's motion to remand.  As explained below, the Circuit Court's decision in Legg is not applicable to this case.

**1.    Legg v. Wyeth Involves the Review of an Award for Attorneys' Fees, Not an Order on Remand**

In Legg, the issue before the appellate court was whether the district court abused its discretion by awarding attorney's fees and costs to the plaintiffs in connection with the removal petition filed by the defendant, the drug manufacturer Wyeth.  Contrary to Merck's argument here, the issue was not whether the district court abused its discretion by remanding the case.  Indeed, the Eleventh Circuit noted that "28 U.S.C. § 1447 (d) bars our review of a remand such as this one based upon the lack of subject matter jurisdiction," but  "the statute does not 'exclude the district court's assessment of costs from appellate review.'"  Legg, 428 F.3d at 1319-20 (quoting Fowler v. Safeco Ins. Co., 915 F.2d 616, 617 (11th Cir. 1990)).  The Court in Legg did not state that the trial court's remand order was in error, nor did the Court rule that the standard of review on remand should be changed.

The language in Legg relied on by Defendants regarding the viability of stating a claim for intentional or innocent misrepresentation against a sales representative is dictum. Moreover, the Legg court's statements regarding claims for intentional and innocent misrepresentation appear to contravene, at least in part, well-settled law. In Alabama, misrepresentations of material fact, even if made by mistake or innocently, constitute legal fraud. See Ala. Code § 6-5-101 (1975). See also Thomas v. Halstead, 605 So.2d 1181 (Ala. 1993). As discussed above, under Alabama law, it is well-established that individual employees can be held liable for torts in which they participate.

The Court in Legg cites Fisher v. Comer Plantation, 772 So. 2d 455, 463 (Ala. 2000), for the proposition that "mere conduits" cannot be held liable for participating in a tort unless bad faith can be shown. The facts presented in Fisher, however, are markedly different from the facts in the present case. In Fisher, the facts did not involve an employee, but an independent contractor. The sales representative defendants here are not independent contractors, but are employed, trained, supervised, and otherwise, under the direction of Merck. Rather than being "mere conduits" of information, the sales representative defendants here are an integral part of a broad and sophisticated marketing campaign to sell FOSAMAX®.

The Eleventh Circuit's discussion regarding the viability of claims against sales representative defendants under Alabama law is dictum and not applicable to the present case. To the degree the Circuit Court relied on the decision of the Supreme Court of Alabama in Fisher in conducting its analysis, that decision is distinguishable.

2.    **Unlike in <u>Legg</u>, Plaintiff Disputes Sales Representative Defendants'**
**Declarations**

In reaching its decision that the district court erred by awarding attorney's fees and costs to the plaintiff in <u>Legg</u>, the Eleventh Circuit considered the fact that the plaintiff failed to contest affidavits submitted by defendants.    In opposition to plaintiff's motion to remand before the district court, Wyeth submitted affidavits of the three named sales representatives. The affidavits stated that the representative did not have prior knowledge of the subject drug's propensity to increase the risk of valvular heart disease. The <u>Legg</u> Court criticizes the lower court for remanding the case back to state court when the plaintiff had not responded to the statements contained in the affidavits.

Unlike in <u>Legg</u>, Plaintiff here refutes statements made in the Declarations of the individual resident defendants submitted by defendant Merck.    In the Declarations, defendants contend in conclusory and self-serving fashion that they were not active participants in the wrongdoing alleged by Plaintiff.    However, defendant Beck's own Declaration acknowledges and verifies that he did, in fact, "detail" FOSAMAX®. His Declaration further states that Merck provided him with prescribing information as well as other information to use when detailing physicians. Merck sales representatives participate in extensive training sessions, seminars, conferences and other meetings which focus on: 1) the information to be presented to physicians; 2) the manner in which to present this information; and 3) how to avoid or otherwise minimize concerns raised by physicians.

As previously stated, the promotional materials, brochures, flashcards and other information used by Merck sales representatives to detail FOSAMAX® to physicians were cited by the FDA on numerous occasions as "misleading" and "lacking in fair

balance." Mr. Beck states in his declaration that he "was not aware of any…association between Fosamax and osteonecrosis of the jaw…beyond…the prescribing information and…materials provided…by Merck."[10] As outlined earlier, Plaintiff has put forth scientific articles, published in well-respected and well-known scientific journals, which raise the issue of the dangers of osteonecrosis of the jaw in patients ingesting FOSAMAX®. The dangers associated with the use of FOSAMAX® were known to Merck, and Plaintiff believes known to its sales representatives. From Mr. Beck's Declaration, it appears undisputed that Merck and Mr. Beck, among other sales representatives, failed to warn physicians such as Dr. Elrod of the risks associated with the use of FOSAMAX®. This goes to the very heart of Plaintiff's claims.

Merck points to the label that was in effect for FOSAMAX® beginning in July 2005. First, the label was not in effect for the entire time period Mrs. Finley was taking FOSAMAX®. She began taking FOSAMAX® in 1998. Therefore, on its face, the 2005 label has little relevance. Secondly, in the 2005 label, osteonecrosis of the jaw is mentioned under the Precautions section of the label. Merck characterizes the language about osteonecrosis of the jaw in the Precautions section as a "warning." <u>See</u> Notice of Removal ¶ 36. The Precautions section is only one portion of a label. A label includes distinct sections such as pharmacology, clinical studies, adverse events, and warnings. Each sections has a specific purpose in terms of the information communicated to physicians and other prescribers. As Merck is well aware and has asserted in other contexts, a "precaution" is not a warning.

---

[10] See Declaration of Michael Beck, Exhibit C to Defendant's Notice of Removal

3.    **The Legg Decision Did Not Change the Law on Fraudulent Joinder in the Eleventh Circuit**

To the extent that <u>Legg</u> may have heretofore called into question the Eleventh Circuit's position on whether a defendant has been fraudulently joined to defeat federal jurisdiction, the Circuit Court recently put that issue to bed in <u>Henderson v. Washington Nat'l Ins. Co.</u>, 454 F.3d 1284 (11th Cir. 2006). In <u>Henderson</u>, the district court denied the plaintiff's motion to remand. The Eleventh Circuit reversed, stating very clearly that the defendant must establish by "clear and convincing evidence" that a defendant was fraudulently joined and that there is no possibility that the plaintiff could prevail against the challenged defendant under state law. The Court found that it must defer to the state court on whether a claim is properly stated in order to maintain the "scrupulous respect for the institutional equilibrium between the federal and state judiciaries that our federal system demands." <u>Id</u> at 5*. Thus, <u>Legg</u> does not represent a change in prevailing law on this topic, as Merck asserts.

4.    **Merck Has Not Met its Burden of Proving by Preponderance of the Evidence That The Amount in Controversy Requirement Has Been Met.**

As outlined above, Plaintiff has stated valid state law claims against the resident Defendants. Therefore, diversity of citizenship is not present, and it is unnecessary to reach the issue of the "amount in controversy." Nevertheless, because Merck raises the issue in its Notice of Removal, Plaintiff points the Court to the rule in the Eleventh Circuit on the issue of the amount in controversy in the diversity jurisdiction context:

> The removal-remand scheme set forth in 28 USC §1446(b) and 1447(c) requires that a court review the propriety of removal on the basis of the removing documents. If the jurisdictional amount is either stated clearly on the face of the documents before the

> Court, or readily deducible from them, then the Court has
> jurisdiction. If not, the court must remand.

Lowery v. Alabama Power Co., 483 F.3d 1184 (11th Cir. 2007).

In the removal context, where damages are unspecified (as in this case), the removing party bears the burden of establishing the jurisdictional amount by a preponderance of the evidence. See Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1356-57 (11th Cir. 1996). Specifically, the removing defendant must establish the amount in controversy by "the greater weight of the evidence, of superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other." Lowery, 483 F.3d at 1209 (citing Black's Law Dictionary, 1220 (8th Ed. 2004)).

Plaintiff's Complaint does not contain an *ad damnum* clause and thus any attempt to engage in a preponderance of the evidence assessment of the amount in controversy would be pure speculation and conjecture in the absence of any evidence. "The absence of factual allegations pertinent to the existence of jurisdiction is dispositive." Id. at 1215see also Constant v. International House of Pancakes, 487 F.Supp. 2d 1308 (N.D. Ala. 2007), Carswell v. Sears, Roebuck And Co., slip copy, 2007 WL 1697003 (M.D.Ala. June 12, 2007), Jackson v. Peoples South Bank, slip. copy, 2007 WL 1857169 (M.D. Ala. June 27, 2007), Ellis Motor Cars, Inc. v. Westport Ins. Corp., slip copy, 2007 WL 1991573 (M.D. Ala. July 5, 2007), Cleveland v. Ark-La-Tex Financial Services, L.L.C., slip copy, 2007 WL 2460753 (S.D.Ala. Aug. 24, 2007), Spidell v. Midland Credit Management, Inc., slip copy, 2007 WL 3171380 (M.D.Ala. Oct. 26, 2007), Pearson's Pharmacy, Inc., v. Blue Cross & Blue Shield of Alabama, slip copy, 2007 WL 3496031 (M.D.Ala. Nov. 14, 2007).

**5.      Defendant Merck Failed To Obtain Consent of All Defendants**

The individual resident Defendants who have been served have not all joined in Merck's removal petition and, as such, removal of this cause by Merck was improper. The individual resident Defendants are necessary parties to a removal action.

Defendant Carol James was served on December, 22 2007, defendant Michael Beck was served on December 28, 2007, and Defendant Sheila Davis was served on January 10, 2008.[11]  None of the three served resident Defendants have explicitly stated they have joined Merck's removal.

Defendant Merck concedes in its Notice of Removal that it has not obtained the consent of the individual resident Defendants, and Defendant Merck contends that their consent to removal is not necessary because they were fraudulently joined to this action. This argument is meritless.

"The law is clear that under 28 U.S.C. § 1446(a) removal procedure requires that <u>all</u> defendants join in the removal petition."[12]   <u>See</u>, <u>e.g.</u>, <u>Chicago, R.I. & P.R. Co. v. Martin</u>, 178 U.S. 245, 247-248, 20 S.Ct. 854, 855, 44 L.Ed. 1055 (1900); <u>Tri-Cities Newspapers, Inc. v. Tri-Cities Printing Pressmen & Assistants Local 349</u>, 427 F.2d 325, 327 (5th Cir.1970) (citing <i>Martin</i>); <u>Adams v. Aero Servs. Int'l, Inc.</u>, 657 F.Supp. 519, 521 (E.D.Va.1987); <u>P.P. Farmers' Elevator Co. v. Farmers Mut. Inc. Co.</u>, 395 F.2d 546 n. 2 (7th Cir.1968) (citing <i>Martin</i>); <u>In re Federal Savings & Loan Insurance Corp.</u>, 837 F.2d 432, 434, n. 1 (11th Cir.1988).  As a matter of law, where there are multiple Defendants in a lawsuit, the case may be removed only if all Defendants consent to the removal. <u>Jerrell v. Kardoes Rubber Co., Inc.</u>, 348 F.Supp.2d 1278, 1282 (M.D. Ala. 2004).

---

[11] See Exhibit F attached.

[12] No exceptions to this rule are laid out in 28 U.S.C. § 1446, nor elsewhere in federal statutory law.

Consent may not be implied, but rather, it must be express.  <u>Newman v. Spectrum Stores, Inc</u>., 109 F. Supp. 2d 1346 (M.D. Ala. 2000).

There are well-recognized exceptions to this rule. A defendant need not join in if: (1) it is merely a nominal or formal party defendant, <u>Tri-Cities Newspapers</u>, 427 F.2d at 327; (2) it had not been served with process at the time the removal notice was filed, <u>Katz v. Costa Armatori</u>, S.p.A., 718 F.Supp. 1508, 1509 (S.D.Fla.1989); <u>Getty Oil Corp., a Div. of Texaco, Inc. v. Insurance Co. of North America</u>, 841 F.2d 1254, 1262 (5th Cir.1988); or (3) the removed claim is a separate and independent claim under 28 U.S.C. § 1441(c), <u>Alexander By Alexander v. Goldome Credit Corp</u>., 772 F.Supp. 1217, 1222 (M.D. Ala.1991).

Defendant Merck does not assert one of the above exceptions to the "unanimity rule," but instead contends that the individual resident Defendants need not join in the removal action because they were fraudulently joined.  While the court in <u>Clay</u>, 77 F. Supp. 2d at 1223 n. 3, indicated that a fraudulently joined Defendant may not be required to join in the removal petition, the court found that the resident Defendants were not fraudulently joined (which meant that they were required to join in the removal), and the court remanded the case back to state court.

Defendant Merck's removal is improper because it has failed to obtain the express consent of the properly joined and served individual resident Defendants.  For this reason, as well as the others put forth in Plaintiff's motion, this cause is due to be remanded to state court.

## V.    CONCLUSION

Defendant Merck has failed to meet its burden of proving that there is no possibility that Plaintiff can establish a cause of action against the individual sales representative Defendants.   For the reasons outlined above, this Court lacks subject matter jurisdiction.   Plaintiff respectfully urges the Court to remand this action in its entirety to the Circuit Court of Montgomery County, Alabama.

Respectfully submitted this 25th day of January, 2008.

/s/ Wesley Chadwick Cook
E. FRANK WOODSON (WOO034)
P. LEIGH O'DELL (ODE006)
WESLEY CHADWICK COOK (COO079)

**Attorneys for Plaintiff**

**OF COUNSEL:**

**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone:  (334) 269-2343
Fax:  (334) 223-1236

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that foregoing document was filed electronically on this 25th day of January, 2008 by uploading the same to the Court's CM/ECF system which will send a Notice of Electronic Filing upon all counsel of record.

/s/ Wesley Chadwick Cook
**OF COUNSEL**

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

GLENDORA TURNER, individ-      )
ually and as Administratrix    )
of the Estate of               )
William Lee Turner,            )
                               )
    Plaintiff,               )
                               )      CIVIL ACTION NO.
    v.                       )      2:05cv702-T
                               )
MERCK & CO., INC., a           )
foreign corporation,          )
et al.,                        )
                               )
    Defendants.              )

ORDER

This lawsuit, which was removed from state to federal

court based on diversity-of-citizenship jurisdiction, 28

U.S.C.A. §§ 1332, 1441, is now before the court on

plaintiff's motion to remand.    The court agrees with

plaintiff that this case should be remanded to state court.

The court agrees with plaintiff that there has been neither

fraudulent joinder, Coker v. Amoco Oil Co., 709 F.2d 1433,

1440 (11th Cir. 1983); Cabalceta v. Standard Fruit Co., 883



F.2d 1553, 1561 (11th Cir. 1989), nor <u>fraudulent misjoinder</u>,

<u>Tapscott v. MS Dealer Service Corp</u>., 77 F.3d 1353, 1360

(11th Cir. 1996).

    Accordingly, it is the ORDER, JUDGMENT, and DECREE of

the court that plaintiff's motion to remand (Doc. no. 11)

is granted and that, pursuant to 28 U.S.C.A. § 1447(c), this

cause is remanded to the Circuit Court of Bullock County,

Alabama.

    It is further ORDERED that the motion to stay (Doc. No.

5) is denied and the motion to dismiss (Doc. No. 3) is left

for disposition by the state court after remand.

    The clerk of the court is DIRECTED to take appropriate

steps to effect the remand.

    DONE, this the 21st day of September, 2005.


                <u>   /s/ Myron H. Thompson   </u>
                UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80012-C.V.-HURLEY

EVELYN IRVIN, as Personal Representative of the
Estate of RICHARD IRVIN, JR.,
     plaintiff,
vs.

MERCK & CO., INC., JOE GHEZZI, and
CHRIS METROPULOS,
     defendants.
_____/

### ORDER DIRECTING REMAND & CLOSING FILE

    **THIS CAUSE** is before the court *sua sponte* for review of its subject matter jurisdiction for

the second time on the successive notice of removal filed by defendant Merck & Co., Inc. For

reasons discussed below, the court shall again remand the case, this time with taxation of attorney's

fees and costs.

### I. INTRODUCTION

    Plaintiff originally filed this suit in the Circuit Court of the Fifteenth Judicial Circuit in

and for Palm Beach County, Florida, on May 14, 2003, asserting state law claims arising out of the

wrongful death of plaintiff's decedent in consequence of his ingestion of the prescription drug

Vioxx, a pharmaceutical product manufactured and marketed by defendant Merck & Co.

    On June 6, 2003, defendant Merck filed its first notice of removal, asserting the diversity

jurisdiction of this court under 28 U.S.C. §1332. On October 7, 2003, the court remanded the

case to state court for lack of subject matter jurisdiction due to defendant's failure to sustain its

burden of establishing the claimed fraudulent joinder of defendants Joe Ghezzi and Chris

1

Metropulos.

On January 7, 2005, Merck filed its second notice of removal in this court. The sole basis for its renewed removal effort is that discovery in the state court proceedings has now proven that defendants Ghezzi and Metropulos are not the correct individuals involved in marketing the Vioxx product at issue in this case. According to Merck, the non-involvement of these individuals was conclusively established at the December 7, 2004 deposition of Dr. Christopher Schirmer, the prescribing physician. Thus, defendant does not assert a new basis for removal, but rather, argues that discovery in the state court proceeding has revealed additional facts which buttress its original contention regarding the fraudulent joinder of defendants Ghezzi and Metropulos.

## II. DISCUSSION

28 U.S.C. § 1446(b), provides in relevant part:

> The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or procedure is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.
>
> If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action.

This section, which allows a defendant to remove a previously remanded case where subsequent pleadings or events reveal a new and different basis for removal, *see e.g.*

2

*Browning v Navarro,* 743 F.2d 1069, 1079 n. 29 (5th Cir. 1984), must be read in harmony with 28 U.S.C. §1447(d), which provides that a remand order is "not reviewable on appeal or otherwise." Section 1447 (d) thus not only forecloses appellate review, but also bars reconsideration by the district court of its own remand order based on lack of subject matter jurisdiction or defects in the removal procedure. *See First Union National Bank v Hall,* 123 F.3d 1374 (11th Cir. 1997), *cert. dism'd,* 523 U.S.1135 (1998); *Harris v Blue Cross/Blue Shield of Ala., Inc.,* 951 F.2d 325, 330 (11th Cir 1992).

A party may not circumvent the §1447(d) prohibition on motions for reconsideration by filing a second notice of removal which simply supplies additional evidentiary support in an effort to demonstrate the inaccuracy of the previous remand order. Thus, in this case the newly acquired deposition testimony of Dr. Schirmer is not a legitimate basis upon which the court may reassess its subject matter jurisdiction. *See e.g. Roughton v Warner-Lambert,* 2001 WL 910408 (M.D. Ala. 2001); *Nicholson v National Accounts, Inc.* 106 F. Supp.2d 1269 (S.D. Ala. 2000).

Having previously remanded this case for lack of subject matter jurisdiction pursuant to §1447(c), the court is now powerless under §1447(d) to reconsider that order and reevaluate the accuracy of its initial decision to remand. *See generally Whittley v Burlington Northern & Santa Fe R.R. Co.,* 2005 WL 221467 (8th Cir. 2005).

Accordingly, it is **ORDERED AND ADJUDGED:**

1. This case is **REMANDED** for lack of subject matter jurisdiction to the Circuit Court of Palm Beach County, State of Florida, pursuant to 28 U.S.C. §1447(c).

2. It is further ordered that plaintiff shall recover from defendant Merck all "just costs and any actual expenses, including attorney's fees, incurred as a result of the removal" pursuant to 28

3

U.S.C. 1447(c).  *See e.g. Moates v Cargill*, 2001 WL 910410 (M.D. Ala. 2001).  Plaintiff shall

submit her duly supported petition for fees and costs within **TEN (10) DAYS** from the date of this

order.

   3.  The court shall retain jurisdiction only for the limited purpose of assessing the attorney

fee and cost award made pursuant to 28 U.S.C. §1447(c).

   4.  The clerk is directed to **CLOSE** this file, **DENY** any pending motions as **MOOT**, and

send a certified copy of this order to the Clerk of the Fifteenth Judicial Circuit in and for Palm

Beach County pursuant to 28 U.S.C. §1447.

   **DONE AND ORDERED** in Chambers at West Palm Beach, Florida this _14th_ day of

February, 2005.

                                         Daniel T. K. Hurley
                                         United States District Judge

copies to:

Angelo Patacca, Esq..
Phillip L. Valente, Jr.
Patricia Lowry, Esq.
Sharon Kegerreis, Esq.

4

FROM:305-523-5226 USDC-FLS    ▀▀: 9-1-904-632-0549    PAGE: 1 OF 5    CONTROL: #885646-CV



# United States District Court
## Southern District of Florida

---

**NOTICE:** Only certain Judges are E-NOTICING, so continue to provide envelopes for cases before non-participating Judges  Visit the court's website· www flsd uscourts gov or call the Help Line (305) 523-5212 for an updated listing of participating Judges

---

Notice of Orders or Judgments

Date:    02/16/05

To:    Angelo  Patacca (aty)
233 East Bay Street
Suite 804 Blackstone Bldg
Jacksonville, FL  32202

Re: Case Number:    9:05-cv-80012    Document Number:    9

NOTE: If this are no longer an attorney in this case, please disregard this notice.
Be sure to promptly notify the Clerk of Court in writing of any changes to your name, address, law firm, or fax number  This notification should be sent for each of your active cases.
If this facsimile cannot be delivered as addressed, or you have ANY problems with this fax transmission, please call the Help Line (305) 523-5212 and the problem will be rectified. Since this transmission originated from the Clerk's Office, JUDGES CHAMBERS SHOULD NOT BE CONTACTED.

Number of pages including cover sheet:

5

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| JAMES O. STRUTHERS, etc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:06cv127-MHT |
| | ) | |
| MERCK & CO., INC., a | ) | |
| foreign Corporation, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

This lawsuit, which was removed from state to federal

court based on diversity-of-citizenship jurisdiction, 28

U.S.C. §§ 1332, 1441, is now before the court on

plaintiff's motion to remand. The court agrees with

plaintiff that this case should be remanded to state

court. First, there has not been <u>fraudulent joinder</u> of

any resident defendant (that is, plaintiff has colorable

claims against such a defendant), <u>see</u> <u>Coker v. Amoco Oil</u>

<u>Co.</u>, 709 F.2d 1433, 1440 (11th Cir. 1983); <u>Cabalceta v.</u>

<u>Standard Fruit Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989).

Second, there has not been <u>fraudulent misjoinder</u> of any

resident defendant (that is, plaintiff has reasonably

joined such a defendant with other defendants pursuant to

Rule 20 of the Federal Rules of Civil Procedure), <u>see</u>

<u>Tapscott v. MS Dealer Service Corp.</u>, 77 F.3d 1353, 1360

(11th Cir. 1996).

Accordingly, it is the ORDER, JUDGMENT, and DECREE

of the court that plaintiff's motion to remand (doc. no.

13) is granted and that, pursuant to 28

U.S.C. § 1447(c), this cause is remanded to the Circuit

Court of Montgomery County, Alabama, for want of

subject-matter jurisdiction.

It is further ORDERED that the motion to stay (Doc.

No. 6) and the motion to expedite (Doc. No. 18) are

denied.

It is further ORDERED that all other outstanding

motions are left for disposition by the state court

after remand.

2

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 13th day of March, 2006.


                        /s/ Myron H. Thompson
                    UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION


| | | |
|---|---|---|
| ROSEMARY LEVERETT, etc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 3:06cv128-MHT |
| | ) | |
| MERCK & CO., INC., etc., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

This lawsuit, which was removed from state to federal court based on diversity-of-citizenship jurisdiction, 28 U.S.C. §§ 1332, 1441, is now before the court on plaintiff's motion to remand. The court agrees with plaintiff that this case should be remanded to state court. First, there has not been fraudulent joinder of any resident defendant (that is, plaintiff has colorable claims against such a defendant), see Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983); Cabalceta v.

<u>Standard Fruit Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989).

Second, there has not been <u>fraudulent misjoinder</u> of any

resident defendant (that is, plaintiff has reasonably

joined such a defendant with other defendants pursuant to

Rule 20 of the Federal Rules of Civil Procedure), <u>see</u>

<u>Tapscott v. MS Dealer Service Corp.</u>, 77 F.3d 1353, 1360

(11th Cir. 1996).

Accordingly, it is the ORDER, JUDGMENT, and DECREE

of the court that plaintiff's motion to remand (doc. no.

1) is granted and that, pursuant to 28 U.S.C. § 1447(c),

this cause is remanded to the Circuit Court of

Tallapoosa County, Alabama, for want of subject-matter

jurisdiction.

It is further ORDERED that the motion to stay (Doc.

No. 9) is denied.

It is further ORDERED that all other outstanding

motions are left for disposition by the state court

after remand.

2

The clerk of the court is DIRECTED to take appropriate steps to effect the remand.

DONE, this the 15th day of March, 2006.


_____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1.  **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a)  **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. § 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

    (b)  **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c)  **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d)  **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5:** The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e)  **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

    Rev.: 4/04

2.   **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

    (a)   **Fed.R.App.P. 4(a)(1)**: A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

    (b)   **Fed.R.App.P. 4(a)(3)**: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

    (c)   **Fed.R.App.P. 4(a)(4)**: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

    (d)   **Fed.R.App.P. 4(a)(5) and 4(a)(6)**: Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

    (e)   **Fed.R.App.P. 4(c)**: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.   **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4.   **Effect of a notice of appeal**: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

FILED
2005 May-25 PM 03:07
U S DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

BRENDA SUE LANDRUM,                    ]
                                       ]
    Plaintiff(s),                    ]
                                       ]
    vs.                              ] CV05-CO-01055-J
                                       ]
MERCK & COMPANY, INC.,                 ]
                                       ]
    Defendant(s).                    ]

ORDER

In accordance with the Memorandum of opinion entered contemporaneously herewith, this action is hereby REMANDED to the Circuit Court of Walker County, Alabama.

Done this 25th day of May 2005.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
130122

EXHIBIT
B

FILED

2005 May-25 PM 03:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | |
|---|---|
| BRENDA SUE LANDRUM, | ] |
| | ] |
| Plaintiff(s), | ] |
| | ] |
| vs. | ] CV05-CO-01055-J |
| | ] |
| MERCK & COMPANY, INC., | ] |
| | ] |
| Defendant(s). | ] |

OPIONION

On May 23, 2005, defendant Merck & Co., Inc., removed this action

from the Circuit Court of Walker County, Alabama.  Merck contends this

court has diversity jurisdiction because the amount in controversy exceeds

$75,000, exclusive of costs and interest, and the alleged Alabama citizenship

of the remaining defendants, former Merck sales representatives, must be

ignored for removal purposes since these defendants are fraudulently

joined. [Doc. 1]. Merck included affidavits from three sales representatives

denying the allegations of the complaint. Id. The sales representative

defendants, Robert Wall, Gary Harlan, Angela Finch, Matthew King, Patricia

Aiken, and Sonya Coley, filed motions to dismiss the claims against them

simultaneously with Merck's removal. [Doc. 3-8]. Merck also filed a motion to stay all proceedings in this action pending transfer by the Judicial Panel on Multidistrict Litigation to In re Vioxx Products Liability Litigation (MDL-1657). [Doc. 10].

The plaintiff, Brendan Sue Landrum, responded with an "Emergency Motion to Remand" on May 24, 2005, arguing that federal courts in this district and elsewhere in Alabama have repeatedly held that in-state pharmaceutical sales representatives are not fraudulently joined. [Doc. 12]. In her complaint filed in the Circuit Court of Walker County, Alabama, Plaintiff alleged that the sales representative defendants negligently, recklessly, intentionally and fraudulently made material representations that Vioxx was safe and effective. [Doc. 1, Ex. A]. In Count 1 of her complaint, Plaintiff alleged a claim under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD). In remaining counts, she claims failure to warn (Count 2), breach of the warranty of merchantability (Count 3), negligence (Count 4), wantonness (Count 5), fraudulent misrepresentation (Count 6), and fraudulent suppression (Count 7). The claims, facts, and arguments asserted in this case are nearly identical to

those in *Marshand v. Wyeth, et al.*, CV-03-CO-319 5-W (N.D. Ala. 2004). The differences are not material to the consideration of the pending motions in this case. The court by reference adopts the analysis set forth in that opinion.

The court is of the opinion that it does not have diversity jurisdiction in this action. This case will be remanded to the Circuit Court of Walker County, Alabama. A separate order will be entered.

Done this 25th day of May 2005.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
130122



ENTERED
CLERK, U.S. DISTRICT COURT

APR 2 5 2005

CENTRAL DISTRICT OF CALIFORNIA
BY
DEPUTY

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**PRIORITY-SEND**
On T 556

**CIVIL MINUTES — GENERAL**

Case No.    **SACV 05-177-JFW (MANx)**                    Date: April 22, 2005

Title:    THEODORE M. SOKARDA, et al. -v- MERCK & COMPANY, INC., et al.

---

**DOCKET ENTRY**

---

**PRESENT:**

    HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

    Shannon Reilly                  None Present
    Courtroom Deputy           Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:    ATTORNEYS PRESENT FOR DEFENDANTS:
          None                             None

PROCEEDINGS (IN CHAMBERS):    ORDER GRANTING DEFENDANT'S *EX PARTE*
                                APPLICATION TO VACATE ORDER TO REMAND OR,
                                ALTERNATIVELY, TO GRANT LEAVE TO AMEND
                                NOTICE OF REMOVAL [filed 3/31/05; Docket No. 15];

                                ORDER VACATING MARCH 24, 2005 ORDER
                                REMANDING ACTION [Docket No. 7];

                                ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE
                                TO AMEND COMPLAINT [filed 3/25/05; Docket No. 8];

                                ORDER GRANTING PLAINTIFFS' MOTION TO
                                REMAND TO STATE COURT PURSUANT TO 28 U.S.C.
                                § 1447(e); 28 U.S.C. § 1447(c) [filed 3/25/05;
                                Docket No. 10]

                                ORDER REMANDING ACTION TO ORANGE COUNTY
                                SUPERIOR COURT;

                                ORDER DENYING DEFENDANT'S MOTION TO STAY
                                ALL PROCEEDINGS PENDING TRANSFER DECISION
                                BY THE JUDICIAL PANEL ON MULTIDISTRICT
                                LITIGATION AS MOOT [filed 3/29/05; Docket No. 20]

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d)

DOCKETED ON CM
APR 25 2005
BY _____ 010

Page 1 of 6           Initials of Deputy Clerk sr

On January 14, 2005, Plaintiffs Theodore M. Sokarda and Patricia A. Sokarda (collectively "Plaintiffs") filed this action in Orange County Superior Court against Merck & Company, Inc. ("Defendant"). On February 23, 2005, Defendant filed a Notice of Removal of Action Under 28 U.S.C. § 1441(b) ("Notice of Removal") based on diversity of citizenship pursuant to 28 U.S.C. § 1332. On March 24, 2005, this Court issued an Order remanding this case to Orange County Superior Court based on a procedural defect and stayed the Remand Order until April 4, 2005 to give Plaintiffs an opportunity to waive the procedural defect and elect to remain in federal court.

On March 25, 2005, Plaintiffs filed a Motion for Leave to Amend Complaint and a Motion to Remand to State Court Pursuant to 28 U.S.C. § 1447(e); 28 U.S.C. § 1447(c) and set the hearing on the Motions for April 25, 2005. On April 4, 2005, in light of the Motions filed by Plaintiffs, the Court continued its Order staying the remand of this action from April 4, 2005 to April 25, 2005. On April 11, 2005, Defendant filed its Oppositions to Plaintiffs' Motions. On April 19, 2005, Plaintiffs filed their Replies.

On March 29, 2005, Defendant filed a Motion to Stay All Proceedings Pending Transfer Decision by the Judicial Panel on Multidistrict Litigation. Plaintiffs did not file an Opposition to Defendant's Motion. On March 31, 2005, Defendant filed an *ex parte* Application to Vacate Order to Remand or, Alternatively, to Grant Leave to Amend Notice of Removal. On April 1, 2005, Plaintiffs filed their Opposition to the *ex parte* Application. On April 5, 2005, Defendant filed a Reply in support of its *ex parte* Application.

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that the foregoing matters are appropriate for decision without oral argument. The hearing calendared for April 25, 2005 is hereby vacated and the matters taken off calendar. After considering the moving, opposing, and reply papers and the arguments therein, the Court rules as follows:

I.    **Defendant's *ex parte* Application to Vacate March 24, 2005 Remand Order**

On March 24, 2005, this Court issued an Order remanding this case to Orange County Superior Court on the grounds that Defendant had failed to provide the Court with the date that Defendant was served with a copy of the summons and Complaint and therefore had failed to carry its burden in demonstrating that its Notice of Removal was timely filed. Recognizing that this was a procedural defect which could be waived by Plaintiffs, the Court stayed the Remand Order to give Plaintiffs an opportunity to waive the procedural defect and elect to remain in federal court.

Defendant argues that the record before this Court at the time the Court issued its Remand Order demonstrated that Defendant had not yet been served with Plaintiffs' Complaint and that the action had been timely removed. In support of its argument, Defendant relies on a statement made to the Court by Plaintiffs in a declaration filed on March 25, 2005. However, the Court issued its Remand Order on March 24, 2005 - one day prior to the date the declaration relied upon by Defendant was filed.[1]

---

[1] Defendant claims that because the Court's Remand Order was not entered until March 29, 2005, the Court was aware of Plaintiffs' filing on March 25, 2005. However, the entry date for a

Notwithstanding the fact that Defendant's removal papers contained a procedural defect, in light of Plaintiffs' failure to object to this defect within the thirty day time period set forth in 28 U.S.C. § 1447(c), the Court **GRANTS** Defendant's *ex parte* Application to Vacate Order to Remand or, Alternatively, to Grant Leave to Amend Notice of Removal. The Court's March 24, 2005 Order remanding this action is hereby **VACATED.**

## II.     Plaintiffs' Motion for Leave to Amend Complaint and Motion to Remand to State Court

Plaintiff Theodore M. Sokarda had a stroke on or about January 16, 2002 and to date, remains in a vegetative state. At the time Mr. Sokarda suffered the stroke, he was using a prescribed dosage of the drug Vioxx. According to Plaintiffs, they filed their Complaint against Defendant, the manufacturer of Vioxx, in state court on January 14, 2005 without serving the Complaint on Defendant, "to preserve their statutory claim." Plaintiffs' Motion to Amend at 3. Plaintiffs claim that after the Complaint was filed, counsel for Plaintiffs continued to investigate the companies which sold, distributed and marketed Vioxx with the intent of amending the Complaint to add additional parties once the investigation had been completed. Despite the fact that Defendant had not yet been served with the Complaint, Defendant removed the action to this Court on February 23, 2005 before Plaintiffs had the opportunity to amend their Complaint to add additional defendants.

In their current Motion for Leave to Amend Complaint, Plaintiffs seek leave to add McKesson Corporation and Amerisourcebergen Drug Corporation (the "Distributor Defendants") as defendants in this action. Plaintiffs are both citizens of California. McKesson Corporation is a Delaware Corporation with its principal place of business in California, and is therefore a citizen of both Delaware and California for the purposes of diversity jurisdiction. *See* 28 U.S.C. § 1332(c). As a result, the joinder of McKesson Corporation as a defendant in this action would destroy diversity and this Court would no longer have subject matter jurisdiction over this action. *See, e.g., Strawbridge v. Curtiss*, 7 U.S. 267 (1806).

Pursuant to 28 U.S.C. § 1447(e), "[i]f after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court." 28 U.S.C. § 1447(e). "When deciding whether to permit joinder under § 1447(e), a court should consider: (1) whether the party sought to be joined is needed for just adjudication and would be joined under Federal Rule of Civil Procedure 19(a); (2) whether the statute of limitations would prevent the filing of a new action against the new defendant should the court deny joinder; (3) whether there has been unexplained delay in seeking the joinder; (4) whether the joinder is solely for the purpose of defeating federal jurisdiction; and (5) whether the claim against the new party seems valid." *Clinco v. Roberts*, 41 F. Supp. 2d 1080, 1086 (C.D. Cal. 1999) (citing Schwarzer, et al., *California Practice Guide: Federal Civil Procedure Before Trial*, ¶ 2:1078 (TRG 1998)).

---

minute order merely signifies when that order is entered on the docket. The Remand Order was actually issued and filed by the Court on March 24, 2005.

Initials of Deputy Clerk _sr_

A.    The extent the new defendants are required for just adjudication

Rule 19 "requires joinder of persons whose absence would preclude the grant of complete relief, or whose absence would impede their ability to protect their interests or would subject any of the parties to the danger of inconsistent obligations." *Clinco*, 41 F. Supp. 2d at 1082; Fed. R. Civ. P. 19(a); *see also CP Nat'l Corp. v. Bonneville Power Admin.*, 928 F.2d 905, 912 (9th Cir. 1991) (A necessary party is one "having an interest in the controversy, and who ought to be made [a] part[y], in order that the court may act on that rule which requires it to decide and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it."). "Although courts consider whether a party would meet [Rule] 19's standard for a necessary party, amendment under § 1447(e) is a less restrictive standard that for joinder under [Rule] 19." *IBC Aviation Servs., Inc. v. Compania Mexicana de Aviacion*, 125 F. Supp. 2d 1008, 1011-12 (N.D. Cal. 2000). The standard "is met when failure to join will lead to separate and redundant actions." *Id.* at 1011 (citing *CP Nat'l Corp.*, 928 F.2d at 910).

In their proposed Amended Complaint, Plaintiffs allege that the Distributor Defendants are "wholesale distributors of all Merck & Company, Inc. products, including Vioxx, and, as such, marketed, sold and distributed Vioxx which was ingested by Plaintiff Theodore M. Sokarda." Proposed Amended Complaint at ¶¶ 3-4. Upon review of Plaintiffs' proposed Amended Complaint, the Court finds that failure to join the Distributor Defendants would "lead to separate and redundant actions." Accordingly, this factor weighs in favor of allowing Plaintiffs' amendment under Section 1447(e).

B.    The extent to which a statute of limitations would affect Plaintiffs' ability to bring a separate suit

Plaintiffs do not argue that a new action against the Distributor Defendants would be time-barred. Accordingly, this factor does not support amendment under Section 1447(e).

C.    The timeliness of the proposed amendment

In their Motion to Amend, Plaintiffs represent that they chose not to serve Defendant Merck with the Complaint immediately after filing this action in state court because they were continuing to research potential claims against additional defendants, and that they only filed their Complaint when they did to "to preserve their statutory claim." Plaintiffs' Motion to Amend at 3. Defendant Merck learned of the action and removed the action to this Court prior to service of the Complaint and before Plaintiffs had the opportunity to make those intended amendments to their Complaint. Once Defendant Merck removed the case, Plaintiffs did not delay in bringing their Motion to Amend, which was filed one month after the date of removal. Accordingly, there was no unexplained delay in seeking to add the additional defendants, and this factor weighs in favor of allowing Plaintiffs' amendment under Section 1447(e).

Initials of Deputy Clerk _er_

**D.   Motive for joinder**

Defendant claims that Plaintiffs' only motivation for attempting to join the Distributor Defendants is to "destroy diversity and force remand." Defendant's Opposition to Motion to Amend at 3. In support of its claim, Defendant cites to the fact that Plaintiffs did not attempt to join the Distributor Defendants until one month after Defendant removed this action to this Court. Defendant's argument is entirely disingenuous in light of the actions taken thus far by Defendant in this case. Defendant learned of this action prior to service of the Complaint, and then removed the case and immediately filed an answer, essentially stripping Plaintiffs of the right to amend as a matter of course before a responsive pleading was filed. Moreover, Defendant's argument fails to account for Plaintiffs' explanation that they were continuing to investigate potential defendants after filing of the Complaint, and intended to amend and serve their Complaint on all defendants at the conclusion of their investigation. It appears to the Court that Plaintiffs attempted to amend their Complaint to add the Distributor Defendants at the first available opportunity, and that it has in fact been Defendant's, and not Plaintiffs' motives which are questionable. Accordingly, this factor weighs in favor of allowing Plaintiffs' amendment under Section 1447(e).

**E.   The validity of Plaintiffs' claims against the new defendants**

Defendant argues that the Court should not permit Plaintiffs to amend their Complaint because their proposed claims against the Distributor Defendants are legally insufficient. In their proposed Amended Complaint, Plaintiffs allege the following ten claims against all defendants: (1) Negligence; (2) Strict liability (failure to warn); (3) Strict liability (design defect); (4) Negligent failure to warn; (5) Negligence *per se*; (6) Misrepresentation and suppression; (7) Breach of warranty; (8) Breach of express warranty; (9) Fraud; and (10) Loss of consortium. Defendant Merck contends that all of the foregoing claims against the Distributor Defendants are based on "an alleged failure to warn about the purported risks of Vioxx," and that "under settled California law, a distributor of prescription pharmaceuticals does not have a duty to warn." Defendant's Opposition to Motion to Amend at 4-5.

The Court does not agree with Defendant that the law in California on this issue is "settled." To the contrary, although California courts have ruled that pharmacists cannot be held strictly liable for failure to warn, they have not addressed whether distributors of prescription drugs can be held liable for failure to warn. Accordingly, the Court finds that Plaintiffs have alleged valid claims for relief against the Distributor Defendants in their proposed Amended Complaint and this factor therefore weighs in favor of allowing Plaintiffs' amendment under Section 1447(e)

Based on the Court's analysis of the foregoing factors, Plaintiffs' Motion to for Leave to Amend Complaint is **GRANTED**. Plaintiffs' Amended Complaint, which was lodged on April 22, 2005, shall be filed as of the date of this Order.

Initials of Deputy Clerk  sr

Since the joinder of Defendant McKesson Corporation destroys diversity, this Court no longer has subject matter jurisdiction over this action and Plaintiffs' Motion to Remand to State Court Pursuant to 28 U.S.C. § 1447(e); 28 U.S.C. § 1447(c) is **GRANTED**.[2]  This action is hereby **REMANDED** to Orange County Superior Court for lack of subject matter jurisdiction.  *See* 28 U.S.C. § 1447(c).

In light of the Court's Order remanding this action to Orange County Superior Court, Defendant's Motion to Stay All Proceedings Pending Transfer Decision by the Judicial Panel on Multidistrict Litigation is **DENIED as moot**.

IT IS SO ORDERED.

The Clerk shall serve a copy of this Minute Order on all parties to this action.

---

[2] In light of the Court's finding that Plaintiffs state potentially viable claims against Distributor Defendants, the Court need not separately address Defendant's argument regarding fraudulent joinder as set forth in its Opposition to Plaintiffs' Motion to Remand.

Initials of Deputy Clerk _sr_

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MYRNA AMISCH, Individually
and on behalf of all others
similarly situated,

Plaintiff,

v.

MERCK & CO., INC., and
EDWARDS MEDICAL SUPPLY, INC.,

Defendants.                                    No. 04-CV-847-DRH

## ORDER

HERNDON, District Judge:

Now before the Court is Defendant Merck & Co., Inc.'s ("Merck) Motion to Stay All Proceedings Pending Transfer Decision by the Judicial Panel on Multidistrict Litigation. **(Doc. 7).**[1] The motion requests that the Court stay all the proceedings until the Judicial Panel on Multidistrict Litigation hears and rules on Merck's motion to transfer this case, along with some 150-plus other cases involving VIOXX®, to a single court for coordinated pretrial management pursuant to **28 U.S.C. § 1407.** Merck's motion states that the MDL is expected to hear Merck's motion sometime in late January 2005.[2]

---

[1] The Court notes that Merck's reply violates the **Local Rule 7.1(d)** of this judicial district. Merck's reply is 7 pages and under **Local Rule 7.1(d)** reply briefs shall not exceed 5 pages.

[2] It is worth mentioning that Schedule A attached to the Letter from Michael J. Beck, Clerk of Panel, United States of America Judicial Panel on Multidistrict Litigation, to All Counsel Involved in the Vioxx Products Liability Litigation (Nov. 22, 2004), does not identify this case as one of the

If the Court were to grant Merck's motion and stay this proceeding pending the hearing on whether to form a MDL on the VIOXX® cases, this Court would not be able to address its subject matter jurisdiction over the matter. A review of the complaint indicates that Plaintiff specifically disclaims federal jurisdiction **(Doc. 2, pp. 2-3)**. Further, both counts of Plaintiff's complaint are based on state law– the Illinois Consumer Fraud Act. The United States Court of Appeals for the Seventh Circuit has explicitly held that district courts have the power to decide whether they have subject matter jurisdiction over a matter prior to transfer to the MDL as ruling on its jurisdiction "is a fundamental obligation of all courts of limited jurisdiction." *Illinois Municipal Retirement Fund v. Citigroup, Inc.*, -- F.3d --, **2004 WL 2749864, *7 (7th Cir. Dec. 2, 2004)(affirming United States Chief District Court Judge G. Patrick Murphy of the Southern District of Illinois' remand of a matter for lack of subject matter jurisdiction after the MDL had issued a conditional transfer order but before transmittal of a final transfer order)**. In *Illinois Municipal Retirement Fund*, the Seventh Circuit stated:

> Though some district courts stay proceedings during the interim following a conditional transfer order, *see, e.g., Bd. of Trs. of the Teachers' Ret. Sys. of the State of Ill. v. WorldCom, Inc.*, 244 F. Supp.2d 900 (N.D. Ill. 2002), this is not required where the court concludes that it lacks subject matter jurisdiction. We will not require a district court that believes that it lacks subject matter jurisdiction over a case to

---

158 actions set for the next Panel Hearing Session in late January 2005. **(Doc. 7, Merck's Motion to Stay All Proceedings Pending Transfer Decision by the Judicial Panel on Multidistrict Litigation, Ex. A)**.

> facilitate a transfer under § 1407, a statute that does
> not itself confer jurisdiction.

*Illinois Municipal Retirement Fund*, 2004 WL 2749864, *7.  In the case at bar,

the Court notes that a conditional transfer order has not even been entered in this

matter – the MDL has yet to hear the motion to *form* a panel to which this matter

may or may not be conditionally transferred.  Consequently, as this Court has not

determined whether it enjoys proper subject matter jurisdiction over this matter, in

addition to the fact that the MDL has not even heard Merck's Section 1407 motion,

the Court finds it is not prudent or judicially economical for the Court to stay the

proceedings herein. *See also, Walson v. Merck & Co.*, **No. 04-CV-27-GPM (Chief**

**Judge Murphy denied motion to stay);** *Caruso v. Merck & Co.*, **NO. 04-CV-759-**

**GPM (Chief Judge Murphy denied motion to stay and granted motion to**

**remand);** *Bilbrey v. Merck & Co.*, **No. 04-CV-836-MJR (Judge Reagan denied**

**motion to stay);** *Sumner v. Merck & Co.*, **04-864-MJR (Judge Reagan denied**

**motion to stay).**

Accordingly, the Court **DENIES** Merck's motion to stay.  **(Doc. 7)**.

**IT IS SO ORDERED.**

Signed this 22nd day of December, 2004.


/s/  David RHerndon
**DAVID R. HERNDON**
**United States District Judge**

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MYRNA AMISCH, Individually and
on behalf of all others similarly situated,

Plaintiff,

vs.

MERCK & CO., INC. and
EDWARDS MEDICAL SUPPLY, INC.,

Defendants.                                No. 04-CV-00847-DRH

<u>MEMORANDUM AND ORDER</u>

HERNDON, District Judge:

## I. Introduction

On October 5, 2004, Plaintiff Myrna Amisch ("Amisch") initiated this class action suit in the Circuit Court of the Third Judicial Circuit, Madison County, Illinois, against Merck & Co., Inc. ("Merck") and Edwards Medical Supply, Inc. ("Edwards Medical") seeking economic damages arising out of the marketing, distribution, and sale of the prescription drug VIOXX®. **(Doc. 2)**. Plaintiff asserts claims against Merck and Edwards Medical under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), **815 ILCS 505/2**. Merck timely removed the case to federal court based on this Court's diversity jurisdiction, **28 U.S.C. §§ 1332, 1441**. **(Doc. 1)**.

Now before the Court is Plaintiff's motion to remand. **(Doc. 11)**. For the reasons set forth below, the Court grants Plaintiff's motion to remand.

## II. The Complaint's Allegations

The Complaint alleges that Plaintiff is a resident of Illinois[1], Merck is a corporation organized under the laws of the State of New Jersey with its principal place of business in New Jersey, and Edwards Medical[2] is a corporation organized under the laws of the State of Illinois with its principal place of business in Illinois. Regarding the amount in controversy, the Complaint expressly states as follows:

> Plaintiff stipulates that she is not seeking and will neither demand nor accept on behalf of any Class member, any recovery in excess of $75,000.00, exclusive of costs and interest.  No claim is asserted here for equitable or injunctive relief. . . .  Plaintiff and each member of the class have individually incurred damages under the laws of Illinois in an amount less than $75,000.  Neither the Plaintiff, nor any member of the class, seek damages exceeding $75,000, nor do their damages individually exceed $75,000, inclusive of interest and attorneys' fees and all relief of any nature sought hereunder.  Neither Plaintiff, nor any of the class members, seek any form of 'common' recover [sic], but rather individual recoveries not to exceed $75,000 for any class member, inclusive of interest and attorneys' fees and all relief of any nature sought hereunder.  Plaintiff and the class members voluntarily limit their claims to less than $75,000 each.

---

[1] To determine an individual's citizenship for diversity purposes, courts look to the state of the individual's domicile. *Dakuras v. Edwards*, 312 F.3d 256, 258 (7th Cir.2002). Domicile has two elements: (1) physical presence or residence in a state and (2) an intent to remain in the state. *Id.* Based on the allegations in the Complaint, it appears Plaintiff is domiciled in Illinois and therefore is a citizen of Illinois for diversity purposes.

[2] Plaintiff alleges Edwards Medical is a licensed distributor of VIOXX®.  (Compl. at ¶ 4). Merck submits the Declaration of David Layton, Senior Director of Order Management Center for Merck, stating Edwards Medical is a distributor of record of Merck products, but has never ordered any VIOXX® from Merck.  [Doc. 1, Notice of Removal ¶ 18 & Nov. 17, 2004 Decl. of David Layton ("Layton Decl.") ¶ 2, attached thereto as Exhibit 2; Doc. 15, Merck's Opp. To Pl.'s Mot. To Remand, Ex. 5].  Because the Court finds that the amount in controversy requirement has not been satisfied as explained below, this issue is not determinative.

(Compl. at ¶ 9).

   According to the Complaint, in order to obtain a consumer market share of VIOXX®, Merck requested the Food and Drug Administration ("FDA") allow Merck to use a fast track, 6-month approval process for scientific testing on VIOXX®. (Compl. at ¶12). Plaintiff alleges that the fast track, 6-month approval process was inadequate and that Merck knew or should have known that the drug caused an increased risk of clotting, hypertension, stroke and myocardial infarction, but that this information was intentionally suppressed by Defendants in order for Merck to gain significant profits from VIOXX® sales. (Compl. at ¶¶ 16, 18). Plaintiff alleges she and members of the Class would not have purchased VIOXX® had they known of the increased risks of hypertension, stroke, and/or myocardial infarcts. (Compl. at ¶ 22).

   With respect to Plaintiff's VIOXX® purchase, Plaintiff alleges she was prescribed VIOXX® and purchased the drug at the Schnucks Pharmacy in Granite City, Illinois, from April 2003 until July 2004. (Compl. at ¶ 24). Plaintiff purchased VIOXX® without knowledge of the facts misrepresented or concealed by Defendants. (Id.) Plaintiff asks to certify a class as follows: "All persons who purchased VIOXX® for personal, family or household purposes in Illinois from May 1, 1999 until it was withdrawn on September 30, 2004." (Compl. at ¶ 25). Plaintiff believes that the class includes hundreds of thousands of members. (Compl. at ¶ 27).

   Counts I and II are brought under the ICFA against Merck and Edwards Medical, respectively. Plaintiff alleges as a direct and proximate result of Defendants'

-3-

unfair acts and/or practice, Plaintiff and Class Members have suffered damages in an amount equal to the purchase price of VIOXX®. **(Compl. at ¶¶ 48, 63)**. Plaintiff requests "damages, attorneys' fees, their cost of suit, and pre-judgment interest, in an amount less than $75,000.00, per Plaintiff or Class Member." **(Compl., Prayer for Relief, Counts I & II)**  Plaintiff also "seeks to disgorge profits made by Defendants for its [sic] failure to inform consumers of the increased risks associated with the use of VIOXX®."[3] **(Compl. at ¶ 22)**

### III. Analysis

Merck removed the case to this Court based on the federal diversity statute, **28 U.S.C. § 1332**. Under **28 U.S.C. § 1441**, removal is proper over any action that could have been filed originally in federal court. However, if the district court lacks subject matter jurisdiction, the action must be remanded to state court pursuant to **28 U.S.C. § 1447(c)**. Courts presume a plaintiff's choice of forum is proper and valid and resolve all doubts regarding jurisdiction in favor of remand. *See Doe v. Allied-Signal, Inc.*, **985 F.2d 908, 911 (7th Cir. 1993)**. The diversity statute requires complete diversity between the parties plus an amount in controversy which exceeds $75,000, exclusive of interest and costs. Complete diversity of citizenship means that "none of the parties on either side of the litigation may be a citizen of a state of which a party on the other side is a citizen." *Howell v.*

---

[3]Plaintiff makes this request in the introductory section of her Complaint. In the same section, Plaintiff also alleges Merck's VIOXX® campaign resulted in more than $2 billion in sales of VIOXX® to consumers in the year 2000 alone. (Compl. at ¶ 19).

*Tribune Entertainment Co.*, 106 F.3d 215, 217 (7th Cir. 1997) (citations omitted). If either requirement of diversity jurisdiction is lacking, the court must remand the case to state court.

As the party seeking to invoke federal diversity jurisdiction, Merck bears the burden of demonstrating diversity jurisdiction exits. *See NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 237 (7th Cir. 1995). A defendant meets this burden by supporting its allegations of jurisdiction with "competent proof," which in the Seventh Circuit requires the defendant to offer evidence which proves "to a reasonable probability that jurisdiction exists." *Chase v. Shop 'N Save Warehouse Foods, Inc.*, 110 F.3d 424, 427 (7th Cir. 1997) (citations omitted).

The status of the case as disclosed by plaintiff's complaint is controlling on the issue as to whether the case is removable. *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 291 (1938). If the face of the complaint establishes that the suit cannot involve the necessary amount, the case should be remanded. *Id.* at 291-92. "Accepted wisdom" provides that the plaintiff's evaluation of the stakes must be respected when deciding whether a claim meets the amount in controversy requirement for federal diversity jurisdiction. *Barbers, Hairstyling for Men & Women, Inc. v. Bishop*, 132 F.3d 1203, 1205 (7th Cir. 1997) (citing *St. Paul Mercury*, 303 U.S. at 289). Here, the Complaint contains language that limits the value of Plaintiff's claim and that of each member of the putative class to less than $75,000. (Compl. at ¶ 9). Notwithstanding Plaintiff's disclaimer, Merck argues that

Plaintiff's claim meets the $75,000 threshold.

Merck argues that Plaintiff's request "to disgorge profits made by Defendants", when considered in the aggregate, independently satisfies the amount in controversy requirement. The Court disagrees. First, while our circuit has adopted the "either viewpoint" approach (that is, the amount in controversy can be determined from either the plaintiff's or defendant's viewpoint), it has nevertheless maintained that "'[w]hatever the form of relief sought, each plaintiff's claim must be held separate from each other plaintiff's claim from both the plaintiff's and defendant's standpoint.'" *See Del Vecchio v. Conseco, Inc.,* **230 F.3d 974, 977-78 (7th Cir. 2000)(citing** *In re Brand Name Prescription Drugs,* **123 F.3d 599, 610 (7th Cir. 1997))**. Merck's request for the Court to consider Plaintiff's claim in the aggregate violates this rule, particularly when Plaintiff provides an express disclaimer for damages in excess of $75,000 and states she does not seek any form of common recovery or equitable relief. *See Hahn v. PepsiCo, Inc.,* **350 F. Supp.2d 758, 764 (N.D. Ill. 2004)(Moran, J.)("Though disgorged profits may exceed $75,000 in the aggregate, defendant cannot base diversity jurisdiction on aggregate damages in a class action.")** Second, even if the Court were to find aggregation appropriate as Merck suggests, Merck has not attempted to quantify the losses which disgorgement would expose it. *See Rubel v. Pfizer Inc.,* **361 F.3d 1016, 1018 (7th Cir. 2004)**. Put simply, the Court finds that Plaintiff's request for disgorgement does not meet the $75,000 jurisdictional threshold.

Merck also contends that Plaintiff's unspecified request for "damages"

-6-

is clearly intended to encompass punitive damages. Merck reasons that punitive damages together with attorneys' fees would take Plaintiff's claims over the $75,000 jurisdictional threshold. The problem with Merck's hypothetical is that it is, just that, a hypothetical. It assumes $6,000 in compensatory damages for each Class Member with no evidence to support its assertion. It also assumes punitive damages are available in this case even without evidence to show its conduct was "outrageous" (a requirement for punitive awards under the Consumer Fraud Act, *see Ekl v. Knecht*, **585 N.E.2d 156, 164 (Ill. App. Ct. 1991)**). The theoretical availability of damages is not enough to establish jurisdiction. *See Am. Bankers Life Assur. Co. v. Evans*, **319 F.3d 907, 909 (7th Cir. 2003)**. Merck bears the burden of coming forward with competent proof to establish the amount of such damages. *See id.* Additionally, the measure of attorneys' fees included in the calculation of the jurisdictional amount is the amount of fees incurred as of the time the complaint is filed. *See Gardynski-Leschuck v. Ford Motor Co.*, **142 F.3d 955, 959 (7th Cir. 1998)("legal expenses yet to be incurred on the date a suit begins do not create a 'case or controversy' within the meaning of Article III")**. Merck points to nothing to suggest that the fees incurred at the time the suit was filed would carry the amount in controversy over the jurisdictional hurdle.

Finally, Merck argues that Plaintiff's "purported limitation" on damages does not deprive the Court of jurisdiction. Merck is incorrect. A party who seeks only monetary relief and wants to avoid litigating in federal court can avoid this fate by stipulating at the time the suit is filed "that [s]he is not seeking and will neither

-7-

demand nor accept any recovery in excess of $75,000 exclusive of costs and interests." *Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1000 (7th Cir. 2000); *see also ANR Pipeline Co. v. 62.026 Acres of Land*, 389 F.3d 716, 718 (7th Cir. 2004)("if the plaintiff commits himself to see no more than $75,000, the petition to remove must be denied."); *In re Shell Oil Co.*, 970 F.2d 355, 356 (7th Cir. 1992)(per curiam)("Litigants who want to prevent removal must file a binding stipulation or affidavit with their complaints.").

While it is true that Illinois does not have a law limiting the plaintiff's recovery to that asked for in the *ad damnum* clause, **735 ILCS § 5/2-604**, Plaintiff here expressly stated in her Complaint "that she is not seeking and will neither demand nor accept on behalf of any Class member any recovery in excess of $75,000, exclusive of costs and interest." **(Compl. at ¶ 9)**. Merck has not persuaded the Court that this stipulation should be treated as anything other than a binding judicial admission. *See Soo Line R. Co. v. St. Louis Southwestern Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997); *see also Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1014 (7th Cir. 2000)(stating that an allegation in a party's pleading may be treated by the court as a binding judicial admission); *Taylor v. Monsanto Co.*, 150 F.3d 806, 809 (7th Cir. 1998)(same). The mere theoretical possibility that Plaintiff could later amend her Complaint to seek relief in excess of $75,000 is an insufficient reason to find jurisdiction exists now, when it does not. *See* 28 U.S.C. § 1446(b)(permitting Merck to remove the case from state court

**within one year of the commencement of the action upon an amendment by Plaintiff which establishes diversity jurisdiction).** In short, Merck has not demonstrated by competent proof that Plaintiff's complaint meets the $75,000 threshold, therefore this Court lacks subject matter jurisdiction.

### IV. Conclusion

In sum, the Court **GRANTS** Plaintiff's motion to remand for lack of subject matter jurisdiction **(Doc. 11)**, but declines to award Plaintiff costs and expenses, including attorneys' fees, incurred as a result of removal. This case is **REMANDED** to the Circuit Court, Third Judicial Circuit, Madison County Illinois, for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

Signed this 11th day of March, 2005.

/s/   David RHerndon
**United States District Judge**

-9-

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ALFRED BRAME, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL NO. 05-034-GPM |
| | ) | |
| MERCK & COMPANY, INC., and | ) | |
| WALGREENS HOME CARE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

MURPHY, Chief District Judge:

Plaintiff filed this action on December 28, 2004, in state court seeking damages for personal injuries and economic losses suffered as a result of taking the prescription drug Vioxx, which was manufactured, marketed, distributed and/or sold by Defendants to the general public. On January 20, 2005, Merck & Company, Inc. (Merck), removed this action from state court based upon the diversity of citizenship statute, 28 U.S.C. § 1332, arguing that Walgreens Home Care, Inc., is fraudulently joined and, therefore, its Illinois citizenship should be disregarded. Plaintiff filed a motion to remand, in which he points out that before the case was removed, he filed an amended complaint to substitute the proper defendant Walgreen Company, d/b/a Walgreens, for the improperly named Walgreens Home Care, Inc. Both Walgreen Company and Walgreens Home Care, Inc., are Illinois citizens, and there is no substantive difference regarding the allegations made against them. Therefore, for purposes of this Memorandum and Order, the Court will refer to the Illinois corporate Defendant as "Walgreens."

Page 1 of 3

In order for this Court to have diversity jurisdiction under 28 U.S.C. § 1332, the parties must be of diverse citizenship and the amount in controversy must exceed the sum or value of $75,000, exclusive of interest and costs. The burden of proof falls on the party seeking to invoke federal diversity jurisdiction to present "competent proof" that the requirements of § 1332 have been met. *Chase v. Shop 'N Save Warehouse Foods, Inc.*, 110 F.3d 424, 427 (7th Cir. 1997); *see also McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 179 (1936). In deciding whether a defendant has been fraudulently joined, a federal court "must engage in an act of prediction: is there any reasonable possibility that a state court would rule against the non-diverse defendant?" *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992). As recognized by the Seventh Circuit Court of Appeals in *Poulos*, "[a]n out-of-state defendant who wants to remove must bear a heavy burden to establish fraudulent joinder." *Id.*

Generally, Merck argues that Walgreens has been fraudulently joined because Plaintiff has not alleged a valid cause of action against this Defendant. Specifically, in its notice of removal, Merck summarily states that "Plaintiff alleges that 'Walgreens sold [VIOXX] to plaintiff ... in the regular course of its business' (Compl. ¶ 35) and that Walgreens should be liable for strict products liability, failure to warn, and breach of warranty. (Counts 3, 6, and 11). There is no reasonable basis for predicting that Plaintiff could prevail on her [sic] asserted claims against Walgreens. ... Accordingly, Walgreens is fraudulently joined." (Doc. 1, ¶ 14 (string citation to cases denying remand omitted).)

Before filing his motion to remand, Plaintiff attempted to resolve this issue by drawing Merck's attention to this Court's order in a similar case, *Gallaher, et al. v. Bayer Corporation, et al*, civil number 01-641-GPM, in which the undersigned decided that Walgreen Company was not

fraudulently joined in a case involving the prescription drug Baycol. The Court would also draw

Merck's attention to its more recent decision in *Elliott v. Wyeth, Inc., et al.*, civil number 03-037-

GPM, another case in which the undersigned decided that Walgreen Company was not fraudulently

joined after carefully considering Illinois's so-called "innocent seller" statute and the "learned

intermediary doctrine."

After carefully reviewing the papers filed in this case, the Court finds a response to the

motion to remand unnecessary. Merck has failed to meet its burden in its notice of removal. The

Court is not persuaded by conclusory allegations and citations to opinions that lack precedential

value. Moreover, the Court will not allow a case over which it lacks jurisdiction to sit on its docket

until a decision is reached by the Judicial Panel on Multidistrict Litigation, especially after the Court

of Appeals' decision in *Illinois Municipal Retirement Fund v. CitiGroup, Inc.*, 391 F.3d 844, 851

(7th Cir. 2004) ("We find nothing absurd in district courts individually evaluating their own

jurisdiction."). In light of this Court's previous rulings in nearly identical cases, to which Plaintiff

alerted Merck, and Merck's utter failure in its notice of removal to satisfy its burden to establish

federal jurisdiction, this is not a close case. Plaintiff's motion (Doc. 8) is **GRANTED**, and this

action is **REMANDED** to the Twentieth Judicial Circuit Court, St. Clair County, Illinois, pursuant

to 28 U.S.C. § 1447(c) for lack of subject matter jurisdiction. Plaintiff's request for fees and costs

is granted, and he shall file his application on or before March 14, 2005.

**IT IS SO ORDERED.**

DATED: 2/17/05

s/ G. Patrick Murphy
G. PATRICK MURPHY
Chief United States District Judge

Page 3 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DAVID J. McQUAY,                          )
                                          )
            Plaintiff,                    )
                                          )
vs.                                       )    CIVIL NO. 05-038-GPM
                                          )
MERCK & COMPANY, INC., and                )
WALGREEN COMPANY, d/b/a Walgreens,        )
                                          )
            Defendants.                   )

## MEMORANDUM AND ORDER

MURPHY, Chief District Judge:

Plaintiff filed this action in state court seeking damages for personal injuries and economic

losses suffered as a result of taking the prescription drug Vioxx, which was manufactured, marketed,

distributed and/or sold by Defendants to the general public.  On January 20, 2005, Merck &

Company, Inc. (Merck), removed this action from state court based upon the diversity of citizenship

statute, 28 U.S.C. § 1332, arguing that Walgreens Home Care, Inc., is fraudulently joined and,

therefore, its Illinois citizenship should be disregarded.  Plaintiff filed a motion to remand, in which

he points out that the defendant named in this action is Walgreen Company, d/b/a Walgreens, and

not Walgreens Home Care, Inc.  Both Walgreen Company and Walgreens Home Care, Inc., are

Illinois citizens, and it is clear to the Court that Merck intended to refer in its notice of removal to

Walgreen Company, which the Court will refer to hereinafter as "Walgreens."

In order for this Court to have diversity jurisdiction under 28 U.S.C. § 1332, the parties must

be of diverse citizenship and the amount in controversy must exceed the sum or value of $75,000,

exclusive of interest and costs. The burden of proof falls on the party seeking to invoke federal

diversity jurisdiction to present "competent proof" that the requirements of § 1332 have been met.

*Chase v. Shop 'N Save Warehouse Foods, Inc.*, 110 F.3d 424, 427 (7th Cir. 1997); *see also McNutt*

*v. General Motors Acceptance Corp.*, 298 U.S. 178, 179 (1936). In deciding whether a defendant

has been fraudulently joined, a federal court "must engage in an act of prediction: is there any

reasonable possibility that a state court would rule against the non-diverse defendant?" *Poulos v.*

*Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992). As recognized by the Seventh Circuit Court of

Appeals in *Poulos*, "[a]n out-of-state defendant who wants to remove must bear a heavy burden to

establish fraudulent joinder." *Id.*

Generally, Merck argues that Walgreens has been fraudulently joined because Plaintiff has

not alleged a valid cause of action against this Defendant. Specifically, in its notice of removal,

Merck summarily states that "Plaintiff alleges that 'Walgreens sold [VIOXX] to plaintiff ... in the

regular course of its business' (Compl. ¶ 35) and that Walgreens should be liable for strict products

liability, failure to warn, and breach of warranty. (Counts 3, 6, and 11). There is no reasonable basis

for predicting that Plaintiff could prevail on her [sic] asserted claims against Walgreens. ...

Accordingly, Walgreens is fraudulently joined." (Doc. 1, ¶ 14 (string citation to cases denying

remand omitted).)

Before filing his motion to remand, Plaintiff attempted to resolve this issue by drawing

Merck's attention to this Court's order in a similar case, *Gallaher, et al. v. Bayer Corporation, et*

*al.*, civil number 01-641-GPM, in which the undersigned decided that Walgreen Company was not

fraudulently joined in a case involving the prescription drug Baycol. The Court would also draw

Merck's attention to its more recent decision in *Elliott v. Wyeth, Inc., et al.*, civil number 03-037-

GPM, another case in which the undersigned decided that Walgreen Company was not fraudulently joined after carefully considering Illinois's so-called "innocent seller" statute and the "learned intermediary doctrine."

After carefully reviewing the papers filed in this case, the Court finds a response to the motion to remand unnecessary. Merck has failed to meet its burden in its notice of removal. The Court is not persuaded by conclusory allegations and citations to opinions that lack precedential value. Moreover, the Court will not allow a case over which it lacks jurisdiction to sit on its docket until a decision is reached by the Judicial Panel on Multidistrict Litigation, especially after the Court of Appeals' decision in *Illinois Municipal Retirement Fund v. CitiGroup, Inc.*, 391 F.3d 844, 851 (7th Cir. 2004) ("We find nothing absurd in district courts individually evaluating their own jurisdiction."). In light of this Court's previous rulings in nearly identical cases, to which Plaintiff alerted Merck, and Merck's utter failure in its notice of removal to satisfy its burden to establish federal jurisdiction, this is not a close case. Plaintiff's motion (Doc. 6) is **GRANTED**, and this action is **REMANDED** to the Third Judicial Circuit Court, Madison County, Illinois, pursuant to 28 U.S.C. § 1447(c) for lack of subject matter jurisdiction. Plaintiff's request for fees and costs is granted, and he shall file his application on or before March 14, 2005.

**IT IS SO ORDERED.**

DATED: 2/17/05

s/ G. Patrick Murphy
G. PATRICK MURPHY
Chief United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 04-14335-CIV-MOORE

MARK TOMLIN and APRIL TOMLIN,

     Plaintiffs,

vs.                        **ORDER**

MERCK & CO., INC., KEVIN BEDELL,
and WALGREEN CO. d/b/a Walgreens,

     Defendants.

_____/

**CLOSED CIVIL CASE**

THIS CAUSE came before the Court upon Plaintiffs' Motion to Remand (DE #4) and Merck's Motion to Stay (DE #9).

UPON CONSIDERATION of the Motions, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

### MOTION TO STAY

Merck argues that the Court should stay all proceedings, including Plaintiffs' Motion to Remand, pending a decision by the Judicial Panel on Multi-district Litigation ("MDL") regarding whether to establish an MDL Court to hear all Vioxx related cases.[1] Plaintiffs oppose the Motion to Stay, and ask this Court to rule on their Motion to Remand before deciding whether a stay is appropriate. While the Court acknowledges that it has discretion to either resolve Plaintiffs' Motion to Remand, or to decline to decide the Motion to Remand and grant Merck's Motion to Stay, the Court chooses to reach the merits of Plaintiffs' Motion. In doing so the Court notes that other, factually similar cases removed by Merck to federal court based on fraudulent joinder have been remanded. See Irvin v. Merck & Co., Inc., Case No. 03-80514-CIV-HURLEY; Kozic v.

---

[1] Merck argues that a stay is appropriate because five other Vioxx cases have already been stayed in the Southern District of Florida, and that those decisions "make clear the necessity of a stay here." Mot. to Stay at 6-7. However, it appears from a review of those cases that one of them is a class action, and that the plaintiffs in the other four cases did not oppose a stay. Therefore, contrary to Merck's contentions, these cases do not make clear the necessity of a stay because they present different factual circumstances than the instant case.

1

Merck & Co., Inc., Case No. 8:04-CV-324-T-27TBM (M.D. Fla. Aug. 9, 2004). Merck attempts to distinguish these cases by arguing that, at the time they were remanded, no MDL had been requested. This attempt is disingenuous at best, and only serves to obscure the real issue before this Court of whether Merck should have removed this case based on fraudulent joinder in light of the prior remands in factually similar cases. Accordingly, Merck's Motion to Stay is DENIED and the Court will address the merits of Plaintiffs' Motion to Remand.

## MOTION TO REMAND

### I.    BACKGROUND

Plaintiff originally filed this case on November 5, 2004, in the Circuit Court of the Nineteenth Judicial Circuit in and for St. Lucie County, Florida, Case No. 56-2004-CA-001523. Merck filed a Notice of Removal on December 1, 2004, alleging diversity of citizenship pursuant to 28 U.S.C. § 1332, on the basis that Plaintiffs had fraudulently joined defendant Kevin Bedell, and therefore his Florida citizenship should be ignored for purposes of diversity jurisdiction. Plaintiffs then filed a Motion to Remand, arguing that the joinder of Bedell was not fraudulent, and consequently, this Court lacks subject matter jurisdiction to hear the case.

### II.    LEGAL STANDARD

#### A.    Motion to Remand

A federal district court must remand to state court any case that was removed improperly or without the necessary jurisdiction. Campos v. Sociedad Aeronautica De Medellin Consolidada, S.A., 882 F. Supp. 1056, 1057 (S.D. Fla. 1994). In deciding a motion to remand, a district court "must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff." Crowe v. Coleman, 113 F.3d 1536, 1539 (11th Cir. 1997). "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court

2

must find that the joinder was proper and remand the case to state court." Cooker v. Amoco Oil Co., 709 F. 2d 1433, 1440 (11th Cir. 1983). This strict construction of removal statutes prevents "exposing the plaintiff to the possibility that they may win a final judgement in federal court, only to have it determined that the court lacked jurisdiction..." Crowe, 113 F. 3d at 1538.

### B.    Fraudulent Joinder

Merck's removal of this case to federal court was based upon its claim of fraudulent joinder. When a case is removed based on fraudulent joinder, the " removing party bears the burden of proving that the joinder of the resident defendant was fraudulent." Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir.1989)(citations omitted). The burden on the defendant is a "heavy one." Crowe, 113 F 3d at 1538. In order to satisfy this burden, the defendant must establish either that the jurisdictional facts were fraudulently alleged, or that there is "no possibility that plaintiff can establish any cause of action against the resident defendant." Id. "The fact that the plaintiffs may not ultimately prevail against the individual [non-diverse] defendants ... does not mean that the plaintiffs have not stated a cause of action for purposes of the fraudulent joinder analysis." Pacheco de Perez .v. AT&T Co., 139 F.3d 1368, 1380 (11th Cir. 1998). Furthermore, in a fraudulent joinder inquiry, the court is not to weigh the merits of the plaintiffs' claims "... beyond determining whether it is an arguable one under state law." In this analysis, the court is to look at plaintiff's pleadings at the time of removal. Cabalceta, 883 F.2d 1553, 1561.

### III.    DISCUSSION

Plaintiffs argue that a remand is necessary because they have a valid cause of action under Florida law against Bedell, and therefore his citizenship cannot be disregarded. In response, Merck argues that the "issue present here... is whether the pleading was sufficient to allege misrepresentations." Resp. at 18. Accordingly, Merck's arguments against remand, and in support

3

of removal, are based on the viability of Plaintiffs' complaint, rather than on whether Florida law generally provides for a cause of action against pharmaceutical sales representatives.[2] As a result, in deciding whether a remand is appropriate, the Court must determine whether Plaintiffs have provided sufficient allegations within their complaint to support any of the claims against Bedell.

Plaintiffs' complaint asserts three causes of action against the non-diverse defendant, Bedell: Count II for negligence, Count III for negligent misrepresentation, and Count IV for fraud. In order for Plaintiffs to prevail on their Motion to Remand, it is only necessary that they state one viable claim under Florida law against Bedell. Estate of Ayres v. Beaver, 48 F. Supp. 2d 1335, 1342 (M.D. Fla. 1999).

Plaintiffs' negligence claim against Bedell includes the following allegations: (1) that Bedell was a sales representative, detail person, or sales manager employed by Merck to promote, sell, distribute and encourage physicians, including Plaintiff's physician, to prescribe Vioxx;(2) that Bedell had a continuing duty to warn Plaintiff and/or Plaintiff's physician in a timely manner about the potential risks and complications associated with Vioxx; (3) that Becell knew or should have known that Vioxx caused unreasonably dangerous risks and side effects; (4) that Bedell failed to adequately and appropriately warn prescribing physicians of the significant risks of cardiovascular events associated with the use of Vioxx; (5) that Plaintiff suffered a heart attack in December of 2003; and (6) that such heart attack was the direct and legal result of the negligence of Bedell. See Pl. Compl. at 2-12.[3]

---

[2] Under Florida law, a pharmaceutical sales representative can be held liable for damages resulting from a patients use of a drug. See Albertson v. Richardson-Merrell, Inc., 441 So. 2d 1146 (Fla. Dist. Ct. App. 1983)(holding that drug manufacturer and individual who promoted drug to medical profession could be held liable for damages resulting from patients use of drug).

[3] Plaintiffs' complaint contains several additional allegations regarding claims for negligent misrepresentation and fraud. However, because the complaint contains sufficient allegations to support their negligence claim against Bedell, the Court need not address the sufficiency of the additional claims.

In light of these allegations, Plaintiffs have stated an arguable claim for negligence under Florida law against Bedell. As a result, Merck has failed to meet its burden of proving that the joinder of Bedell was fraudulent. Therefore, because Bedell and Plaintiffs are Florida residents, there is not complete diversity and this Court lacks jurisdiction to hear this case.

### IV.    CONCLUSION

Based on the foregoing it is ORDERED AND ADJUDGED as follows:

1) Merck's Motion to Stay (DE #9) is **DENIED**;

2) Plaintiffs' Motion to Remand (DE #4) is **GRANTED**, based on lack of subject matter jurisdiction;

3) This case is remanded to the Circuit Court of the Nineteenth Judicial Circuit in and for St. Lucie County, Florida;

4) In light of Merck's prior notice that Plaintiffs' claim against a pharmaceutical representative was viable under Florida law, Plaintiffs may, pursuant to 28 U.S.C. § 1447(c), move this Court for costs and expenses incurred as a result of Merck's removal;

5) This case is **CLOSED**.

DONE AND ORDERED in Chambers at Miami, Florida, this 18th day of February, 2005.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record

5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**FRANKFORT**

|  |  |  |
|---|---|---|
| | ) | |
| VIRGINIA A. HENDERSHOT, ET AL., | ) | Civil Action No. 3:05-70-JMH |
| RICHARD D. SOUTHWORTH, | ) | Civil Action No. 3:05-73-JMH |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **ORDER** |
| v. | ) | |
| | ) | |
| | ) | |
| MERCK & CO., INC., ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

** ** ** ** ** ** ** ** **

These matters are before the Court on the above-named Plaintiffs' motions to remand their cases to state court. These cases arise out of harm to Plaintiffs allegedly caused by Vioxx, and each complaint alleges product liability claims against Merck and negligence claims against the physicians who prescribed Vioxx to Plaintiffs.[1] All responses and replies having been filed, these matters are now ripe for review.

## I. BACKGROUND

*A.   Procedural Background*

Plaintiffs filed these actions in various state courts, and Defendant Merck removed them, claiming that the Court has subject

_____

[1]    Some of these cases also include claims against the physicians' employers, but as these claims are entirely derivative of the claims against the physicians, they need not be considered separately.   In addition, Plaintiffs make claims against drug representatives named as John Does.   These fictitious defendants will be disregarded for purposes of this motion.

matter jurisdiction based on diversity.  *See* 28 U.S.C. § 1441(a); 28 U.S.C. § 1332(a).  Plaintiffs are citizens of Kentucky, Merck is a citizen of New Jersey under 28 U.S.C. § 1332(b), and the amount in controversy exceeds the jurisdictional minimum.  The physicians named in each of the state-court complaints are citizens of Kentucky, and thus according to Plaintiffs the presence of these non-diverse defendants destroys diversity.  Merck contends that the physicians were fraudulently joined solely for the purposes of avoiding federal jurisdiction.

B.    *The Complaints Against Merck*

Plaintiffs make a number of allegations in their complaints, most of which are directed at Merck.[2]  Plaintiffs allege that Merck actively concealed the cardiovascular risks of Vioxx from both the medical community and the public at large, and they include a "Vioxx Timeline" that describes the relevant studies, articles, and FDA actions regarding Vioxx.  According to the complaints, even before Vioxx was approved, there were both human and animal studies indicating that COX-2 inhibitors increase cardiovascular risks.  In March of 2000, Merck revealed the initial results of the Vioxx Gastrointestinal Outcomes Research (the "VIGOR" study), which showed that Vioxx had twice the rate of serious cardiovascular

---

[2]    The complaints are nearly identical, with only the names and some of the dates changed.

2

events as a comparator drug, Naproxen.[3]

In January of 2001, an FDA advisory panel recommended that Merck change the labeling on Vioxx to reflect the cardiovascular risk, a step that Merck took in April of 2002. In the interim, the Journal of the American Medical Association had published a study again showing an increase in cardiovascular risk as compared to Naproxen, and a number of healthcare providers asked Merck to conduct tests on the cardiovascular risks associated with Vioxx. Eventually, in September of 2004, Merck pulled Vioxx from the market.

Plaintiffs assert that throughout this process Merck both concealed and actively misrepresented the true dangers of Vioxx. The claims asserted against Merck include negligence, strict liability, failure to warn, false advertising, and breach of various warranties.

C.    The Claims Against the Physicians

The claims against the physicians are negligence claims. Plaintiffs incorporate their history of the emerging knowledge of the dangers of Vioxx and claim that the physicians knew or should have known of the cardiovascular risks, failed to adequately

---

[3]    The complaint does not reveal to whom or in what medium these initial results were revealed. Plaintiffs also allege that when the final results of the VIGOR study appeared in the New England Journal of Medicine, Merck failed to disclose the cardiovascular risk. Although the circumstances of the initial release of data are unclear, at this stage all ambiguities must be resolved in favor of Plaintiffs, as further discussed below.

consider those risks, and failed to obtain informed consent. Other than the facts that the named physicians treated Plaintiffs and prescribed Vioxx to them, the only allegations supporting the claims against the physicians are the history of the public knowledge of the dangers of Vioxx. Plaintiffs argue that this is sufficient to state a claim that the physicians knew or should have known of the dangers of Vioxx.

## II. ANALYSIS

A.    *Fraudulent Joinder*

A case can only be removed if it could have been originally brought in federal court, and as there is no federal question, jurisdiction is only proper if the parties are completely diverse and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1441(a); 28 U.S.C. § 1332. "[A] party seeking to bring a case into federal court carries the burden of establishing diversity jurisdiction." *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999) (internal quotation marks omitted).

The only issue is whether the non-diverse physicians were fraudulently joined.[4] The burden is on Merck to show fraudulent

---

[4]    Plaintiffs also argue that removal was defective because Merck failed to obtain the consent of all defendants to removal. While the statutes authorizing removal do not explicitly state that removal can be effected only with the consent of all defendants, the case law is clear that all named defendants must either join in the notice of removal or file notices demonstrating consent to removal. *See, e.g.*, *Brierly v. Alusuisse Flexible Packaging, Inc.*, 184 F.3d 527, 533-34 (6th Cir. 1999). However, a removing defendant need not obtain the consent of parties who are

4

joinder, and as with any dispute over removal, all doubts are to be resolved against removal. *See Brierly v. Alusuisse Flexible Packaging, Inc.*, 184 F.3d 527, 534 (6th Cir. 1999); *Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 949 (6th Cir. 1994). "To prove fraudulent joinder, the removing party must present sufficient evidence that a plaintiff could not have established a cause of action against non-diverse defendants under state law." *Coyne*, 183 F.3d at 493.

The Sixth Circuit has held that "if there is a colorable basis for predicting that a plaintiff *may* recover against non-diverse defendants, th[e] Court *must remand* the action to state court." *Id.* (emphasis added); *see also Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.*, 176 F.3d 904, 907 (6th Cir. 1999) ("[T]he inquiry is whether [plaintiff] had at least a colorable cause of action."). Any ambiguities in the relevant state law must be taken in the light most favorable to Plaintiffs. *See Alexander*, 13 F.3d at 949. Thus, the question before the Court is not whether Plaintiffs will prevail at trial on their claims against the physicians. The question is not even whether the Court believes that the physicians were in fact joined to defeat diversity. *See Jerome-Duncan*, 176 F.3d at 907 (holding that a plaintiff's motive in joining a non-

---

fraudulently joined. *See Constant v. Wyeth*, 352 F. Supp. 2d 847, 849 (M.D. Tenn. 2003). Accordingly, whether removal was defective based on a lack of consent is entirely dependent on whether the non-diverse physicians were fraudulently joined, and it need not be addressed separately.

diverse defendant is "immaterial to our determination regarding fraudulent joinder"). The question is whether, resolving all ambiguities in favor of Plaintiffs, Merck has shown that there is no colorable basis for predicting that Plaintiffs could prevail in state court.

Several courts have noted that the standard for a defendant to show fraudulent joinder is even higher than the standard for succeeding on a motion to dismiss under Rule 12(b)(6). *See Little v. Purdue Pharma, L.P.*, 227 F. Supp. 2d 838, 845-46 (S.D. Ohio 2002) (citing *Batoff v. State Farm Ins. Co.*, 977 F.2d 848 (3d Cir. 1992); *Hartley v. CSX Transp, Inc.*, 187 F.3d 422 (4th Cir. 1999)). As the Third Circuit has noted, "it is possible that a party is not fraudulently joined, but that the claim against that party ultimately is dismissed for failure to state a claim upon which relief may be granted." *Batoff*, 977 F.2d at 852. "[T]he benefit of the doubt given a plaintiff as part of the fraudulent joinder inquiry should be more deferential than even that given under Rule 12(b)(6). . . . [A] decision overruling a motion for remand where the defendant is claiming fraudulent joinder connotes that a plaintiff's claim, as to the non-diverse defendants, has no basis in law or reason." *Little*, 227 F. Supp. 2d at 846-47; *see also Batoff*, 977 F.2d at 852 (holding that a party is not fraudulently joined if the claims against them are not "wholly insubstantial and frivolous").

6

Merck makes two principal arguments in support of fraudulent joinder. First, Merck argues that Plaintiffs' claims against the physicians are wholly conclusory. Second, Merck argues that Plaintiffs' claims against the physicians are inconsistent with their allegations against Merck. As the fraudulent joinder inquiry depends on whether Plaintiffs have stated a colorable claim against the non-diverse defendants in state court, *see Coyne*, 183 F.3d at 493, the Court must assess Plaintiffs' complaints in light of Kentucky law, and to this the Court now turns.[5]

B.    *Conclusory Pleadings*

It is no doubt true, as Merck points out, that the complaints are long on allegations of wrongdoing by Merck and short on allegations against the physicians. From this fact Merck would have the Court draw the conclusion that the complaints are so deficient and conclusory that the physicians must be fraudulently joined. Therefore, the Court must determine whether the complaints state sufficient facts to sustain a claim against the doctors under Kentucky law.

"The elements of a medical malpractice claim are generally:

---

[5]    There are pending motions to stay in these cases, and Merck has argued that the issue of fraudulent joinder should be determined after transfer to MDL. However, as the determination of whether the physicians have been fraudulently joined depends on whether Plaintiffs have stated a claim under state law, *see Coyne*, 183 F.3d at 493, the MDL court would have to make fifty separate determinations. Although courts have gone both ways on this issue, this Court believes that it is in the interest of efficiency to rule on the motion to remand before transfer.

(1) duty; (2) breach of duty; (3) causation; and (4) injury."
*Gordon v. Kemper*, 2005 WL 678535 at *2 (Ky. App. Mar. 25, 2005);
*see also Wheeler v. Baptist Healthcare Sys.*, Inc., 14 Fed. App. 559
(6th Cir. 2001). A physician has a duty to use the same degree of
care and skill as would be expected of a reasonably competent
physician in similar circumstances. *See Mitchell v. Hadl*, 816
S.W.2d 183, 185 (Ky. 1991). Kentucky recognizes a physician's
failure to obtain informed consent as an actionable form of
negligence. *See Hawkins v. Rosenbloom*, 17 S.W.2d 113, 118-19 (Ky.
App. 1999).

Plaintiffs' complaints allege that the cardiovascular risks
associated with COX-2 inhibitors had been shown in both human and
animal studies before Vioxx's approval, and that public information
about the cardiovascular risks of Vioxx came out, notwithstanding
Merck's attempts to conceal the risks, from March of 2000 through
the time Vioxx was pulled from the market in September of 2004.
According to Plaintiffs, this means that at least at some point
during this period, the physicians knew or should have known of the
risks of Vioxx and should have disclosed the risks to Plaintiffs.
Plaintiffs allege that the physicians prescribed Vioxx and that
this was a proximate cause of the harm.

Kentucky's Civil Rules, like the Federal Rules of Civil
Procedure, require only that a plaintiff state a claim with
sufficient specificity so that defendants receive fair notice of

8

the claims against them.    As the Kentucky Court of Appeals explained, "[u]nder the theory of 'notice' pleading adopted by the Civil Rules a complaint will not be dismissed for failure to state a claim unless it appears to a certainty that the plaintiff would not be entitled to relief under any state of facts which could be proved in support of his claim.    *It is immaterial whether the complaint states 'conclusions' or 'facts' as long as fair notice is given.*"  *Pierson Trapp Co. v. Peak*, 340 S.W.2d 456, 460 (Ky. 1960) (emphasis added and internal citations omitted); *see also Morris v. Cabinet for Families & Children*, 69 S.W.3d 73, 74 (Ky. 2002) ("The principal objective of a pleading is to give fair notice to the opposing party.").    "[T]he Rules of Civil Procedure with respect to stating a cause of action should be liberally construed and . . . much leniency should be shown in construing whether a complaint . . . states a cause of action."  *Smith v. Isaacs*, 777 S.W.2d 912, 915 (Ky. 1989) .

Vague and conclusory though Plaintiffs' allegations may be, Plaintiffs have met the standard required for pleading negligence. Plaintiffs have alleged a breach of the physicians' duty by failing to know, failing to consider, and failing to inform the patient of the risks of Vioxx as a reasonable physician would have. Plaintiffs have alleged that they were injured and that this injury was caused in part by the physicians' failure to meet their duty.

There are sufficient facts alleged such that the physicians

9

would have fair notice of the claims and be able to frame an answer. A physician could answer by stating that he or she was unaware of the dangers and that a reasonable physician would not have encountered the information described in the complaint until after harm had already befallen their patients. The physician might even be right, but what a reasonable physician would have known is surely a matter for the jury and not a matter for the Court on a motion to remand. As the complaints give the physicians fair notice of the claims against them, they will not be held insufficient merely because their allegations are phrased largely as conclusions rather than as facts. *See Pierson Trapp Co.*, 340 S.W.2d at 460.

Moreover, even if the Court believed that the complaints against the physicians were too conclusory to state a claim, there is a remedy short of finding fraudulent joinder. As Judge Caldwell recently recognized in a well-reasoned opinion rejecting allegations of fraudulent joinder, if a complaint is too vague a defendant's remedy is to seek a more definite statement. *See Asher v. Minn. Mining & Mfg. Co.*, No-04-CV-522, 2005 WL 1593941, at *3 (E.D. Ky. June 30, 2005). In *Asher*, a defendant argued that the complaint lacked specificity in its claims against the non-diverse defendants and therefore that those defendants were fraudulently joined. Judge Caldwell rejected that argument, holding that "[t]he Defendants' proper recourse under Kentucky state law . . . would be

10

to request a more definite statement under CR 12.05. The Complaint would not be dismissed because of the alleged deficiencies."[6] *Id.*; *see also Little*, 227 F. Supp. 2d at 843 (remanding suit against drug manufacturer and non-diverse pharmacies even though "[t]he pleadings are general in their nature; the specifics few").

The Court cannot find that the allegations are so bereft of factual underpinnings that the physicians are fraudulently joined. Reading the complaints in the light most favorable to Plaintiffs, the allegations include facts that go to duty, breach, harm, and causation, and the Court believes that the defendant-physicians have received fair notice of the claims against them. If the physicians feel that the complaints are too conclusory, their remedy is to move for a more definite statement.[7]

---

[6]    In a similar fashion, the District Court for the Southern District of Ohio noted, in response to a claim that parties had been fraudulently joined, that a federal court should not deny remand based on factual deficiencies in the pleadings when the Plaintiffs would have the opportunity to amend their complaints in state court. *See Little*, 227 F. Supp. 2d at 847; Ky. R. Civ. P. 15.01 (following Fed. R. Civ. P. 15(a) and directing that leave to amend "be freely given when justice so requires").

[7]    Merck has noted that this Court has found fraudulent joinder in somewhat similar cases in the past. *See Sires v. Eli Lilly & Co.*, No. 5:05-CV-117, 2005 WL 1239636 (E.D. Ky. May 24, 2005); *Salisbury v. Purdue Pharma, L.P.*, 166 F. Supp. 2d 546 (E.D. Ky. 2001). The complaints in those cases, however, were even more deficient than the complaints in this case. In *Sires*, the complaint failed even to allege that the defendant-physician had prescribed the drug at issue in the action, and in *Salisbury* the complaint did not include an allegation that the defendant pharmacies had sold the drug to the plaintiffs. The complaints in this case at least allege that the physicians prescribed Vioxx.

11

C.   *Inconsistent Pleadings*

Merck also argues that the claims against the physicians are inconsistent with the main thrust of the complaints, which is that Merck engaged in a program of concealing the risks of Vioxx from not only the public but from the medical community as well. According to Merck, if it is true that they concealed this information from the physicians, then it is impossible that Plaintiffs will be able to show that the physicians knew or should have known of the risks.

This argument fails for two reasons. First, giving Plaintiffs the benefit of all doubts, it is not clear that the allegations against Merck are necessarily inconsistent with the allegations against the physicians.  It is perfectly plausible that a drug manufacturer could engage in a pattern of concealing information about a drug's risks, and yet that a reasonable physician would still have known of the risks from the information that had come out.  Plaintiffs allege that certain information about the risks of Vioxx was publicly known at various times notwithstanding Merck's concealment, and that even aside from specific information about Vioxx, the cardiovascular risks associated with COX-2 inhibitors were known before the approval of Vioxx.

Second, the Kentucky Civil Rules, like the Federal Rules, allow alternative or inconsistent pleadings: "A party may . . . state as many separate claims . . . as he has regardless

12

of consistency." Ky. R. Civ. P. 8.05(2). Several courts have rejected the argument that it is a fatal flaw for a plaintiff to argue that a drug company withheld information from the medical community and at the same time that a physician should have known of the risks of a particular drug. *See, e.g., Collins v. Bacon*, No. 1:05-CV-211, 2005 WL 2429844 at *3 (E.D. Tenn. Sept. 30, 2005); *Lauderdale v. Merck & Co.*, No. 1:01-CV-418, 2002 WL 449423 at *2-3 (N.D. Miss. Feb. 4, 2002). Although other courts have ruled the other way on this issue, this Court does not find that the partial inconsistency in Plaintiffs' complaints means that Plaintiffs do not have a colorable claim against the physicians in state court.

### III. CONCLUSION

Although the complaints in these cases are not models of clarity, and the bulk of the allegations relate to the conduct of Merck, the Court cannot find that they are so deficient as to warrant a finding of fraudulent joinder. The burden on a defendant seeking to prove fraudulent joinder is high, and Merck has not met that burden. Plaintiffs state a claim against the non-diverse physicians that may be colorable in state court, and that is all that they must do for their motion to remand to be granted.

Accordingly, and for the foregoing reasons, **IT IS ORDERED:**

(1) That in **3:05-cv-70**, Plaintiffs' motion to remand [Record No. 8] be, and the same hereby is, **GRANTED**; that all other pending motions be, and the same hereby are, **DENIED AS MOOT**; that this

13

action be **REMANDED** to Franklin Circuit Court.

(2) That in **3:05-cv-73**, Plaintiffs' motion to remand [Record No. 10] be, and the same hereby is, **GRANTED**; that all other pending motions be, and the same hereby are, **DENIED AS MOOT**; that this action be **REMANDED** to Trimble Circuit Court.

This the 22nd day of December, 2005.



Signed By:

**Joseph M. Hood**

**United States District Judge**

14



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville MD 20857

APR 1 4 1997

**TRANSMITTED VIA FACSIMILE**

Ellen R. Westrick
Senior Director, Office of Medical/Legal
Merck & Co., Inc.
P.O. Box 4, WP37B-113
West Point, Pennsylvania  19486

Re:  **NDA 20-560**
     Fosamax (alendronate sodium tablets)
     MACMIS ID #4775

Dear Ms. Westrick:

This letter is in reference to Merck & Co. Inc.'s (Merck)
October 18, 1996, FDA Form 2253 submission for Fosamax of a
"Compare the Facts" Flashcard (#L7026-996).

The Division of Drug Marketing, Advertising and Communications
(DDMAC) has reviewed this flashcard and finds that it is
misleading and in violation of the Federal Food, Drug, and
Cosmetic Act.  Specifically, DDMAC objects to the following:

Risk Information

The flashcard is misleading because it fails to present important
risk information for Fosamax and thus lacks fair balance.  For
example, the flashcard fails to present the following risk
information:

     . Warning regarding reports of serious esophageal adverse
     experiences reported in patients receiving Fosamax and the
     need to discontinue therapy if symptoms develop.

     . Warning regarding important dosing and administration
     restrictions required for Fosamax therapy.



EXHIBIT
C

Ellen R. Westrick                                    Page 2
NDA 20-560, Fosamax

Further, the contraindications and risk information presented in
the footnote on the reverse side of the flashcard lack prominence
in relation to the efficacy information.

Superior Efficacy Claims

The flashcard includes a chart comparing selected points in the
prescribing information for Fosamax and Miacalcin.   The
statements "Demonstrated significant reductions in vertebral
fracture risk" and "Built bone in the hip as well as spine over
three years" are misleading because they imply superior efficacy
of Fosamax versus Miacalcin in the absence of substantial
evidence; i.e., data from adequate and well-controlled,
comparative trials.

Compliance Claims

The claims of superior compliance for Fosamax versus Miacalcin
discussed in the flashcard are misleading because the analysis is
based on an assumption of 14 days of therapy per 2 ml container.
However, Miacalcin vials actually contain an average of 18 doses.
The product labeling reference to 14 doses/vial is the minimum
number of doses contained in any vial.   Thus, Merck's analysis
understates the proportion of patients that fill their Miacalcin
prescriptions on time.

DDMAC requests that Merck immediately discontinue the
dissemination and use of these materials and other promotional
materials that contain similar themes.   DDMAC further requests
that Merck submit a written response to this letter no later than
April 28, 1997, outlining Merck's plan to comply with DDMAC's
request.

If Merck has any comments or questions, please contact the
undersigned at the Food and Drug Administration, Division of Drug
Marketing, Advertising and Communications, HFD-40, Rm. 17B-20,
5600 Fishers Lane, Rockville, MD  20857.

Ellen R. Westrick                                    Page 3
NDA 20-560, Fosamax

In all future correspondence related to this matter, please refer
to MACMIS ID #4775 and the NDA number.

                         Sincerely,

                         Anne Reb

                         Anne M. Reb, MS, NP
                         Regulatory Review Officer
                         Division of Drug Marketing,
                           Advertising and Communications

Ellen R. Westrick                                    Page 4
NDA 20-560, Fosamax


Comments: Lechter 12/12/96
Comments: Burke 12/12/96
Draft: Reb 12/18/96
Revised: Reb 12/24/96
Comments: Feather 12/31/96
Revised: Reb 12/31/96
Comments: Burke 12/31/96
Revised: Reb 1/2/97
Comments: Palmer 1/8/97
Comments: Palmer/O'Brien 1/10/97

Revised: Reb 1/13/97
Comments: O'Brien 2/3/97
Revised: Reb 3/28/97
Comment: Palmer 3/31/97
Comments/Concur: Palmer 4/9/97

CC:
HFD 40/NDA 20-560
HFD 40/Count/Palmer/Reb
HFD 510/NDA 20-560
HFD 510/Dutta/Hedin

MACMIS File ID #: 4775
Macmis type: LETT
Action code: VIOL
fOI: Releasable

Material ID # 45353
              L7026-996


fos1010.cha



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

_____

Food and Drug Administration
Rockville MD 20857

JUL - 2 1997

**TRANSMITTED VIA FACSIMILE**

Ellen R. Westrick
Senior Director, Office of Medical/Legal
Merck & Co., Inc.
P.O. Box 4, WP37B-113
West Point, Pennsylvania  19486

Re:  **NDA 20-560**
     Fosamax (alendronate sodium tablets)
     MACMIS ID #5575

Dear Ms. Westrick:

Reference is made to Merck & Co. Inc.'s (Merck) June 6, 1997, FDA
form 2253 submission for Fosamax.  This material consists of a
brochure customized for Blue Cross Blue Shield for Georgia
(#974652) titled "Are you one of 20 million American women with
osteoporosis."

The Division of Drug Marketing, Advertising and Communications
(DDMAC) has reviewed this material and has determined that it is
misleading and in violation of the Federal Food, Drug, and
Cosmetic Act and applicable regulations for the following
reasons:

.  The headline on page two, "Menopause is the single most
important cause of osteoporosis" is false because although
menopause is a factor contributing to the development of
osteoporosis, menopause alone does not cause osteoporosis.
Further, the headline is misleading because it overstates the
population eligible for therapy with Fosamax by implying that all
women develop osteoporosis at menopause.  DDMAC has commented on
this issue previously in our December 15, 1995, advisory letter
and most recently in our April 14, 1997, advisory letter for
Fosamax.

DDMAC requests that Merck immediately discontinue the
dissemination and use of this brochure and other promotional
materials that contain similar themes.  DDMAC requests that Merck
submit a written response to this letter no later than

Ellen R. Westrick                           Page 2
NDA 20-560, Fosamax

July 18, 1997, including Merck's plan to comply with DDMAC's
request.

If Merck has further comments or issues, please contact me at the
Food and Drug Administration, Division of Drug Marketing,
Advertising and Communications, HFD-40, Rm. 17B-20, 5600 Fishers
Lane, Rockville, MD  20857.

In all future correspondence related to this matter, please refer
to MACMIS ID #5575 and the NDA number.

                    Sincerely,

                    Anne M. Reb, MS, NP
                    Regulatory Review Officer
                    Division of Drug Marketing,
                       Advertising and Communications



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

---

Food and Drug Administration
Rockville MD 20857

**TRANSMITTED VIA FACSIMILE**

JUL 1 6 1999

Ms. Ellen R. Westrick
Senior Director
Office of Medical/Legal
U.S. Human Health
Merck & Co., Inc.
P.O. Box 4, WP37C-116
West Point, PA 19486

Re:  **NDA 20-560  Fosamax (alendronate sodium)**
     **NDA 21-042  Vioxx (rofecoxib)**

     **MACMIS ID # 8086**

Dear Ms. Westrick:

As part of its routine monitoring program, the Division of Drug Marketing, Advertising, and Communications (DDMAC) has become aware of promotional materials for Fosamax (alendronate sodium) and Vioxx (rofecoxib) that are lacking in fair balance or otherwise misleading. Reference is made to two direct-to-consumer (DTC) Broadcast Advertisements for Fosamax (MISC-FOS-8PR98), submitted under cover of Form FDA 2253 on June 9, 1999.  Reference is also made to a DTC Print Ad for Vioxx, appearing in the July 7, 1999, issue of the *El Nuevo Dia*. The publication of these materials by Merck & Company, Inc. (Merck) violates the Federal Food, Drug, and Cosmetic Act (Act) and its implementing regulations. DDMAC requests that the use of the above referenced material and those containing the same or similar violations cease immediately.

**Reminder Advertisements**

Reminder advertisements call attention to the name of the drug product, but may not contain written, printed, or graphic matter containing representations or suggestions relating to the advertised drug product.

Ms. Ellen R. Westrick                                          Page 2
Merck & Co., Inc.

<u>Fosamax : Broadcast Ad-Script #3 "Women"</u>

This advertisement in its entirety makes a representation or suggestion about
Fosamax. The pictorial presentation of an active, menopausal or postmenopausal
woman swimming coupled with the statements, "I don't feel I have changed and
I certainly don't want my life to change" and "Discover Fosamax" makes a
representation or suggestion about the use of Fosamax.

<u>Vioxx : DTC Print Ad</u>

This advertisement in its entirety makes a representation about Vioxx. The
pictorial presentation of a hand (an X-ray image with superimposed red markings
at the joints) makes a representation or suggestion about the use of Vioxx.

Therefore, DDMAC considers both advertisements to be full product ads and in
violation of the Act for the following reasons:

- they fail to provide adequate information regarding the product's
  approved indication and usage,
- they fail to include risk information,
- they fail to present a brief summary of necessary information related to
  side effects, contraindications, and effectiveness, or provide adequate
  provision for the dissemination of full product labeling in connection with
  the broadcast ad.

**Fosamax : Broadcast Ad-Script #2 "No title"**

DDMAC considers this ad to be a product specific ad, because the advertisement
in its entirety clearly identifies Fosamax. Although this ad does not mention
Fosamax directly, the statement, "But there is a medication with the power to
rebuild bones and reduce the risk of fractures" implicates only Fosamax as the
drug with both of these particular effects. Therefore, DDMAC considers this
advertisement to be a full product ad and in violation of the Act for the following
reasons:

- it fails to provide the name (proprietary and established) of the drug,
- it fails to provide adequate information regarding Fosamax's approved
  indication and usage,
- it fails to include risk information,
- it fails to present a brief summary of necessary information related to side
  effects, contraindications, and effectiveness, or provide adequate
  provision for the dissemination of full product labeling in connection with
  the broadcast ad.

Ms. Ellen R. Westrick                                                    Page 3
Merck & Co., Inc.

Merck should immediately cease using these and all other promotional materials
for Fosamax and Vioxx that contain the same or similar claims or presentations.
Merck should submit a written response to DDMAC, on or before July 30, 1999,
describing its intent and plans to comply with the above.  In its letter to DDMAC,
Merck should include a list of all promotional materials that were discontinued,
and the discontinuation date.

Merck should direct its response to the undersigned by facsimile at (301) 594-
6771, or by written communication at the Division of Drug Marketing,
Advertising, and Communications, HFD-40; Room 17B-20; 5600 Fishers Lane;
Rockville, MD 20857.  DDMAC reminds Merck that only written communications
are considered official.

In all future correspondence regarding this matter, please refer to
MACMIS#8086, NDA 20-560, and NDA 21-042.

                         Sincerely,

                         Michael A. Misocky R.Ph., J.D.
                         Regulatory Review Officer
                         Division of Drug Marketing,
                            Advertising, and Communications

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville, MD 20857

**TRANSMITTED BY FACSIMILE**

Ellen R. Westrick
Executive Director, Office of Medical/Legal
Merck & Co., Inc.
UG3BC-10
P.O. Box 1000
North Wales, PA 19454-1099

RE:    NDA# 20-560
       **Fosamax (alendronate sodium tablets)**
       **MACMIS ID # 9727**

Dear Ms. Westrick:

As part of its routine monitoring and surveillance program, the Division of Drug Marketing, Advertising, and Communications (DDMAC) has become aware of the Fosamax web site www.FOSAMAX.com (6-20-01) disseminated by Merck & Co., Inc. (Merck) which promotes this drug product in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and its implementing regulations. Specifically, we object because the web site overstates the benefits of Fosamax while minimizing the risks associated with the drug.

**Overstatement of Benefit**

In the patient information section of the Fosamax web site, each web page has the same side bar on the left side of the page. The side bar consists of links to other web pages within the Fosamax web site. One link is titled "Preserving Your Independent Lifestyle." Use of this phrase in the context of product-specific promotional materials misleadingly implies an outcome of Fosamax treatment that has not been demonstrated by substantial evidence. Therefore, this claim is misleading because it overstates the potential benefit of Fosamax. Previous correspondence, dated October 4, 2000, addressed this concept in our response to your request for comment.

The information provided regarding the use of Fosamax in conjunction with Estrogen/Hormone Replacement Therapy (ERT/HRT) which appears in the patient information portion of the web site is misleading because it does not include facts material in light of representations made. For example, you provide information that "In clinical studies, the combination of FOSAMAX and ERT/HRT increased bone density more than either FOSAMAX or HRT alone." This presentation is misleading without the additional contextual information from the approved product labeling (PI) that no significant effect was seen for total body bone mineral density (BMD) or that the long-term effects of combined Fosamax and HRT on fracture occurrence and fracture healing have not been studied.

Westrick
Merck
NDA 20-560

Page 2

## Inadequate Communication of Risk Information

The "Product Highlights" section of the healthcare professional portion of the web site is further divided into headings entitled "Efficacy," "Proven Tolerability," and "Indications." Presenting risk information under the heading "Proven Tolerability" minimizes the serious adverse effects associated with Fosamax therapy. According to the PI, these effects include cases of severe esophageal adverse reactions requiring hospitalization. Previous correspondence, dated December 20, 2000, and January 18, 2001, addressed this concept in our response to your request for comment.

The warning that patients should discontinue Fosamax and seek medical attention if they develop signs or symptoms signaling a possible esophageal reaction is incomplete because it does not include new or worsening heartburn. Therefore, the presentation is misleading because it is inconsistent with the PI in regard to this important warning. Previous correspondence, dated December 20, 2000, addressed this concept in our response to your request for comment.

The reference to inclusion of "Up to 54% of patients with a history of GI disorders at baseline" in the postmenopausal osteoporosis treatment studies is misleading. It does not convey the material information that patients who had a history of major upper GI tract disease were excluded from the studies. Previous correspondence, dated October 23, 2000, addressed this concept in our response to your request for comment.

DDMAC requests that Merck immediately discontinue the violative portions of the web site and all other promotional materials that contain the same or similar violative claims or representations. DDMAC requests that Merck submit a written response to this letter no later than July 5, 2001, including your plan to comply with DDMAC's request. Your written response should include a list of all materials that you have discontinued and the date that they were discontinued.

If you have any questions or comments, please contact me by facsimile at (301) 594-6771, or at the Food and Drug Administration, Division of Drug Marketing, Advertising, and Communications, HFD-42, rm. 17B-20, 5600 Fishers Lane, Rockville, MD 20857. DDMAC reminds you that only written communications are considered official. In all future correspondence regarding this particular matter, please refer to MACMIS ID #9727 in addition to the NDA number.

Sincerely,

*{See appended electronic signature page}*

Margaret M. Kober, R. Ph.
Regulatory Review Officer
Division of Drug Marketing,
Advertising, and Communications

This is a representation of an electronic record that was signed electronically and
this page is the manifestation of the electronic signature.

/s/
----------------------
Margaret Kober
6/20/01 01:18:09 PM

CLINICAL ARTICLES

# Osteonecrosis of the Jaws Associated With the Use of Bisphosphonates: A Review of 63 Cases



EXHIBIT
D

*Salvatore L. Ruggiero, DMD, MD,\* Bhoomi Mehrotra, MBBS,†*
*Tracey J. Rosenberg, DMD, MD,‡*
*and Stephen L. Engroff, DDS, MD§*

**Purpose:** Bisphosphonates are widely used in the management of metastatic disease to the bone and in the treatment of osteoporosis. We were struck in the past 3 years with a cluster of patients with necrotic lesions in the jaw who shared 1 common clinical feature, that they had all received chronic bisphosphonate therapy. The necrosis that was detected was otherwise typical of osteoradionecrosis, an entity that we rarely encountered at our center, with less than 2 patients presenting with a similar manifestation per year.

**Patients and Methods:** We performed a retrospective chart review of patients who presented to our Oral Surgery service between February 2001 and November 2003 with the diagnosis of refractory osteomyelitis and a history of chronic bisphosphonate therapy.

**Results:** Sixty-three patients have been identified with such a diagnosis. Fifty-six patients had received intravenous bisphosphonates for at least 1 year and 7 patients were on chronic oral bisphosphonate therapy. The typical presenting lesions were either a nonhealing extraction socket or an exposed jawbone; both were refractory to conservative debridement and antibiotic therapy. Biopsy of these lesions showed no evidence of metastatic disease. The majority of these patients required surgical procedures to remove the involved bone.

**Conclusions:** In view of the current trend of increasing and widespread use of chronic bisphosphonate therapy, our observation of an associated risk of osteonecrosis of the jaw should alert practitioners to monitor for this previously unrecognized potential complication. An early diagnosis might prevent or reduce the morbidity resulting from advanced destructive lesions of the jaw bone.
© *2004 American Association of Oral and Maxillofacial Surgeons*

*J Oral Maxillofac Surg 62:527-534, 2004*

Cancer patients with metastatic bone lesions often present with a multitude of complications that in-

\*Chief, Division of Oral and Maxillofacial Surgery, Long Island Jewish Medical Center, New Hyde Park, NY.

†Attending, Division of Hematology and Oncology, Long Island Jewish Medical Center, New Hyde Park, NY.

‡Former Chief Resident, Division of Oral and Maxillofacial Surgery, Long Island Jewish Medical Center, New Hyde Park, NY.

§Fellow, Department of Dentistry and Oral and Maxillofacial Surgery, University of Maryland Medical Systems, Baltimore, MD.

Address correspondence and reprint requests to Dr Ruggiero: Division of Oral and Maxillofacial Surgery, Long Island Jewish Medical Center, New Hyde Park, NY 11040; e-mail: ruggiero@lij.edu

© 2004 American Association of Oral and Maxillofacial Surgeons
0278-2391/04/6205-0077$30.00/0
doi:10.1016/j.joms.2004.02.004

clude pain, pathologic fracture, spinal cord compression, and hypercalcemia.[1] Bone metastases result in excess activation of osteoclasts mediated by a variety of cytokines produced by tumor cells.[2] Bisphosphonates are nonmetabolized analogues of pyrophosphate that are capable of localizing to bone and inhibiting osteoclastic function. Bisphosphonates bind avidly to exposed bone mineral around resorbing osteoclasts, resulting in very high levels of bisphosphonate in the resorption lacunae. Because bisphosphonates are not metabolized, these high concentrations are maintained within bone for long periods of time. Bisphosphonates are then internalized by the osteoclast, causing disruption of osteoclast-mediated bone resorption. Although exact mechanism of this bisphosphonate-mediated osteoclast inhibition has not been completely elucidated, it has been established that these compounds affect bone turnover at

various levels.[3] At the tissue level, bisphosphonates will inhibit bone resorption and decrease bone turnover as assessed by biochemical markers. The degree to which these compounds will also alter bone formation is related to their effects on bone turnover, which is closely coupled to bone formation. On a cellular level, the biphosphonates are clearly targeting the osteoclasts and may inhibit their function in several ways: 1) inhibition of osteoclast recruitment,[4] 2) diminishing the osteoclast life span,[5] and 3) inhibition of osteoclastic activity at the bone surface.[6] At a molecular level, it has been postulated that bisphosphonates modulate osteoclast function by interacting with a cell surface receptor or an intracellular enzyme.[7]

Despite the uncertainty regarding the exact mechanism of action of the bisphosphonates, their role in decreasing osteoclast-mediated lysis of bone has been well established in clinical trials.[1,8] The efficacy of these agents in reducing bone pain, hypercalcemia, and skeletal complications has been extensively documented in patients with advanced breast cancer and multiple myeloma.[9-12] Thus bisphosphonates are frequently administered to patients with osteolytic metastases, especially if there is risk for significant morbidity. Based on clinical practice guidelines established by the American Society of Clinical Oncology, the use of bisphosphonates is considered the standard of care for treatment of 1) moderate to severe hypercalcemia associated with malignancy and 2) metastatic osteolytic lesions associated with breast cancer and multiple myeloma in conjunction with antineoplastic chemotherapeutic agents.[13,14] More recently, the indication for bisphosphonate treatment was broadened to include osteolytic lesions arising from any solid tumor. This has resulted in a rampant use of these bisphosphonates in most medical oncology practices within the past several years.

Pamidronate, a first-generation bisphosphonate, is administered intravenously over a 2- to 24-hour period every 3 to 4 weeks at a dose of 90 mg. Zolendronic acid, the most potent bisphosphonate in clinical use, is the next-generation bisphosphonate that was recently approved for patients with metastatic breast cancer, multiple myeloma, hypercalcemia of malignancy, or Paget's disease of bone and for patients with documented bone metastases from any solid tumor (ie, prostate cancer, lung cancer). In comparison with pamidronate, zolendronic acid was significantly more effective in controlling hypercalcemia of malignancy and reducing the overall number of skeletal-related events.[15] Zolendronic acid is administered as a monthly infusion at a dose of 4 mg over a period of 15 minutes. If tolerated, it is not uncommon for these patients to be maintained on bisphosphonate therapy indefinitely. The oral bisphosphonate preparations (alendronate, risedronate) are also po-



**FIGURE 1.** Exposed necrotic maxillary bone in a patient receiving zolendronic acid for 6 months. The patient had posterior maxillary extractions performed 4 months earlier. (Courtesy of Dr Jay Neugarten, New Hyde Park, NY.)

tent osteoclast inhibitors, but they are not as efficacious in the treatment of malignant osteolytic disease and therefore are indicated only for the treatment of osteoporosis.

At the oral and maxillofacial surgery departments of our centers, we noted a growing number of patients referred for evaluation and management of "refractory osteomyelitis" of varying duration. The typical presentation was a "nonhealing" extraction socket or exposed jawbone with progression to sequestrum formation associated with localized swelling and purulent discharge. Up to this point, this rare clinical scenario was seen only at our centers in patients who had received radiation therapy and accounted for 1 or 2 cases per year. The lesions were refractory to conservative debridement procedures and antibiotic therapy (Fig 1). All involved sites had previously undergone biopsy to rule out metastatic disease. Despite clinical and radiographic similarities to osteoradionecrosis, none of the patients had received radiation therapy to the region surrounding the jawbones. Seven of the 63 patients had a diagnosis of osteoporosis with no history of malignancy. All other affected patients had a history of one of the following malignant diseases: breast cancer, multiple myeloma, prostate cancer, lung cancer, uterine leiomyosarcoma, plasmacytoma, and leukemia (Fig 2). All patients had radiographic or nuclear scan evidence of metastatic osteolytic bone lesions. All were actively receiving chemotherapy. The individual chemotherapeutic regimens varied widely in accordance with tumor type and character. However, all patients were receiving infusions of either pamidronate or zolendronic acid at monthly intervals (Fig 3). The duration of the bisphosphonate therapy at presentation ranged from 6 to 48 months. Fourteen patients studied had received pamidronate and had been subsequently switched to zolendronic acid.



**FIGURE 2.** Spectrum of diagnoses associated with exposed bone (n = 63).

## Patients and Methods

In accordance with the office of the Institutional Review Board, a chart review was performed on all oncology patients who presented with a diagnosis of osteonecrosis or osteomyelitis of the jaw. Patients who had a prior history of radiation therapy to the jaw region or neoplastic disease that directly involved the jaws were excluded from the review.

## Results

From February 2001 through June 2003, a total of 63 patient charts from Long Island Jewish Medical Center and The University of Maryland were identified and reviewed (Table 1). There were 45 female patients and 18 male patients ranging in age from 43 to 89 years (mean age, 62 years). The most common oncologic diagnoses at presentation were multiple myeloma (28 patients) and breast cancer (20 patients), followed by prostate cancer (3 patients), lung cancer (1 patient), uterine leiomyosarcoma (1 patient), plasmacytoma (1 patient), and leukemia (1 patient). Seven patients with a diagnosis of osteoporosis were taking bisphosphonates and had no history of malignant disease or chemotherapy exposure (patients 35-37, 40, 46, 47, and 56). Twenty-four patients (38%) presented with maxillary bone involvement (19 unilateral and 5 bilateral) and 40 (63%) had mandibular bone involvement (37 unilateral and 3 bilateral). Patient 15 presented with exposed and necrotic bone in all 4 quadrants. The typical presenting symptoms were pain and exposed bone at the site of a previous tooth extraction. However, 9 of the 63 patients (14%) had had no history of a recent dentoalveolar procedure and nevertheless presented with spontaneous exposure and necrosis of the alveolar bone. Radiographs routinely showed regions of mottled bone,

consistent with sequestrum formation (Figs 4, 5). Chronic maxillary sinusitis secondary to necrotic bone and an oroantral fistula were evident in several patients with posterior maxillary involvement (patients 2, 3, 5, 13, and 17). On microscopic examination, all of the specimens consisted of necrotic bone with associated bacterial debris and granulation tissue (Fig 6). Culture results consistently revealed normal oral flora. Six patients had radiographic signs of osteolysis before the extraction of teeth, which suggested involvement of the alveolar bone before extraction.

## MANAGEMENT

Minor debridement procedures under local anesthesia were attempted; however, a majority of the patients required surgical procedures to remove all of the involved bone. The procedures included 45 sequestrectomies, 4 marginal mandibular resections, 6 segmental mandibular resections, 5 partial maxillectomies, and 1 complete maxillectomy. Patients 1 and 2 received hyperbaric oxygen therapy (30 one-hour sessions) before undergoing a marginal mandibular resection of necrotic bone. However, despite the presence of vascularized bone at the resection margins, there has been progressive necrosis that will likely necessitate a segmental resection. Patients who showed regions of exposed and necrotic bone but were asymptomatic have been followed and treated conservatively with local wound care and irrigations. One patient with metastatic uterine leiomyosarcoma presented with a large sequestered segment of the right maxilla that had spontaneously exfoliated, resulting in a large oroantral communication. The cessation of bisphosphonate treatment has not had a major impact on the progression of this process. Five patients had persistent bone necrosis and even developed new regions of exposed bone despite being removed from bisphosphonate therapy by their oncologists.



**FIGURE 3.** Profile of bisphosphonate use within patient group.

530                                    BISPHOSPHONATES AND OSTEONECROSIS OF THE JAWS

**Table 1. PATIENT DATA**

| Patient No. | Gender | Age (yr) | Diagnosis | Bisphosphonate | Site of Necrosis | Treatment |
|---|---|---|---|---|---|---|
| 1 | F | 69 | Breast cancer | Pamidronate | Mandible | HBO, Marginal mandibulectomy |
| 2 | F | 65 | Breast cancer | Pamidronate | Mandible | Sequestrectomy |
| 3 | F | 62 | Breast cancer | Zolendronate | Maxilla (bilateral) | Total maxillectomy |
| 4 | F | 81 | Breast cancer | Pamidronate | Mandible (pathologic fracture) | Segmental mandibulectomy |
| 5 | F | 62 | Breast cancer | Pamidronate | Mandible | Marginal mandibulectomy |
| 6 | F | 66 | Breast cancer | Pamidronate | Bilateral mandible | Sequestrectomy |
| 7 | F | 63 | Breast cancer | Pamidronate | Maxilla | Partial maxillectomy |
| 8 | F | 56 | Breast cancer | Pamidronate | Mandible | Segmental mandibulectomy |
| 9 | F | 66 | Breast cancer | Pamidronate | Mandible (pathologic fracture) | Sequestrectomy |
| 10 | F | 73 | Breast cancer | Pamidronate, Zolendronate | Maxilla | Partial maxillectomy |
| 11 | F | 45 | Breast cancer | Pamidronate | Bilateral maxilla | Partial maxillectomy |
| 12 | F | 57 | Multiple myeloma | Pamidronate, Zolendronate | Mandible | Sequestrectomy (x3), segmental mandibulectomy |
| 13 | F | 59 | Multiple myeloma | Pamidronate | Maxilla | Partial maxillectomy |
| 14 | M | 75 | Multiple myeloma | Pamidronate | Mandible (pathologic fracture) | Segmental mandibulectomy |
| 15 | F | 70 | Multiple myeloma | Pamidronate | Bilateral maxilla and mandible (pathologic fracture) | Multiple sequestrectomies, segmental mandibulectomy |
| 16 | F | 71 | Multiple myeloma | Pamidronate | Mandible | Sequestrectomy |
| 17 | M | 65 | Multiple myeloma | Pamidronate | Mandible | Sequestrectomy, segmental mandibulectomy |
| 18 | F | 69 | Multiple myeloma | Pamidronate | Mandible (pathologic fracture) | Segmental mandibulectomy |
| 19 | M | 58 | Multiple myeloma | Pamidronate, Zolendronate | Mandible | Marginal mandibulectomy |
| 20 | F | 79 | Multiple myeloma | Pamidronate | Mandible | Conservative management |
| 21 | F | 71 | Multiple myeloma BMT | Pamidronate | Maxilla | Conservative management |
| 22 | F | 58 | Multiple myeloma | Pamidronate, Zolendronate | Maxilla | Partial maxillectomy |
| 23 | M | 63 | Lung cancer | Pamidronate | Maxilla | Sequestrectomy |
| 24 | M | 80 | Prostate cancer | Pamidronate | Bilateral maxilla | Sequestrectomy |
| 25 | F | 80 | Uterine sarcoma | Pamidronate | Maxilla | Partial maxillectomy (spontaneous) |
| 26 | M | 47 | CML BMT | Pamidronate | Mandible | Sequestrectomy |
| 27 | F | 76 | Breast cancer | Pamidronate | Mandible | Sequestrectomy |
| 28 | M | 76 | Prostate cancer | Pamidronate | Maxilla | Sequestrectomy |
| 29 | M | 58 | Multiple myeloma | Pamidronate | Maxilla | Sequestrectomy |
| 30 | F | 43 | Breast cancer | Pamidronate, Zolendronic acid | Mandible | Sequestrectomy |
| 31 | M | 78 | Prostate cancer | Pamidronate | Mandible | Sequestrectomy |
| 32 | M | 70 | Multiple myeloma | Pamidronate | Mandible | Sequestrectomy |
| 33 | M | 78 | Multiple myeloma | Pamidronate | Maxilla | Sequestrectomy |
| 34 | M | 85 | Multiple myeloma | Zolendronic acid | Mandible | Sequestrectomy |
| 35 | F | 77 | Osteoporosis | Alendronate | Bilateral mandible | Sequestrectomy |
| 36 | F | 82 | Osteoporosis | Alendronate | Maxilla | Sequestrectomy |
| 37 | F | 80 | Osteoporosis | Risedronate | Mandible | Sequestrectomy |
| 38 | M | 55 | Multiple myeloma | Pamidronate | Mandible | Sequestrectomy |
| 39 | F | 87 | Multiple myeloma | Pamidronate, Zolendronic acid | Mandible | Sequestrectomy |
| 40 | M | 72 | Osteoporosis | Alendronate, Zolendronic acid | Mandible | Sequestrectomy |

RUGGIERO ET AL    531

**Table 1. PATIENT DATA (Cont'd)**

| Patient No. | Gender | Age (yr) | Diagnosis | Bisphosphonate | Site of Necrosis | Treatment |
|---|---|---|---|---|---|---|
| 41 | M | 79 | Multiple myeloma | Pamidronate, Zolendronic acid | Mandible | Sequestrectomy |
| 42 | M | 66 | Multiple myeloma | Pamidronate, Zolendronic acid | Mandible | Sequestrectomy |
| 43 | M | 80 | Multiple myeloma | Pamidronate, Zolendronic acid | Maxilla | Sequestrectomy |
| 44 | M | 68 | Multiple myeloma | Zolendronic acid | Mandible | Sequestrectomy |
| 45 | M | 68 | Multiple myeloma | Pamidronate, Zolendronic acid | Mandible | Sequestrectomy |
| 46 | F | 59 | Osteoporosis | Alendronate | Mandible | Sequestrectomy |
| 47 | F | 60 | Osteoporosis | Alendronate | Mandible | Sequestrectomy |
| 48 | F | 56 | Breast cancer | Pamidronate | Mandible | Sequestrectomy |
| 49 | F | 89 | Breast cancer | Pamidronate | Maxilla | Sequestrectomy |
| 50 | F | 76 | Multiple myeloma | Pamidronate | Mandibular | Sequestrectomy |
| 51 | F | 43 | Breast cancer | Zolendronic acid | Maxilla | Sequestrectomy |
| 52 | F | 79 | Breast cancer | Zolendronic acid | Maxilla | Sequestrectomy |
| 53 | F | 82 | Breast cancer | Zolendronic acid | Maxilla | Sequestrectomy |
| 54 | M | 60 | Multiple myeloma | Pamidronate, Zolendronic acid | Maxilla | Sequestrectomy |
| 55 | F | 52 | Breast cancer | Zolendronic acid | Maxilla | Sequestrectomy |
| 56 | F | 68 | Osteoporosis | Alendronate | Mandible | Sequestrectomy |
| 57 | M | 73 | Multiple myeloma | Zolendronic acid | Maxilla | Sequestrectomy |
| 58 | M | 69 | Multiple myeloma | Zolendronic acid | Mandible | Sequestrectomy |
| 59 | F | 74 | Multiple myeloma | Pamidronate | Mandible | Sequestrectomy |
| 60 | M | 70 | Multiple myeloma | Pamidronate, Zolendronic acid | Mandible | Sequestrectomy |
| 61 | F | 48 | Breast cancer | Pamidronate, Zolendronic acid | Mandible | Sequestrectomy |
| 62 | M | 56 | Plasmacytoma | Pamidronate | Maxilla | Sequestrectomy |
| 63 | F | 58 | Breast cancer | Pamidronate | Mandible | Sequestrectomy |

Abbreviations: BMT, bone marrow transplant; CML, chronic myelogenous leukemia.

## Discussion

Based on these patients' respective histories, clinical presentations, and responses to surgical and antibiotic treatments, it appears that the pathogenesis of this osteonecrotic process is most consistent with localized vascular insufficiency. The lesion's clinical similarity to osteoradionecrosis, with compromised bone that sequestrates either spontaneously or after a minor procedure, followed by secondary infection, is striking. The incidence of osteonecrosis in our patient population who are not receiving bisphosphonates remains exceedingly low. In the past 3 years, only 4 patients had a similar clinical presentation. Three of



**FIGURE 4.** Panoramic radiograph of the mandible following extractions of left posterior teeth in a patient receiving pamidronate. The image shows the mottled bone in the region of the nonhealing extraction sites.



**FIGURE 5.** Axial computed tomography scan of the mandible of patient in Figure 2 showing regions of mottled bone and sequestrum.



**FIGURE 6.** Photomicrograph of necrotic bone shows empty lacunae. Sequestrum is surrounded by neutrophils and bacterial debris (hematoxylin and eosin stain, original magnification ×100).

these patients had prior radiation therapy for treatment of squamous carcinoma, and 1 patient had a diagnosis of florid osseous dysplasia. The relatively high percentage of cases with clinical involvement of the maxilla (24 of 63 patients) is unusual given that site's inherently rich vascular supply. In our opinion, the mechanism by which bisphosphonates could compromise bone vascularity may be related to its effect on the osteoclasts. The potent bisphosphonate-mediated inhibition of osteoclast function serves to decrease bone resorption and inhibit normal bone turnover remodeling, resulting in microdamage accumulation and a reduction in some mechanical properties of bone.[16] However, bone resorption and remodeling play an essential role in maintaining normal bone homeostasis. As osteoclasis occurs, there are a host of cytokines and growth factors released into the surrounding matrix that are essential for modulating new bone development. The inhibition of new bone formation can affect the quality of bone during growth and fracture healing. Metaphyseal sclerotic banding is a documented effect of periodic bisphosphonate treatment in growing children.[17,18] Whyte et al[19] reported a case of osteopetrosis that developed in a child receiving high-dose pamidronate over a 2-year period, where it was noted that endochondral bone was not remodeled and became encased within trabecular bone. In fracture repair, the bisphosphonate-mediated inhibition of bone remodeling results in a more profound and larger callus with no compromise in mechanical integrity.[20-22] Bisphosphonates also have shown effects unrelated to osteoclast inhibition. Pamidronate has been associated with an acute phase reaction characterized by fever and transient changes in various cytokine levels such as interleukin-6, tumor necrosis factor-α, C-reactive protein, and elastase.[23]

More important, pamidronate was reported to significantly depress bone blood flow in rats.[24,25] The mechanism of this effect may be attributable to a complex interaction of pamidronate with growth hormone and insulin-like growth factor I, both of which are thought to play a role in the regulation of blood circulation in bones. In a recent study, bisphosphonates were shown to inhibit endothelial cell function in vitro and in vivo.[26] Those cells treated with bisphosphonates showed decreased proliferation, an increased rate of apoptosis, and a decrease in capillary-tube formation.[26] In that same study, there was a marked reduction in the number of blood vessels in pagetic bone marrow after bisphosphonate treatment compared with pretreatment biopsy results. Bisphosphonates have also shown potent antiangiogenic properties due to their ability to significantly decrease circulating levels of vascular endothelial growth factor (a potent angiogenic factor) in breast cancer patients with bone metastases.[27] Wood et al[28] showed the antiangiogenic properties of bisphosphonates on several levels: 1) potent inhibitor of vessel sprouting in a chick embryo model and 2) potent inhibition of angiogenesis induced by subcutaneous implants impregnated with basic fibroblast growth factor in a murine model. These previously unrecognized antiangiogenic properties have generated interest in using bisphosphonates as potential antitumor agents.[29] Furthermore, these bisphosphonate properties could explain the apparent ischemic changes noted in our patients' mandibles and maxillas. These complications were not recognized during the trial stages of these drugs. This suggests that the ischemic effects may be cumulative in nature. The apparent selective involvement of the maxilla and mandible in these patients may be a reflection of the unique environment of the oral cavity. Typically, healing of an open bony wound (eg, extraction socket) in the presence of oral microflora occurs quickly and without infection. However, when the vascular supply of the mandible or maxilla is compromised by either radiation therapy or some other agent(s), then minor injury or disease in these sites is much more likely to develop into a nonhealing wound. That in turn can progress to widespread necrosis and osteomyelitis. Unlike patients with osteoradionecrosis, necrosis of the maxilla was common in bisphosphonate patients (38%) despite the inherently rich vascular supply of the maxilla. If, however, a blood-borne agent was responsible for the bone necrosis, the maxilla would certainly be at risk of developing disease, given the vascularity of the maxilla and its potential for increased exposure. The chemotherapeutic agents and steroid preparations taken by these patients can also affect wound healing and also must be considered as a possible etiologic factor. Another consideration is that these

chemotherapy agents act synergistically with bisphosphonates to promote bone necrosis. Despite these uncertainties in the underlying mechanisms, the temporal relationship of bisphosphonate treatment with the subsequent development of osteonecrosis becomes abundantly clear. Bisphosphonate treatment was the only common factor across all 63 patients. Moreover, 7 patients in this series receiving treatment for osteoporosis were taking bisphosphonates and had no history of malignant disease or exposure to chemotherapy.

The management of these patients with bisphosphonate-related osteonecrosis remains extremely difficult. Surgical debridements have not been completely effective in eradicating the necrotic bone and hyperbaric oxygen therapy has not been uniformly effective in limiting the progression of this process. It was often difficult, if not impossible, to obtain a surgical margin with viable bleeding bone. Therefore, surgical treatment should be reserved for those patients who are symptomatic. Regions of necrotic bone that are a constant source of infection and are not responsive to irrigations and antibiotic therapy should be removed. However, it is likely that the margin of the debridement will remain exposed. Symptomatic patients with pathologic mandibular fractures often require a segmental resection with a continuity defect and might require immediate reconstruction with a rigid plate. Reconstruction with free or vascularized bone and soft tissue grafts is not feasible given the likelihood that necrotic bone will be present or develop at the resection margin. Most patients with limited regions of exposed bone have been successfully managed with irrigations and antibiotic therapy.

The effect of bisphosphonates on dental implant osseointegration is unclear. In the ovariectomized rat model, Narai and Nagahata[30] reported that titanium implants placed in the femur of osteoporotic animals receiving alendronate had higher removal torque values than those animals who were not receiving bisphosphonate. However, dental implant failures attributable to oral bisphosphonate therapy have been reported in patients with osteoporosis.[31] The short- and long-term effects of bisphosphonates on dental implant osseointegration need to be established for those patients receiving the more potent bisphosphonates such as pamidronate and zolendronic acid. In light of these finding, clinicians should be aware of the potential for implant failure and delayed wound healing, especially in patients receiving intravenous bisphosphonates for malignant disease.

It has been well established that bisphosphonates are extremely effective in reducing the symptoms and complications of metastatic bone disease. Consequently, these drugs have had a profound impact on the quality of life for these patients. However, the jaw complications presented in this review have had a major negative effect on the quality of daily life for each of these patients. Although the etiology of this osteonecrotic process remains unclear, from our observations it does appear that bisphosphonates may be at least partially responsible. Because pamidronate and now zolendronic acid have become standard regimens for patients with breast cancer and multiple myeloma, awareness of this complication and its clinical significance is critical. At present, the potential relationship between bisphosphonates and osteonecrosis of the jaw remains unreported in refereed journals. There is emerging evidence from clinical observations and early clinical trials suggesting that adjuvant bisphosphonate treatment may have antitumor activity.[32] This would, in effect, broaden the indications for their use in the near future. Moreover, the prevalence of this potential complication is significant because most of the affected patients had jaw disease that was not detected by their medical oncologists. The diagnosis in each case was established only after the patient presented for a dental consultation. It is important therefore that the medical community, and specifically the medical oncologist, become aware of this potential complication because such a large and growing number of their patients require bisphosphonate therapy. Similar to those patients who require head and neck radiation treatment, a complete dental evaluation should be performed before commencing bisphosphonate treatment to identify and address any dental pathology.

Although this report serves to alert clinicians about the potential complication of bone necrosis in patients receiving bisphosphonate therapy, many questions remain concerning the underlying pathogenesis of this process. Further research is needed to elucidate the precise relationship between bisphosphonates and osteonecrosis.

*Acknowledgments*

The authors would like to thank Dr Kanti Rai, Dr John Fantasia, Dr Ronald Burakoff, and Dale Janson, RPAC, for their assistance and support in preparation of the manuscript.

## References

1. Hortobagyi GN, Theriault RL, Lipton A, et al: Long-term prevention of skeletal complications of metastatic breast cancer with pamidronate. J Clin Oncol 16:2038, 1998
2. Conte PF, Giannessi PG, Latreille J, et al: Delayed progression of bone metastases with pamidronate therapy in breast cancer patients: A randomized multicenter phase III trial. Ann Oncol 5:S41, 1994 (suppl 7)
3. Rodan GA, Fleisch HA: Bisphosphonates: Mechanisms of action. J Clin Invest 97:2692, 1996
4. Hughes DE, MacDonald BR, Russell RGG, et al: Inhibition of osteoclast-like cell formation by bisphosphonates in long-term cultures of human bone marrow. J Clin Invest 83:1930, 1989

5. Hughes DE, Wright KR, Uy HL, et al: Bisphosphonates promote apoptosis in murine osteoclasts in vitro and in vivo. J Bone Miner Res 10:1478, 1995

6. Murakami H, Takahashi N, Sasaki T, et al: A possible mechanism of the specific action of bisphosphonates on osteoclasts: Tiludronate preferentially affects polarized osteoclasts having ruffled borders. Bone 17:137, 1995

7. Sahni M, Guenther HL, Fleisch H, et al: Bisphosphonates act on rat bone resorption through the mediation of osteoblasts. J Clin Invest 91:2004, 1993

8. van Holten-Verzantvoort ATM, Kroon HM, Bijvoet OLM, et al: Palliative pamidronate treatment in patients with bone metastases from breast cancer. J Clin Oncol 11:491, 1993

9. Berenson JR, Lichtenstein A, Porter L, et al: Long term pamidronate treatment of advanced multiple myeloma patients reduces skeletal events. J Clin Oncol 16:593, 1998

10. Hortobagyi GN, Theriault RL, Porter L, et al: Efficacy of pamidronate in reducing skeletal complications in patients with breast cancer and lytic bone metastasis. N Engl J Med 335:1785, 1996

11. Berenson JR, Lichtenstein A, Porter L, et al: Efficacy of pamidronate in reducing skeletal events in patients with advanced multiple myeloma. N Engl J Med 334:448, 1996

12. Theriault RL, Lipton A, Hortobagyi GN, et al: Pamidronate reduces skeletal morbidity in women with advanced breast cancer and lytic lesions: A randomized placebo-controlled trial. J Clin Oncol 17:846, 1999

13. Hillner BE, Ingle JN, Berenson JR, et al: American Society of Clinical Oncology guideline on the role of bisphosphonates in breast cancer. J Clin Oncol 18:1378, 2000

14. Berenson JR, Hillner BE, Kyle RA, et al: American Society of Clinical Oncology clinical practice guidelines: The role of bisphosphonates in multiple myeloma. J Clin Oncol 20:3719, 2002

15. Coleman RE: Optimizing treatment of bone metastases by Aredia[R] and Zometa[R]. Breast Cancer 7:361, 2000

16. Mashiba T, Hirano T, Turner CH, et al: Suppressed bone turnover by bisphosphonates increases microdamage accumulation and reduces some biomechanical properties in dog rib. J Bone Miner Res 5:613, 2001

17. Brumsen C, Hamdy NA, Papapoulos SE: Long-term effects of bisphosphonates on the growing skeleton: Studies of young patients with severe osteoporosis. Medicine 76:266, 1997

18. Glorieux FH, Bishop NJ, Plotkin H, et al: Cyclic administration of pamidronate in children with severe osteogenesis imperfecta. N Engl J Med 339:947, 1998

19. Whyte MP, Wenkert D, Clements KL, et al: Bisphosphonate-induced osteopetrosis. N Engl J Med 349:457, 2003

20. Goodship AE, Walker PC, McNally D, et al: Use of a bisphosphonate (pamidronate) to modulate fracture repair in ovine bone. Ann Oncol 5:S53, 1994 (suppl 7)

21. Cao Y, Mori S, Mashiba T, et al: Raloxifene, estrogen and alendronate affect the processes of fracture repair differently in ovariectomized rats. J Bone Miner Res 17:2237, 2002

22. Li J, Mori S, Kaji Y, et al: Effect of bisphosphonate (incadronate) on fracture healing of long bones in rats. J Bone Miner Res 14:969, 1999

23. Thiebaud HD, Sauty A, Burckhardt P, et al: An in vitro and in vivo study of cytokines in the acute-phase response associated with bisphosphonates. Calcif Tiss Int 61:386, 1997

24. Kapitola J, Zak J, Lacinova Z, et al: Effect of growth hormone and pamidronate on bone blood flow, bone mineral and IGF-I levels in the rat. Physiol Res 49:S101, 2000 (suppl 1)

25. Kapitola J, Zak J: Effect of pamidronate on bone blood flow in oophorectomized rats. Physiol Res 47:237, 1998

26. Fournier P, Boissier S, Filleur S, et al: Bisphosphonates inhibit angiogenesis in vitro and testosterone-stimulated vascular regrowth in the ventral prostate in castrated rats. Cancer Res 62:6538, 2002

27. Santini D, Vincenzi B, Avvisati G, et al: Pamidronate induces modifications of circulating angiogenic factors in cancer patients. Clin Cancer Res 8:1080, 2002

28. Wood J, Bonjean K, Ruetz S, et al: Novel antiangiogenic effects of the bisphosphonate compound zoledronic acid. J Pharmacol Exp Ther 302:1055, 2002

29. Powles T, Paterson S, Kanis JA, et al: Randomized, placebo-controlled trial of clodronate in patients with primary operable breast cancer. J Clin Oncol 20:3219, 2002

30. Narai S, Nagahata S: Effects of alendronate on the removal torque of implants in rats with induced osteoporosis. Int J Oral Maxillofac Implants 18:218, 2003

31. Starck W, Epker B: Failure of osseointegrated dental implants after diphosphonate therapy for osteoporosis: A case report. Int J Oral Maxillofac Implants 10:74, 1995

32. Diel ID, Solomayer EF, Costa SD, et al: Reduction in new metastases in breast cancer with adjuvant clodronate treatment. N Engl J Med 339:357, 1998

Downloaded from bmj.com on 21 January 2008



# Drugs for pre-osteoporosis: prevention or disease mongering?

Pablo Alonso-Coello, Alberto López García-Franco, Gordon Guyatt and Ray Moynihan

*BMJ* 2008;336;126-129
doi:10.1136/bmj.39435.656250.AD

Updated information and services can be found at:
http://bmj.com/cgi/content/full/336/7636/126

*These include:*

**References**

This article cites 15 articles, 8 of which can be accessed free at:
http://bmj.com/cgi/content/full/336/7636/126#BIBL

**Rapid responses**

You can respond to this article at:
http://bmj.com/cgi/eletter-submit/336/7636/126

**Email alerting service**

Receive free email alerts when new articles cite this article - sign up in the box at the top left of the article

**Topic collections**

Articles on similar topics can be found in the following collections

Menopause (incl HRT) (150 articles)
Other Women's health - other (563 articles)
Other Public Health (2704 articles)
Osteoporosis (168 articles)

**Notes**



EXHIBIT

To order reprints follow the "Request Permissions" link in the navigation box

To subscribe to *BMJ* go to:
http://resources.bmj.com/bmj/subscribers

ANALYSIS

Downloaded from bmj.com on 21 January 2008

falling for professional environmental assessment—for example, to occupational therapy.[34] People who have difficulty in performing a simple sit to stand test or taking over 13 seconds to complete a simple timed "up and go test"[35] should be referred to a geriatrician or falls clinic for a more comprehensive evaluation.

The physiological profile assessment instrument is a useful, inexpensive tool for evaluating risk of falling.[36] Among older people living in the community, this well validated instrument has a 75% positive predictive accuracy for distinguishing multiple fallers in the next year from those who will fall once or less.[36]

Another question is whether general practitioners should prescribe hip protectors to prevent hip fractures related to falls. Hip protectors are designed to shunt the force and energy of impact away from the greater trochanter, thus preventing fracture.[37] The first randomised clinical trials of hip protectors showed good efficacy, but later, more inconsistent, study results have been attributed to differences in study designs, variation in the devices' capacity to attenuate biomechanical forces, and widely varying user compliance.[20 37] Like antiresorptive drugs, hip protectors seem to have poor long term compliance.[20 37]

> **SUMMARY POINTS**
>
> Falling, not osteoporosis, is the strongest single risk factor for fractures in elderly people
>
> Bone mineral density is a poor predictor of an individual's fracture risk
>
> Drug treatment is expensive and will not prevent most fractures in elderly people
>
> Randomised controlled trials show that falls in older people can be reduced by up to 50%
>
> General practitioners should shift the focus in fracture prevention by systematically assessing risk of falling and providing appropriate interventions to reduce the risk

Nevertheless, current meta-analyses and systematic reviews suggest that in institutions with high rates of hip fracture, the use of hip protectors may reduce hip fractures by 23-60%.[21 37-39] However, there is no evidence of benefit from hip protectors for lower risk people living in the community.[38]

In summary, it is time to shift the focus in fracture prevention from osteoporosis to falls. Falling is an under-recognised risk factor for fracture, it is preventable, and prevention provides additional health benefits beyond avoiding fractures.

**Contributors and sources:** The authors have a long experience and research interest in methodological issues of bone densitometry, epidemiology, and prevention of osteoporosis, falls, and fractures in elderly people. This article arose out of discussions at several meetings on osteoporosis and hip fracture prevention including, most recently, the Pauto symposium on preventing bone fragility and fractures in Tampere, Finland, May 2006. TLNJ conceived the paper and wrote the first draft with KMK. All authors contributed to the initial critical review of the literature, planned the rationale for the article, contributed to the serial drafts and agreed the final submission. TLNJ is guarantor.

**Competing interests:** None declared.

**Provenance and peer review:** Not commissioned; externally peer reviewed.

References are on bmj.com

# Drugs for pre-osteoporosis: prevention or disease mongering?

After looking at data used to support treatment of women with slightly lowered bone mineral density, **Pablo Alonso-Coello and colleagues** argue that proponents have overstated the benefits and underplayed the harms

Osteoporosis is a controversial condition. An informal global alliance of drug companies, doctors, and sponsored advocacy groups portray and promote osteoporosis as a silent but deadly epidemic bringing misery to tens of millions of postmenopausal women.[1] For others, less entwined with the drug industry, that promotion represents a classic case of disease mongering—a risk factor has been transformed into a medical disease in order to sell tests and drugs to relatively healthy women.[2] Now the size of the osteoporosis market seems set to greatly expand, as the push begins to treat women with pre-osteoporosis. These are women who are apparently at risk of being at risk, a condition known as osteopenia that is claimed to affect more than half of all white postmenopausal women in the United States.[3] We examine the evidence from four posthoc analyses of trials of osteoporosis drugs that is claimed to support this move.

### Expanding an already controversial condition

In 1994 a small study group associated with the World

**Pablo Alonso-Coello** family practitioner, Iberoamerican Cochrane Center, Department of Clinical Epidemiology and Public Health, Hospital de Sant Pau (Universidad Autónoma de Barcelona), 08041, Barcelona, Spain

**Alberto López García-Franco** family practitioner, Servicio Madrileño de Salud, Madrid, Spain

**Gordon Guyatt** professor, Department of Clinical Epidemiology and Biostatistics and Department of Medicine, McMaster University Faculty of Health Sciences, Hamilton, ON, Canada

**Ray Moynihan** conjoint lecturer, Faculty of Health, University of Newcastle, Callaghan, New South Wales, Australia

Correspondence to: P Alonso-Coello palonso@santpau.es

Accepted: 9 December 2007

Health Organization defined "normal" bone mineral density as that of young adult women, instantly categorising many older women as having abnormal bones.[4] The working group proposed osteoporosis should be diagnosed when bone mineral density is 2.5 standard deviations below the mean for healthy young adult women and osteopenia be diagnosed when bone density was 1.0 to 2.5 standard deviations below the mean (table 1). The authors of the definition stated these cut-off values were "somewhat arbitrary," and as others have subsequently observed, these criteria were intended for epidemiological studies and not as the clinical treatment thresholds they are being used for today.[6]

As disclosed in the report, the drug industry contributed to the funding of the World Health Organization's study group.[4] The disclosure reads: "This meeting was organized by the WHO Collaborating Centre for Metabolic Bone Disease, Sheffield, England, the World Health Organization and the European Foundation for Osteoporosis and Bone Disease, with financial support from the Rorer

Downloaded from bmj.com on 21 January 2008

Table 1 | WHO classification of osteoporosis

| | Bone mineral density* | T score | Prevalence (%)† |
|---|---|---|---|
| Normal | <1 SD | >−1 | 20 |
| Osteopenia (or low bone mass) | 1-2.5 SD | −1 to −2.5 | 52 |
| Osteoporosis | ≥2.5 SD | ≤−2.5 | 28 |

*Below the young adult mean.
†In white women older than 50 years.[1]

Foundation, Sandoz Pharmaceuticals and Smith Kline Beecham."

Notwithstanding ongoing debate about the definition of this condition, there is currently widespread agreement that well designed and well conducted randomised trials have shown that most of the drugs now approved for the treatment of women with postmenopausal osteoporosis reduce the risk of important fractures. Furthermore, in women with moderate or especially high risk, these treatments are cost effective, although this is not necessarily the case in osteopenic women.[7]

What remains uncertain is the risk of fracture that warrants treatment and, given its limited predictive power in establishing women's fracture risk, the appropriate role of bone mineral density in guiding prevention.[8] Since the mid-1990s, drug marketing

in the United States and elsewhere has encouraged treatment of younger postmenopausal women at relatively low risk of fracture. As part of that strategy, measurement of bone mineral density has been widely promoted—sometimes aggressively—as the key way to diagnose osteoporosis.[1] Against the backdrop of controversy and uncertainty, current attempts to promote drug therapies to people with osteopenia warrant scepticism.

### Treating those at risk of being at risk?

In recent years several scientific publications have reanalysed data from the original trials of osteoporosis drugs, including alendronate, raloxifene, risedronate, and strontium ranelate (table 2).[9-12] The key aim has been to present subgroup analyses to investigate the benefits of these drugs for women with pre-osteoporosis or osteopenia, which is said to affect around half of all older women. In Europe, drug companies have already begun to market their drugs to women with osteopenia. In Spain, after complaints from two of the authors, regional drug authorities have required two companies (Lilly and Procter and Gamble) to modify their promotional materials.[13] As with other attempts to define and treat new categories

Table 2 | Studies reanalysing data of patients with osteopenia

| Original trials | Raloxifene[10] MORE trial (7705 women) | Alendronate[9] FIT I and FIT II trials (6457 women) | Risedronate[11] Four trials: BMD and VERT trials | Strontium ranelate[12] SOTI (1649 women) and TROPOS (5091 women) |
|---|---|---|---|---|
| Dose | 60 mg/day | 5 mg/day for 2 years and 10 mg/day afterwards | 5 mg/day | 2 g/day |
| Inclusion criteria | Osteoporotic or radiographically apparent vertebral fractures | FIT I: T score <−1.6 with at least one vertebral fracture at baseline | BMD trials: T score <−2 | SOTI: osteoporosis and at least one vertebral fracture |
| | | FIT II: no vertebral fracture at baseline | VERT: ≥2 radiographically identified vertebral fractures or 1 vertebral fracture and low lumbar spine BMD (T score <−2) | TROPOS: osteoporosis |
| No of women in reanalysis | 2557 | 3737 without vertebral fracture | 620 women | 1166 women |
| | | 3737 overall | | |
| Mean age | 65 years | 68 years | 64 years | 75 years |
| Follow up | 3 years | 3-4.5 years | 1.5-3 years | 3 years |
| Subgroup inclusion criteria | Osteoporotic and osteopenic women without previous vertebral fracture. | T score <−1.6 and >2.5 with or without vertebral fracture | Baseline femoral neck T score between −1 and −2.5 and no prevalent vertebral fracture | Lumbar spine osteopenia with any bone mineral density at femoral neck without vertebral fracture |
| Risk of vertebral fracture in osteopenic women without baseline vertebral fracture | Clinical vertebral fracture | Clinical vertebral fracture (2797 women) | Morphometric vertebral fracture | Morphometric vertebral fracture (4447 women) |
| | Control event rate: 1.2% | Control event rate: 0.9% | Cumulative incidence: 4.2% for placebo, 1.8% for risedronate | Control event rate: 8.6% |
| | RR=0.25; 95% CI 0.04 to 0.63 (20 events). ARR=0.9% | RR=0.46; 95% CI 0.16 to 1.17 (19 events). ARR=0.5% | HR=0.44; 95% CI 0.11 to 1.78 | RR=0.41; 95% CI 0.17 to 0.99 (23 events). ARR=5.1% |
| Results in original trials for osteoporotic women | RR=0.7; 95% CI 0.5 to 0.8 | FIT I: HR=0.45; 95% CI 0.27 to 0.72 | VERT: RR=0.59; 95% CI 0.43 to 0.82 | TROPOS: RR=0.61; 95% CI 0.51 to 0.73 |
| | | FIT II (any fracture): RR=0.86; 95% CI 0.73 to 1.01 | | SOTIS: RR=0.59; 95% CI 0.48 to 0.73 |
| Risk of non-vertebral fracture in — osteopenic women | | — | Cumulative incidence: 5.4% for placebo — 0.4% for risedronate | |
| | | | HR=0.09; 95% CI 0.01 to 0.71† | |
| Limitations acknowledged by authors | Yes* | Yes* | Yes* | Yes |
| Potential conflicts of interest‡ | Yes | Yes | Yes | Yes |
| Years since original trial | 4 | 7 | 7-10 | 2-3 |

RR=relative risk; ARR=absolute risk reduction; HR=hazard ratio.
*Not in abstract or conclusions.
†Risedronate was found to reduce the risk of combined morphometric vertebral and non-vertebral fractures (HR=0.27; 0.09 to 0.83). Nevertheless, when women with baseline lumbar spine T scores below −2.5 were excluded this effect did not reach significance (HR=0.22; 0.03 to 2.02).
‡ See text for details.

Downloaded from bmj.com on 21 January 2008

of pre-disease, such as pre-hypertension,[14] and pre-diabetes,[15] this move to treat pre-osteoporosis raises serious questions about the benefit-risk ratio for low risk individuals, and about the costs of medicalising and potentially medicating an enormous group of healthy people.

### Reanalysis: science in the service of marketing?

In broad terms the key finding of all four reanalyses is that the benefit of anti-osteoporosis drugs remains, in relative terms, roughly the same in the low risk women with osteopenia as in women with densitometric osteoporosis and those who have had fractures. That is no surprise—a substantial body of evidence shows that relative risk reductions are usually more or less constant across patients with varying baseline risk.[16] Even so, the post-hoc criteria for choosing the osteopenic subgroups are questionable. Particularly problematic is the inclusion of women with vertebral fractures, a subgroup whose high risk of subsequent fracture is well documented (table 2). Furthermore, in the unlikely event that reductions in relative risk differ substantially, the reanalyses are underpowered to show this (range of number of events 19-23). Thus, if the goal of these reanalyses is to prove that relative effects are similar across risk groups, the evidence is necessarily weak.

### Exaggerating benefits

In general, the reanalyses tend to focus more heavily, although not exclusively, on describing the reduction in fracture risk in relative rather than absolute terms. This is especially apparent in the abstract and the conclusions. When absolute baseline risk of fracture is low, as it is for women without existing fractures or other major risk factors, the absolute benefits of any treatment will similarly be low, and the numbers needed to treat will be high. Impressive sounding reductions in relative risk can mask much smaller reductions in absolute risk. What is relevant to people is that much lower baseline risk means much smaller absolute benefits from potentially long term drug treatment and therefore much higher risk to benefit and cost to benefit ratios.

The authors of the raloxifene reanalysis cite a 75% reduction in relative risk in the first line of their discussion, although this translates into only a 0.9% reduction in absolute risk.[10] But what baseline risk should we use to estimate the absolute effect of prophylaxis in osteopenic women? The four studies show widely disparate absolute risks in control patients: from 0.9% to 8.6% over three to five years. Few events and the likelihood of idiosyncratically selected populations make this variability unsurprising. Data from large community cohorts are more appropriate for estimating baseline risk. These suggest that incidence is unlikely to be greater than 1% a year.[17][18] Even if we use the largest relative risk reduction from the four studies,[18] this incidence

> ## SUMMARY POINTS
>
> Drug treatments reduce the risk of fracture in women with osteoporosis
>
> Drug marketing is being directed at women with osteopenia with a low risk of fracture
>
> The rationale for this strategy comes from questionable post-hoc reanalyses that understate side effects and overstate potential benefits
>
> Treatment decisions should be based on the assessment of the absolute risk of fracture

implies that we need to treat 133 (95% confidence interval 104 to 270) women for three years to prevent a single vertebral fracture. In other words, up to 270 women with pre-osteoporosis might need to be treated with drugs for three years so that one of them could avoid a single vertebral fracture.

Aside from the tendency to emphasise the relative over the absolute risk reduction, the authors of three of the four reanalyses focus exclusively on vertebral fractures, rather than long bone and hip fractures, which are more relevant to patients.[9][10][12] In addition, two reanalyses use morphometric rather than clinical vertebral fractures as their outcome of interest.[11][12] Two thirds of vertebral fractures are subclinical or asymptomatic and may not affect quality of life. As a consequence showing that drugs reduce vertebral fractures may not be as important to patients as it seems.

### Playing down side effects

The flip side of exaggerating benefits is playing down harms, and most of the reanalyses have this problem. The analysis of strontium ranelate does not mention side effects.[12] Yet the drug is known to cause diarrhoea, and there is concern over an increased risk of vascular, neurological, and laboratory abnormalities.[19][20] Only recently the European Medicines Agency recommended changes in the product information because of the risk of severe hypersensitivity reactions.[21]

Similarly the reanalysis of raloxifene data focuses solely on the potential benefits, with no mention of



Alendronate: who needs it?

Downloaded from bmj.com on 21 January 2008

an increased risk of venous thromboembolism[22] or, as recently observed, an increased risk of stroke.[23] Alendronate has well established side effects, including potentially serious gastrointestinal side effects and rare but catastrophic osteonecrosis of the jaw, which again are not discussed.[24] Although the risedronate analysis briefly mentions side effects, perhaps not coincidentally, the authors state the drug is as safe as placebo.[11]

## Potential conflicts of interest

Like much of the published literature on osteoporosis, these analyses have potential conflicts of interest. All of the original drug trials being reanalysed were funded by industry. In three of four cases, drug company employees were part of the team conducting the reanalyses.[9-11] In the other case, the reanalysis was conducted by a group that included investigators with financial ties to industry.[12] In the reanalysis of raloxifene, three of the eight investigators were employees of Eli Lilly, the drug's manufacturer.[10] The reanalysis of Merck's alendronate was funded by Merck, and three of the five main authors have potential conflicts of interest: one is a Merck employee, one is a consultant to Merck, and the other is on Merck's speakers bureau.[9] For the reanalysis of data on risedronate two of the five authors are employees of Procter and Gamble, the company that markets the drug in Spain.[11] In the case of the strontium ranelate paper, three out of eight authors serve as consultants, advisory board members, and speakers for Servier, the manufacturer of this drug. The Institute de Recherches Internationales Servier sponsored the study.[12]

## Where to from here?

The World Health Organization is currently developing an absolute fracture risk algorithm that will provide guidance on how to deal with women categorised as having osteopenia.[25] Whether this advice will stop industry efforts to encourage treatment in low risk women is, however, questionable. The drug industry has already begun marketing its osteoporosis drugs to the large group of women defined as having osteopenia: potentially half of the world's postmenopausal women. Notwithstanding the genuine value of these drugs in reducing fracture risk for some women, we need to ask whether the coming wave of marketing targeting those women with pre-osteoporosis will result in the sound effective prevention of fractures or the unnecessary and wasteful treatment of millions more healthy women.

We thank Carlos Isasi and Ivan Solá for their support, comments, and enthusiasm.

Contributors and sources: PA-C and ALG-F, are both active members of the Spanish Society of Family and Community Medicine, working there on women's health issues. GG is a clinical trialist and methodologist who has published a number of systematic reviews of osteoporosis therapies. RM is a health writer, researcher, and author who has written previously about osteoporosis and disease mongering. PA-C and ALG-F developed the concept of the paper and produced the first draft. RM drafted a revised

document. GG contributed to the discussion of the content of the paper, in particular the methodological limitations of the studies and responding to reviewer comments. All authors revised the paper, made relevant contributions, and approved its content. PA-C is the guarantor.

Provenance and peer review: Not commissioned; externally peer reviewed.

1   Moynihan R, Cassels A. Selling sickness: how drug companies are turning us all into patients. Sydney: Allen and Unwin, 2005.
2   Moynihan R, Heath I, Henry D. Selling sickness: the pharmaceutical industry and disease mongering. BMJ 2002;324:886-91.
3   International Osteoporosis Foundation. Key statistics for North America. www.iofbonehealth.org/facts-and-statistics.html.
4   Assessment of fracture risk and its application to screening for postmenopausal osteoporosis: report of a WHO study group. World Health Organ Tech Rep Ser 1994;843:1-129.
5   Cummings SR. A 55-year-old woman with osteopenia. JAMA 2006;296:2601-10.
6   Nelson HD, Morris CD, Kraemer DF, Mahon S, Carney N, Nygren PA, et al. Osteoporosis in postmenopausal women: diagnosis and monitoring. Evidence report/technology assessment 28. Rockville, MD: Agency for Healthcare Research and Quality, 2001.
7   Schousboe JT, Nyman JA, Kane RL, Ensrud KE. Cost-effectiveness of alendronate therapy for osteopenic postmenopausal women. Ann Intern Med 2005;142:734-41.
8   Marshall D, Johnell O, Wedel H. Meta-analysis of how well measures of bone mineral density predict occurrence of osteoporotic fractures. BMJ 1996;312:1254-9.
9   Quandt SA, Thompson DE, Schneider DL, Nevitt MC, Black DM. Effect of alendronate on vertebral fracture risk in women with bone mineral density T score of −1.6 to −2.5 at the femoral neck: the fracture intervention trial. Mayo Clin Proc 2005;80:343-9.
10  Kanis JA, Johnell O, Black DM, Downs RW, Sarkar S, Fuerst T, et al. Effect of raloxifene on the risk of new vertebral fracture in postmenopausal women with osteopenia or osteoporosis: a reanalysis of the multiple outcomes of raloxifene evaluation trial. Bone 2003;33:293-300.
11  Siris ES, Simon JA, Barton IP, McClung MR, Grauer A. Effects of risedronate on fracture risk in postmenopausal women with osteopenia. Osteoporos Int 2007 Oct 30 Epub ahead of print.
12  Seeman E, Devogelaer J, Lorenc R, Spector T, Brixen K, Balogh A, et al. Strontium ranelate reduces the risk of vertebral fractures in patients with osteopenia. J Bone Miner Res 2007 Nov 12 Epub ahead of print.
13  Dirección General de Farmacia y Productos Sanitarios. Ficha de control de publicidad de medicamentos 2/2007. Madrid: Consejería de Sanidad Comunidad de Madrid, 2007.
14  Chobanian AV, Bakris GL, Black HR, Cushman WC, Green LA, Izzo JL, et al, Seventh report of the joint national committee on prevention, detection, evaluation, and treatment of high blood pressure: the JNC 7 report. JAMA 2003;289:2560-72.
15  Valensi P, Schwarz EH, Hall M, Felton AM, Maldonato A, Mathieu C. Pre-diabetes essential action: a European perspective. Diabetes Metab 2005;31:606-20.
16  Deeks JJ. Issues in the selection of a summary statistic for meta-analysis of clinical trials with binary outcomes. Stat Med 2002;21:1575-600.
17  Miller PD, Barlas S, Brenneman SK, Abbott TA, Chen YT, Barrett-Connor E, Siris ES. An approach to identifying osteopenic women at increased short-term risk of fracture. Arch Intern Med 2004;164:1113-20.
18  The relationship between bone density and incident vertebral fracture in men and women. J Bone Miner Res 2002;17:2214-21.
19  O'Donnell S, Cranney A, Wells GA, Adachi JD, Reginster JY. Strontium ranelate for preventing and treating postmenopausal osteoporosis. Cochrane Database Syst Rev 2006;(4):CD005326.
20  Stevenson M, Davis S, Lloyd-Jones M, Beverley C. The clinical effectiveness and cost-effectiveness of strontium ranelate for the prevention of osteoporotic fragility fractures in postmenopausal women. Health Technol Assess 2007;11(4).
21  European Medicines Agency. EMEA recommends changes in the product information for Protelos/Osseor due to the risk of severe hypersensitivity reactions. Press release, 16 Nov 2007. www.emea. europa.eu/humandocs/PDFs/EPAR/protelos/PressRelease_Protelos_41745807en.pdf.
22  Ettinger B, Black DM, Mitlak BH, Knickerbocker RK, Nickelsen T, Genant HK, et al. Reduction of vertebral fracture risk in postmenopausal women with osteoporosis treated with raloxifene: results from a 3-year randomized clinical trial. JAMA 1999;282:637-45.
23  Barrett-Connor E, Mosca L, Collins P, Geiger MJ, Grady D, Komitzer M, et al. Effects of raloxifene on cardiovascular events and breast cancer in postmenopausal women. N Engl J Med 2006;355:125-37.
24  Department of Health and Human Services Public Health Service, Food and Drug Administration. ODS postmarketing safety review. August 2004. www.fda.gov/OHRMS/DOCKETS/ac/05/briefing/2005-4095B2_03_04-FDA-TAB3.pdf.
25  Kanis JA, Oden A, Johnell O, Johansson H, De Laet C, Brown J, et al. The use of clinical risk factors enhances the performance of BMD in the prediction of hip and osteoporotic fractures in men and women. Osteoporos Int 2007;18:1033-46.



**AlaFile E-Notice**



03-CV-2007-001987.00
Judge: EUGENE W. REESE

To:  COOK WESLEY CHADWICK
     chad.cook@beasleyallen.com

---

# NOTICE OF SERVICE

---

### IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

### MARTHA FINLEY V. MERCK & CO., INC.; ET AL
### 03-CV-2007-001987.00

The following matter was served on 12/28/2007

**D003 BECK MICHAEL**

**CERTIFIED MAIL**

**MELISSA RITTENOUR**
**CIRCUIT COURT CLERK**
MONTGOMERY COUNTY, ALABAMA
251 S. LAWRENCE STREET
MONTGOMERY, AL 36102

334-832-4950



**AlaFile E-Notice**

03-CV-2007-001987.00

Judge: EUGENE W. REESE

To:  COOK WESLEY CHADWICK
     chad.cook@beasleyallen.com

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

MARTHA FINLEY V. MERCK & CO., INC.; ET AL
03-CV-2007-001987.00

The following matter was served on 1/10/2008

D002 DAVIS SHELIA
CERTIFIED MAIL

MELISSA RITTENOUR
CIRCUIT COURT CLERK
MONTGOMERY COUNTY, ALABAMA
251 S. LAWRENCE STREET
MONTGOMERY, AL 36102

334-832-4950



**AlaFile E-Notice**

03-CV-2007-001987.00

Judge: EUGENE W. REESE

To:  COOK WESLEY CHADWICK
chad.cook@beasleyallen.com

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

MARTHA FINLEY V. MERCK & CO., INC.; ET AL
03-CV-2007-001987.00

The following matter was served on 12/22/2007

D004 JAMES CAROL
CERTIFIED MAIL

MELISSA RITTENOUR
CIRCUIT COURT CLERK
MONTGOMERY COUNTY, ALABAMA
251 S. LAWRENCE STREET
MONTGOMERY, AL 36102

334-832-4950